UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDWARD WALSH,

                                    Plaintiff,

        - against -

WOR RADIO a/k/a BUCKLEY
BROADCASTING COMPANY,

                                    Defendant.

Index No.  003729/07

**DEFENDANT'S
MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO
DISMISS OR, IN THE
ALTERNATIVE, TO STAY
PENDING ARBITRATION**

        Defendant Buckley Broadcasting Corporation ("BBC"), erroneously denominated WOR-Radio a/k/a Buckley Broadcasting Company in the Complaint, respectfully submits this memorandum of law in support of its motion to dismiss the Complaint filed by plaintiff Edward Walsh ("Walsh") pursuant to Federal Rule of Civil Procedure 12(b), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), and the Labor-Management Relations Act ("LMRA"), or, in the alternative, to stay the proceedings pending arbitration of plaintiff's claims.

## PRELIMINARY STATEMENT

        This is an action alleging breach of an oral employment agreement. The alleged agreement, which allegedly incorporated virtually all of the substantive terms of the parties' previous written employment agreement, requires the parties to arbitrate all claims arising under the agreement. The alleged oral agreement further referenced a collective bargaining agreement covering Walsh that also requires all claims to be

154229.v4

Walsh filed a demand for arbitration against BBC in accordance with those alleged

provisions. Notwithstanding Walsh's appropriate commencement of an arbitration

proceeding to prosecute his claim, he now attempts to litigate the same claim before this

Court while the arbitration proceeding is pending. Well-settled law precludes Walsh's

court action. It should be dismissed pursuant to both the FAA (9 U.S.C. § 3) and Section

301 of the LMRA (29 U.S.C. § 385). Alternatively, if the Court concludes that there is

any reasonable possibility that an arbitrator will rule that Walsh's claim is not

arbitrable, the action should be stayed pending the arbitrator's determination.

### FACTUAL BACKGROUND

#### A.    The Alleged Oral Agreement

BBC does business as WOR Radio 710 AM, a longstanding New York City–

area radio station. Walsh is a radio personality who was employed by BBC as a radio

program host for six years pursuant to successive three-year written employment

agreements. The last written agreement between the parties expired on September 25,

2006 (hereinafter, the "Written Agreement"). (Complaint ¶ 5.) (A true copy of the

Written Agreement is attached hereto as Exhibit A.)[1] On or about August 10, 2006,

Walsh had lunch with BBC General Manager Robert Bruno ("Bruno"), with whom he

had worked closely for over 20 years. The Complaint alleges (and Bruno and BBC

---

[1] The Court may consider documents referenced in the Complaint, but not attached thereto, on a Rule 12 motion to dismiss. *See, e.g., Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998) (citing *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996)).

154229.v4

-2-

emphatically deny) that Walsh and Bruno reached an oral agreement at that lunch to extend Walsh's employment for another three years under the same terms and conditions of the Written Agreement. (*Id.* ¶¶ 6-7.) The Complaint alleges that the only negotiated change from the Written Agreement is that Walsh was to receive four weeks' vacation (rather than the three weeks provided for in the Written Agreement) under the alleged oral agreement. (*Id.* ¶ 8.) After the parties allegedly entered into the oral agreement, and prior to the expiration of the Written Agreement, BBC informed Walsh that it would not negotiate a new employment agreement with him and would not continue to employ him beyond the expiration of the Written Agreement. Walsh's sole claim in the instant suit is that BBC breached the alleged oral agreement renewing his employment with BBC under the terms and conditions of the expired Written Agreement. (*Id.* ¶ 10.)

## B.    The Written Agreement

The Written Agreement was a personal services contract consisting of a letter agreement (the "Letter Agreement") and incorporated terms and conditions ("Terms and Conditions") governing Walsh's employment by BBC as a program host on WOR. The Letter Agreement and the Terms and Conditions acknowledge that each party is bound by the terms and conditions of the collective bargaining agreement between BBC and the American Federation of Television and Radio Artists ("AFTRA"), a labor organization, and that Walsh will be a member of AFTRA for the duration of the Agreement. (Exhibit A, Letter Agreement at ¶ 9; Terms and Conditions at pp. 4-5, Section VII(1).) Section VII(3) of the Terms and Conditions further provides that "all

154229.v4

disputes or controversies of any kind and nature arising out of and in connection with this Agreement shall be determined by arbitration in accordance with the grievance and arbitration provisions of the applicable AFTRA collective bargaining agreement." (Exhibit A, Terms and Conditions at p. 5, Section VII(3).)

### C.    The Collective Bargaining Agreement

BBC and AFTRA are parties to a collective bargaining agreement (the "CBA"), effective September 1, 2003, through August 31, 2007. (A true copy of the CBA is attached hereto as Exhibit B.)[2] Side Letter 5 of the CBA states that "with reference to program hosts and talent employed by WOR-AM, the Company shall, for the term of the Agreement, abide by the terms and conditions of all of the National Code of Fair Practice and Local Codes where applicable." (Exhibit B at p. 51.) As a program host for WOR,[3] Walsh was covered by Side Letter 5 and, therefore, by the National Code of Fair Practice for Commercial Radio Broadcasting (the "National Code"), a contract between AFTRA and certain radio broadcasting employers throughout the country, including in Section 25(a) specifically, WOR-AM in New York. (A true copy of the National Code is attached hereto as Exhibit C.)

---

[2] The Court may take judicial notice of a collective bargaining agreement on a motion to dismiss. *Ackerman v. Local Union 363, International Brotherhood of Elec. Workers*, 423 F. Supp. 2d 125, 127 (S.D.N.Y 2006); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y 2005).

[3] The Written Agreement provides that Walsh "shall perform services as host of the morning drive program." (Exhibit A, Letter Agreement at p. 1.)

Section 60 of the National Code ("Grievance and Arbitration") provides for the arbitration of "all disputes and controversies of every kind or nature" arising out of the Code under the Labor Arbitration Rules of the American Arbitration Association. (Exhibit C, Section 60(3) at p. 31.)[4] Section 60 also specifically covers disputes arising under "any contract or engagement . . . in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuation or termination of this Code and/or such contract or engagement." (*Id.*). Section 60(3)(c) of the National Code states that "the parties agree that the provisions of this Paragraph (the grievance and arbitration provision) shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court." (*Id.* at p. 32.)

## D.    **The Arbitration Proceeding**

On November 22, 2006, Walsh's counsel filed a Demand for Arbitration with the American Arbitration Association ("AAA") in accordance with the terms of the Written Agreement and the alleged oral agreement. (A true copy of the Demand for Arbitration is attached hereto as Exhibit D.) On November 30, 2006, AFTRA filed with the AAA a First Amended Demand for Arbitration, which describes the "Controversy" subject to arbitration as BBC's failure "to pay [to Walsh] owed wages and/or severance pay under the provisions of the . . . collective bargaining agreement and under [Walsh's]

---

[4] The CBA also contains a broad arbitration clause covering any dispute arising out of the CBA. (Exhibit B, Section X at p. 8.)

personal services contract." (A true copy of the Amended Demand for Arbitration is attached hereto as Exhibit E.) BBC and AFTRA (on Walsh's behalf) have agreed to arbitrate all of Walsh's claims before the AAA.

Having filed in November 2006 for arbitration of his claims arising out of the alleged oral agreement, which allegedly incorporated the clear, broad, and dispositive arbitration provisions of the Written Agreement, Walsh nevertheless filed the instant lawsuit on May 10, 2007, seeking the same relief. The Amended Demand for Arbitration is pending before the AAA, and BBC is prepared to arbitrate. Indeed, the Complaint does not allege, nor could it, that BBC has in any way failed or refused to arbitrate Walsh's claims asserted in the pending Amended Demand for Arbitration.

## ARGUMENT

## I.   THE COMPLAINT MUST BE DISMISSED BECAUSE THE ALLEGED ORAL CONTRACT CONTAINS A BINDING AGREEMENT TO ARBITRATE ALL CLAIMS ARISING UNDER SUCH CONTRACT.

The Federal Arbitration Act encourages courts to enforce arbitration agreements. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991). In fact, the FAA manifests both "a liberal federal policy favoring arbitration agreements" and an express affirmation of the arbitration process. *Id.* at 25 (citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Thus, "having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 26 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

In light of the federal policy in favor of arbitration, "[t]he role of the courts in reviewing matters subject to arbitration . . . is limited to determining two issues: (i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party to the agreement has failed, neglected or refused to arbitrate, in whole or in part." *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir. 1996) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04 (1967)). Because Walsh has not alleged that BBC has neglected or refused to arbitrate his claims (in fact, an arbitration proceeding is pending), the only issue before this Court is whether Walsh and BBC had a valid agreement to arbitrate the instant claim.

In determining questions of arbitrability, courts generally apply state-law principles governing the formation of contracts. *Bell v. Cendant Corp.,* 293 F.2d 563, 566 (2d Cir. 2002). In this case, New York law applies because the contract at issue was executed and performed in New York and applies New York law. (*See* Exhibit A, Terms and Conditions at p. 5, Section VIII(D).) Under New York law, "[i]n the absence of fraud or other wrongful act on the part of another contracting party, a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellsschaft,* 365 F.3d 144, 149 (2d Cir. 2004) (finding plaintiff's Title VII claims subject to arbitration) (quoting *Metzger v. Aetna Ins. Co.,* 277 N.Y. 411, 416 (1920)); *see also Berger v. Cantor Fitzgerald Securities,* 967 F. Supp. 91, 93 (S.D.N.Y. 1997). Walsh does not allege (nor could he) that BBC fraudulently or wrongfully induced him to execute the Written Agreement. There can be no doubt, then, that Walsh assented to the arbitration provision in that agreement.

154229.v4

Because the Complaint alleges that the only substantive difference between the Written Agreement and the alleged oral agreement related to the amount of vacation Walsh would receive, (Complaint ¶ 8), the alleged oral agreement imported the same arbitration provision from the Written Agreement, a provision to which Walsh again assented when he allegedly struck his oral agreement.

Furthermore, "a court should decide at the outset whether the arbitration agreement [is] broad or narrow." *Hanjin Shipping Co. Ltd. v. Union Pacific Railroad Co.*, No. 05 Civ. 8476, 2006 WL 1096389, *2 (Apr. 26, 2006 S.D.N.Y.) (quoting *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)) (copy attached at Tab 1). Arbitration clauses that "cover all claims or controversies arising from an agreement have generally been held to be broad." *Id.* (citing *Collins*, 58 F.3d at 18). A broad arbitration clause "creates the presumption of arbitrability, which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005)); *see also Eastern Fish Co. v. South Pacific Shipping Co., Ltd.*, 105 F. Supp. 2d 234, 237-38 (S.D.N.Y. 2000). The broad arbitration clause in the Written Agreement provides that all claims arising out of the agreement must be submitted to arbitration. (Exhibit A, Terms and Conditions at p. 5, Section VII(3).) This provision, which creates a presumption of arbitrability, is simply not susceptible to an interpretation that the parties did not intend Walsh's breach of contract claim to be arbitrated.

Under the FAA, a court must stay any proceeding pending arbitration of any claims referable to arbitration under an arbitration agreement. 9 U.S.C. § 3. *McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1107 (2d Cir. 1990), *cert. denied*, 498 U.S. 897 (1990). Where all of a plaintiff's claims asserted in a court case are arbitrable, however, the court should dismiss the court action entirely. *See, e.g., Sound Around, Inc. v. CE Electronic Sales Corp.*, No. 98 CV 1051, 1999 WL 167715, at \*2 (E.D.N.Y. Jan. 11, 1999) (copy attached at Tab 2); *Berger v. Cantor Fitzgerald Securities*, 967 F. Supp. 91, 93 (S.D.N.Y. 1997) (citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Alter v. Englander*, 901 F. Supp. 151, 155 (S.D.N.Y. 1995); *Hart Enterprises International Inc. v. Anhui Provincial Import and Export Corp.*, 888 F. Supp. 587, 591 (S.D.N.Y. 1995)); *see also Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001).

Because Walsh's sole claim unquestionably is covered by the arbitration clause of the Written Agreement and therefore the alleged oral agreement, the Court should dismiss the Complaint rather than stay the proceedings. *Berger*, 967 F. Supp. at 96 ("As all of the plaintiff's claims must be submitted to arbitration, no useful purpose will be served by granting a stay of these proceedings.").

## II. THE COMPLAINT MUST BE DISMISSED BECAUSE ITS SOLE CLAIM IS SUBJECT TO ARBITRATION UNDER A COLLECTIVE BARGAINING AGREEMENT.

The Supreme Court announced in its *Steelworkers* Trilogy that there is a strong federal policy favoring the arbitration of labor disputes. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S. Ct. 1358 (1960). The Court

further held in *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347 (1960), that national labor policy promotes a court's enforcement of grievance and arbitration provisions in collective bargaining agreements pursuant to Section 301 of the LMRA. *Id.* at 577-78. Walsh's claim clearly falls within the scope of coverage of the grievance procedure in both the CBA and the National Code. In *United Steelworkers v. Enterprise Wheel & Car Corp.*, the Supreme Court held that, "[a]part from matters that the parties *specifically* exclude, all of the questions on which the parties disagree . . . come within the scope of the grievance and arbitration provisions of the collective agreement." *United Steelworkers*, 363 U.S. at 581 (emphasis added). In other words, there is a presumption of arbitrability for disputes arising under a collective bargaining agreement that contains an arbitration provision. *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650, 106 S. Ct. 1415 (1986).

        The Written Agreement specifically provides that Walsh shall be an AFTRA member and shall be covered by the AFTRA collective bargaining agreement. (Exhibit A, Letter Agreement at ¶ 9; Terms and Conditions at pp. 4-5, Section VII(1).) The Written Agreement also provides that all disputes arising under the agreement shall be submitted to arbitration in accordance with the grievance and arbitration provisions of the applicable AFTRA collective bargaining agreement. (Exhibit A, Terms and Conditions at p. 5, Section VII(3).) Side Letter 5 of the CBA provides that program hosts such as Walsh are covered by the terms and conditions of the National Code. (Exhibit B at p. 51.) Accordingly, the grievance and arbitration provision of the National Code applies to

Walsh's claims, which concern the "existence, validity . . . enforcement . . . breach . . . or termination" of a "contract or engagement" (the alleged oral agreement to extend the Written Agreement) in a field covered by the National Code (here, program host). (Exhibit C, Section 60(3) at p. 31.)  The National Code also makes clear that its grievance and arbitration provision "shall be a complete defense to any suit, action or proceeding instituted in Federal . . . court."  (Exhibit C, Section 60(3)(c) at p. 32.)  Indeed, there is nothing in the National Code to support the position that the parties sought to specifically exclude the current controversy from the scope of their contractual grievance procedure. To the contrary, Walsh's instant claim is precisely the kind of claim contemplated by the AFTRA arbitration clause.

To the extent that Walsh may seek to evade arbitration by arguing that the grievance procedures set forth in the National Code, expressly incorporated by reference in the Written Agreement, and allegedly adopted in the oral agreement are somehow not controlling or exclusive, such an attempt would be contrary both to the plain language of the agreements and to the settled labor law principle to resolve any doubts as to the reach of a grievance or arbitration clause in favor of coverage. *See, e.g., Republic Steel Corp. v. Maddox*, 379 U.S. 650, 659 (1965); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960).  Strong federal policy favoring the arbitration of labor disputes compels the dismissal of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint or, in the alternative, stay these proceedings pending arbitration of plaintiff's claim.

Dated: New York, New York
        July 3, 2007

KAUFF McCLAIN & McGUIRE LLP

By: _____

William E. Zuckerman (WEZ-2700)
J. Patrick Butler (JPB-8484)

950 Third Avenue, Fourteenth Floor
New York, New York  10022
(212) 644-1010

Counsel for Defendant
Buckley Broadcasting Company

## CERTIFICATE OF SERVICE

The undersigned, an attorney admitted to practice before the Courts of the State of New York and this Court, affirms under penalty of perjury that on July 3, 2007, he caused a true copy of the foregoing Memorandum of Law in Support of Defendant's Motion to Dismiss or, in the Alternative, To Stay the Action Pending Arbitration and the attachments thereto, including copies of all cited unreported/unpublished decisions, as well as the Notice of Motion to Dismiss to be served by FedEx overnight delivery, upon attorney for plaintiff, John R. Keough III., Waesche, Sheinbaum & O'Regan, P.C., 111 Broadway, New York, New York 10006-1991.

_____
J. Patrick Butler

154923.v1

# EXHIBIT A



September 22, 2003

Mr. Edward Walsh
340 East 64th Street
Apt. 20B
New York, NY 10021

Dear Ed,

The following terms constitute the essential agreement ("Agreement") between
WOR Radio (Buckley Broadcasting Company (BBC)), and Edward Walsh
("Artist").

1.      Artist shall perform services as host of the morning drive program (the
"Program"), currently broadcast live not to exceed 5:00 a.m. to 10:00 a.m.
weekdays. Artist may be asked to perform services as the host of one pre-
recorded Program each week, to be broadcast on Saturday mornings and to be
recorded during the course of the Monday-through-Friday work week. Artist shall
attend such production and staff meetings and make public appearances as
deemed reasonably necessary by BBC.

2.      During the term of this Agreement (defined below), Artist's services as a
radio program host shall be exclusive to WOR Radio and the WOR Radio
Network.

3.      The term of this agreement shall be for a period of three (3) years
commencing September 25, 2003. BBC shall have the right to terminate this
agreement at the end of any 13 week cycle by giving Artist not less than 28 days
prior written notice of such termination.

4.      As compensation, Artist shall receive from BBC the following:

    (a)    Base Salary -- Payable on a semi-monthly basis for on-air services and
           preparation for on-air services, BBC shall pay to Artist the sum of Five
           Hundred Thousand ($500,000) Dollars.

    (b)    Ratings-Based Incentive Compensation

           An amount equal to $10,000 for every one-tenth (1/10th) AQH Rating
           increase over three-tenths of one point (0.3) in the Adults 25-54 year
           old demographic category. It is understood that no amount shall be
           due if the AQH rating remains at (or at any time reverts to) three-tenths

of one point (0.3) rating.  Such amount shall be paid at reasonable intervals following each rating period.

(c)    Advertising Commission

An amount equal to seven and one-half percent (7.5%) of all net revenues (defined as gross revenue received by BBC or any party authorized to receive gross revenue on behalf of BBC  less only the outside agency commission from the sale of all commercial announcements within the Program, except non-WOR Network ROS spots) that exceed the yearly threshold of $3 million.  Such amount shall be paid on a monthly basis once the $3 million threshold has been exceeded.

5.     Artist shall be entitled to three (3) weeks vacation and to all regular BBC holidays.

6.     BBC shall provide Artist with daily car service between Artist's residence and BBC's studio in New York City.  In addition, BBC shall pay $1000 per month ($12,000 annually) to Artist as a car allowance.

7.     Broadcasts of the Program shall emanate from BBC's studio in New York City.  Occasional remote broadcasts from Artist's summer residence may take place with prior approval at the sole discretion of BBC.

8.     The attached Standard Terms and Conditions are incorporated by reference herein; provided, that the terms recited herein shall govern to the extent any conflict exists between such terms and the Standard Terms and Conditions.

9.     Both BBC and Artist shall adhere to the provisions of the AFTRA collective bargaining agreement in effect during the term of the agreement.  BBC shall make all applicable contributions to the AFTRA Health and Retirement Funds on the compensation paid to Artist hereunder for on-air services and preparation for on-air services, which services shall be the only AFTRA-covered services provided for hereunder.

Very truly yours,

BUCKLEY BROADCASTING
CORPORATION

Robert Bruno, VP & General Manager

Edward Walsh        date        9.23-07

2

## TERMS AND CONDITIONS

### I.    SERVICES

A.    BBC to Direct Services.  Buckley Broadcasting Corporation ("BBC") agrees to engage Edward Walsh ("Artist") in connection with the programs of BBC, including inserts within programs (herein "Program(s)"), as set forth in the accompanying letter agreement to which these Terms and Conditions are attached, and in connection with such general activities of BBC, as BBC may from time to time direct and as specified herein. (The letter agreement together with these Terms and Conditions shall be referred to for convenience herein as the "Agreement.") Artist shall duly comply with all rules, regulations and policies of BBC.  Artist shall refrain from any offensive or distasteful remarks or conduct in connection with Artist's engagement hereunder according to BBC's standards and practices, and Artist shall comply with such rules, regulations, and policies of BBC's sponsors and their advertisers of which Artist is informed by BBC.

B.    Artist's Services.

1.    Artist's services shall consist of the services designated in the Agreement. In addition, Artist shall furnish BBC with such written materials as BBC shall require, shall perform, on a live or pre-recorded basis as specified by BBC, such promotional announcements and public services announcements as BBC shall request for broadcast as determined by BBC, shall operate the technical equipment with respect to the Programs as required by BBC, shall assist in selling and promoting the Programs and shall make reasonable personal appearances in connection therewith. Artist's services hereunder shall be performed live, or on tape and at such place or places all as specified by BBC.

2.    BBC shall have the several rights from time to time, in its sole and unrestricted discretion: (a) to change the time of broadcasting of the Programs, provided, if Artist is assigned to another time period, BBC shall in good faith consider renegotiating his compensation; (b) to fix and, from time-to-time, change the number, length and position of the commercial and other announcements to be made in the Programs, and (c) to edit, alter or delete any material from, add any material to, or otherwise change in any manner the content or proposed content of any of the Programs.

3.    Artist shall furnish BBC with sufficient material for each Program hereunder to fill the entire broadcast time scheduled for each such Program.  Artist shall also inform BBC as to the identity of any guests, if any, to appear on the Programs as soon as Artist has made arrangements for such guests to appear on the Programs.  No material furnished by Artist under the Agreement shall contain any matter offensive to BBC's policies and practices regarding good taste or shall violate any applicable federal, state or local law or regulation or any of BBC's policies.  Except as otherwise expressly provided herein, BBC shall have the sole and exclusive control over the content and format of each Program.

### II.    BBC'S RIGHTS

A.    Artist hereby acknowledges and agrees that the Programs, as well as their title, format, scripts, characters and all other subject matters thereof, are and shall remain, both while

this Agreement shall be in effect and at all times thereafter, BBC's exclusive property in any and all fields, and the Artist shall not at any time obtain any right, title or interest whatsoever in or to any thereof. Without limiting the generality of the foregoing, Artist acknowledges and agrees that BBC shall have the following exclusive rights:

      1.     The exclusive right to broadcast and rebroadcast the Programs including the right to broadcast, disseminate or exhibit the same in such manner and to such degree as BBC shall deem appropriate by any means or methods now or hereafter known;

      2.     The exclusive right from time to time to broadcast the Programs or any of them on any commercial or other basis whatsoever deemed appropriate by BBC;

      3.     The exclusive right to make and use, and to authorize any advertiser to make and use, transcriptions, tape recordings and any other recordings of each Program for reference, audition or file purposes.

      B.     Artist hereby acknowledges and agrees that BBC shall also have the following rights:

      1.     The exclusive right to use, and to authorize any advertiser to use, Artist's name, biography and likenesses for the purpose of advertising and publicizing the Programs and the products and/or services of any said advertiser, but no advertisement or publicity shall be in the form of a personal endorsement by Artist of any advertiser, product or service without Artist's prior consent. The rights herein granted shall extend to any advertisement or publicity released or authorized prior to the expiration or prior termination of this Agreement. Artist shall not, without BBC's prior consent, release or authorize any advertising or publicity material relating to the Programs.

      2.     The exclusive right to the services of Artist in the field of radio broadcasting; it being further specifically understood that Artist shall not so long as this Agreement shall continue in effect, without BBC's prior approval not to be unreasonably withheld, appear or perform services on any radio program or commercial announcement whatsoever which is broadcast on any radio station other than WOR Radio and the WOR Radio Network (the "Station").

## III.   ARTIST'S CONDUCT, ILLNESS, ETC.

      A.     Artist shall act at all times with due regard to public morals and conventions. If Artist shall have committed or does commit an act, or if Artist shall have acted or does act, in a manner constituting an offense or crime involving moral turpitude under applicable federal, state or local laws, or which brings Artist into public disrepute, contempt or scandal, or which reflects unfavorably upon BBC or its parent or any of subsidiaries and/or divisions, the sponsors, if any, or their advertising agencies, if any, or otherwise injures the success of the Programs and/or of BBC, BBC shall have the right to terminate this Agreement effective upon notice.

      B.     In the event that Artist shall fail to perform services in connection with any scheduled Program because of Artist's illness or disability, BBC shall have the right to substitute another person thereon in place of Artist. Compensation to Artist during any period of non-

87147.2                            - 2 -

# EXHIBIT B

# COLLECTIVE BARGAINING AGREEMENT

## between

## BUCKLEY BROADCASTING CORPORATION

## and

## AMERICAN FEDERATION OF TELEVISION AND

## RADIO ARTISTS - NEW YORK LOCAL

## EFFECTIVE SEPTEMBER 1, 2003 - AUGUST 31, 2007

## for

## STAFF ANNOUNCERS AND STAFF NEWSPERSONS

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | SCOPE OF AGREEMENT | 1 |
| ARTICLE II | WARRANTY AND RECOGNITION | 2 |
| ARTICLE III | UNION MEMBERSHIP | 3 |
| ARTICLE IV | UNION SHOP | 3 |
| ARTICLE V | ADMISSION TO PREMISES | 4 |
| ARTICLE VI | SHOP STEWARD | 4 |
| ARTICLE VII | NO STRIKE CLAUSE | 4 |
| ARTICLE VIII | MINIMUM TERMS AND CONDITIONS | 6 |
| ARTICLE IX | DEDUCTIONS | 7 |
| ARTICLE X | GRIEVANCE & ARBITRATION | 8 |
| ARTICLE XI | NO DISCRIMINATION | 9 |
| ARTICLE XII | COMPLIANCE WITH LAW | 10 |
| ARTICLE XIII | CHECK-OFF | 10 |
| ARTICLE XIV | AFTRA HEALTH AND RETIREMENT FUNDS | 11 |
| ARTICLE XV | CODES OF FAIR PRACTICE | 12 |
| ARTICLE XVI | TERM OF AGREEMENT | 13 |
| ARTICLE XVII | TITLE AND SUCCESSORS AND ASSIGNS | 13 |
| ARTICLE XVIII | NEGOTIATION OF NEW AGREEMENT | 14 |
| ARTICLE XIX | INDIVIDUAL EMPLOYMENT CONTRACTS | 14 |
| ARTICLE XX | TRAVEL ACCIDENT POLICY | 15 |
| ARTICLE XXI | NOTICES | 16 |
| ARTICLE XXII | BEREAVEMENT LEAVE | 16 |
| ARTICLE XXIII | BULLETIN BOARD | 16 |
| SCHEDULE I-A | | 18 |
| 1. | STAFF DUTIES | 18 |
| 2. | EMPLOYMENT OF STAFF ANNOUNCERS | 18 |
| 3. | STAFF SALARY | 19 |
| 4. | WORK WEEK AND WORK DAY | 20 |
| 5. | WORK ON DAYS OFF | 20 |
| 6. | DAYS OFF | 21 |
| 7. | MEAL PERIODS | 21 |

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 8. | NOTICE OF CHANGE OF STAFF STRETCH | 22 |
| 9. | REST PERIOD BETWEEN STAFF STRETCHES | 22 |
| 10. | TRAVEL TIME AND TRAVEL EXPENSES | 22 |
| 11. | VACATIONS | 23 |
| 12. | PART TIME OR PER DIEM ANNOUNCERS | 25 |
| 13. | SICK LEAVE | 26 |
| 14. | TERMINATION | 27 |
| 15. | SEVERANCE PAY | 27 |
| 16. | LEAVE OF ABSENCE | 28 |
| 17. | COMPETITIVE AUDITIONS | 28 |
| 18. | EXCLUSIVITY | 28 |
| 19. | WAIVERS | 30 |
| SCHEDULE I-B | | 31 |
| 1. | STAFF DUTIES | 31 |
| 2. | STAFF SALARY | 32 |
| 3. | HOLIDAYS | 37 |
| 4. | SICK LEAVE | 38 |
| 5. | VACATIONS | 38 |
| 6. | TERMINATION | 39 |
| 7. | NOTICE AND SEVERANCE PAY | 39 |
| 8. | INSURANCE | 40 |
| 9. | COMBAT ASSIGNMENT | 40 |
| 10. | EXPENSES | 40 |
| 11. | PART-TIME OR PER DIEM NEWSPERSONS | 41 |
| SIDE LETTER #1 – ADDITIONAL TECHNICAL DUTIES | | 43 |
| SIDE LETTER #2 – SEVERANCE ON RETIREMENT | | 45 |
| SIDE LETTER #3 – PUBLIC SERVICE AND PUBLIC AFFAIRS ANNOUNCEMENTS | | 47 |
| SIDE LETTER #4 – MISCELLANEOUS MATTERS | | 49 |
| SIDE LETTER #5 – PROGRAM HOSTS AND TALENT | | 51 |
| SIDE LETTER #6 – INTERNET | | 54 |

AGREEMENT made as of the 1st day of September, 2003, between American Federation of Television and Radio Artists, AFL-CIO, a voluntary association, organized and existing under the laws of the State of New York, and having its principal office at 260 Madison Avenue, New York, New York, (hereinafter called "AFTRA") and Buckley Broadcasting Corporation, operator of WOR-AM, a corporation organized and existing under the laws of the State of Delaware and having its principal office at 1440 Broadway, New York, New York 10018, (hereinafter called "Company").

In consideration of the covenants and agreements herein contained, it is agreed as follows:

## ARTICLE I

## SCOPE OF AGREEMENT

(a)     This Agreement applies, and is limited in its application, to staff announcers and staff newspersons employed by the Company on WOR-AM as of the date of this Agreement, and to all announcers and newspersons added to said staff, such persons being hereinafter referred to as "staff announcers" and "staff newspersons."

(b)     Staff announcers may be required to perform the duties set forth in Schedule I-A, Staff Duties.

- 1 -

(c)     Staff newspersons shall include all regularly employed persons rendering on-the-air services in the field of news.  In the event of extraordinary news emergencies, when no other staff newsperson or staff announcer is available, the Company may assign another person to make special flash news announcements where the essence of their value is immediate broadcast.  In this connection, the Company shall make every effort to use regularly employed staff newspersons, staff announcers, or other AFTRA staff or free-lance personnel, in that order.  The Company shall not avail itself of the foregoing in a manner calculated to evade the performance of this Agreement in whole or in part.

(d)     Certain limited portions of this Agreement apply to part-time and per diem announcers and newsperson and persons employed as program hosts and talent.

## ARTICLE II

## WARRANTY AND RECOGNITION

(a)     AFTRA warrants that it represents, for collective bargaining purposes, a majority of the staff announcers and staff newspersons employed by the Company.

(b)     The Company recognizes AFTRA as the exclusive collective bargaining agent for all staff announcers and staff newspersons employed by the Company subject to the provisions of Section 9(a) of the National Labor Relations Act, as amended.

113778.v7

## ARTICLE III

### <u>UNION MEMBERSHIP</u>

(a)    All staff announcers and staff newspersons shall be employed by the Company directly and shall be or become members of AFTRA in good standing in accordance with the provisions of Article 4 herein.

(b)    AFTRA shall accept as a member of AFTRA any persons the Company wishes to employ as a staff announcer or staff newsperson, except persons not eligible because of suspension or expulsion from AFTRA or its affiliated organizations in the Associated Actors and Artists of America. It is the intention of this provision to prevent AFTRA from closing its books so as to prevent any person whom the Company wishes to employ as a staff announcer or staff newsperson from joining AFTRA, but nothing herein shall limit the right of AFTRA to suspend, expel, or refuse to re-admit a member for justifiable cause. AFTRA shall not impose unreasonable entrance fees, dues or assessments.

## ARTICLE IV

### <u>UNION SHOP</u>

During the term of this Agreement, the Company shall employ and maintain in its employment only such persons covered by this Agreement as are members of AFTRA in good standing, or shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder, or the date of execution of this Agreement, whichever is the later and thereafter maintain such membership in good standing as a condition of employment.

- 3 -

113778.v7

## ARTICLE V

## ADMISSION TO PREMISES

Any officer or other duly authorized representative of AFTRA shall be admitted to the premises of the Company at any reasonable time for the purpose of determining the maintenance of wages and working conditions hereunder; provided that such officer or representative shall exhibit satisfactory evidence of his office and authority, and provided that admission to the premises shall not interfere with the conduct of the Company's business. Any person so admitted shall comply with all rules and regulations of the Company while on its premises, and not more than two such persons shall be entitled to admission at the same time.

## ARTICLE VI

## SHOP STEWARD

AFTRA shall have the right to appoint, or the staff announcers and staff newspersons shall elect, a Shop Steward from among the staff announcers and staff newspersons and such steward shall be recognized by the Company as AFTRA's employee representative. The Shop Steward shall have no authority to settle disputes or interpret this Agreement but shall report to AFTRA all matters brought to his/her attention relating to its application.

## ARTICLE VII

## NO STRIKE CLAUSE

During the existence of this Agreement AFTRA and staff announcers and staff newspersons and any other persons employed pursuant to this

- 4 -

113778.v7

Agreement shall perform their obligations hereunder, and shall not engage in a

strike (including a sympathy strike) against, picket or boycott the Company.

Anything herein to the contrary notwithstanding, no staff announcer or staff

newsperson shall be required to cross any legal primary picket line against the

Company involving employees employed at WOR-AM which has theretofore been

established or recognized by AFTRA, and a refusal to cross such a picket line shall

not be grounds for disciplining the staff announcer or staff newsperson nor shall it

be considered a breach of this Agreement on the part of AFTRA.

In no case shall staff announcers or staff newspersons or any other

persons employed pursuant to this Agreement engage in a strike (including a

sympathy strike) against, picket or boycott the Company by reason of the

reception, broadcast or transmission by the Company of any radio programs on

which persons are used who are employed by others than the Company,

irrespective of whether such programs originate at a point at which AFTRA or

others are striking or are transmitted to a point at which AFTRA or others are

striking.

During the term of this Agreement, the Employer shall not lockout

any staff announcers or staff newspersons or any other persons employed pursuant

to this Agreement.

In the event that staff announcers or staff newspersons or any other

persons employed pursuant to this Agreement shall engage in a strike (including a

sympathy strike) against, picket or boycott the Company, the Company may, at its

- 5 -

113778.v7

option, terminate this Agreement on written notice to AFTRA. Nothing herein shall preclude the Company from seeking and obtaining any other remedy pursuant to this Agreement or law.

In the event AFTRA is engaged in a strike on behalf of staff announcers or staff newspersons performing staff duties at any other station, the Company shall not, without the consent of AFTRA, require staff announcers or staff newspersons to render services on programs originating in the City of New York in excess of the number of programs originating in the City of New York which are normally made available to such other station, where such excess broadcasting involving the service of staff announcers or staff newspersons is designed to replace broadcasts which would, in the absence of such strike, be of local origination at the station where such strike exists.

## ARTICLE VIII

## MINIMUM TERMS AND CONDITIONS

The minimum terms and conditions which cover the employment of staff announcers and staff newspersons are those contained in Schedule I-A and Schedule I-B and annexed hereto and made a part hereof. The Company shall not enter into any contract with or employ any staff announcer or staff newsperson upon terms and conditions less favorable to the staff announcer or staff newsperson than those set forth in said Schedules. No waiver by any staff announcer or staff newsperson of any provision in said Schedules shall be sought by the Company from the staff announcer or staff newsperson or be effective unless the written consent of AFTRA to such waiver is first obtained, and nothing

113778.v7

- 6 -

in this Agreement shall be deemed to prevent any staff announcer or staff newsperson from negotiating for or obtaining better terms than the minimum terms provided in said Schedules. Existing contracts with all staff announcers and staff newspersons are hereby modified in accordance herewith, but no terms, wages or hours which are more favorable to staff announcers, and no terms or wages more favorable to staff newspersons, than those herein specified, shall be deemed so modified.

The Company shall make no contract with any staff announcer or staff newsperson at terms less favorable to such staff announcer or staff newsperson than those contained in this Agreement and make no changes or alterations of these provisions without the written consent of AFTRA, nor, without such consent, shall any staff announcer or staff newsperson be deemed engaged upon terms which would commit such staff announcer or staff newsperson to perform any services after this Agreement expires or is terminated, which would violate any rule of AFTRA. Issuance of, or compliance with such AFTRA rule shall not subject AFTRA or AFTRA members to any liability.

## ARTICLE IX

## DEDUCTIONS

No deductions, directly or indirectly, by way of commission or otherwise, may be made by which any staff announcer or staff newsperson shall receive less than the minimums established by this Agreement, such minimums being net to the staff announcer or staff newsperson, except for withholdings or deductions which are required by law, and except for deductions for group

- 7 -

113778.v7

insurance, medical service and other similar service, where mutually agreed upon between the staff announcer or staff newsperson and the Company.

## ARTICLE X

### GRIEVANCE & ARBITRATION

(a)    In the event there should be any controversy or dispute arising with respect to this Agreement or the interpretation or breach thereof between AFTRA and the Company, AFTRA and the Company shall promptly and in good faith attempt to settle such dispute amicably.  In the event that they are unable so to do, any such controversy or dispute shall be settled by arbitration in accordance with the labor arbitration rules then obtaining of the American Arbitration Association, each party bearing half the expense, and judgment upon the award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction. A demand for arbitration shall be made in writing.

The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the arbitrator. The award of the arbitrator shall be made within seven (7) days after the close of the submission of evidence.  All awards rendered by the arbitrator shall be final and binding.

113778.v7

(b)    In no event may a party to this Agreement institute an arbitration proceeding over a grievance arising under this Agreement unless a demand for arbitration is filed within ninety (90) days from the date that the party has knowledge of the occurrence of the event giving rise to the dispute or with due diligence should have known of the occurrence of the event giving rise to the dispute .

(c)    On the request of either AFTRA or the Company, any controversy or dispute between a staff announcer or staff newsperson and the Company arising out of or connected with this Agreement or the employment by the Company of a staff announcer or staff newsperson pursuant hereto shall be settled by arbitration pursuant to the provisions of paragraphs (a), (b) and (c) hereof except that half the expense shall be borne by AFTRA.

### ARTICLE XI

### NO DISCRIMINATION

The Company and AFTRA shall not discriminate against any applicant for employment or any staff announcer or staff newsperson because of age, race, sex, creed, color, national origin or sexual orientation.  The Company shall not discriminate against any staff announcer or staff newsperson because of any claim made by him/her or submitted to arbitration by him/her or through AFTRA as herein provided, respecting the performance of this Agreement.

113778.v7

## ARTICLE XII

## COMPLIANCE WITH LAW

If there are any provisions of this Agreement which are in conflict with law, then such conflicting provisions shall be deemed modified so as to conform to the provisions of law.

## ARTICLE XIII

## CHECK-OFF

(a)     The Company, on thirty (30) days' written notice from AFTRA, shall deduct, for and on account of union membership dues, that percentage or amount requested in the AFTRA notice, of all compensation earned and to be earned by each staff announcer and staff newsperson for whom there shall be filed with the Company a written assignment in accordance with Section 302(c) of the Labor Management Relations Act, 1947, as amended.  The Company shall commence making such deductions with the first wage payment to be made to each such staff announcer and staff newsperson following the date of the filing of said written assignment, and such deductions shall continue thereafter with respect to each and every subsequent wage payment to be made to each such staff announcer and staff newsperson during the effective period of employment.

113778.v7

(b)    Within ten (10) days after the end of each month, the Company shall remit to AFTRA the total amount of all deductions made during said month for all such staff announcers and staff newspersons.  At the time of such remittance, and together therewith, the Company shall also furnish a record certifying the names of the staff announcers and staff newspersons on whose account such deductions were made, their respective earnings during said month, and the amount of deductions for each such staff announcer and staff newsperson during said month.

(c)    The Company shall cooperate with the Union in order to expedite the procurement by the Union of the written assignments of the staff announcers and staff newspersons, as herein required.

### ARTICLE XIV

### AFTRA HEALTH AND RETIREMENT FUNDS

(a)    Except as otherwise provided in paragraphs (b) and (c), the provisions of Paragraph 102 of the "1994-1997 AFTRA CODE OF FAIR PRACTICE FOR NEW YORK LOCAL TELEVISION BROADCASTING" or its successor Codes shall apply to staff announcers and staff newspersons employed hereunder.  Staff announcers and staff newspersons shall be deemed eligible employees within the meaning of, and as that term is used in Section 102 of the aforesaid paragraph of said Code.  To the extent applicable, the aforesaid paragraph of said Code is made a part of this Agreement with the same force and effect as though set forth herein word for word, except that all references to the Code shall be deemed to refer to this Agreement.

- 11 -

113778.v7

(b)     Contributions to the AFTRA Health and Retirement Funds shall be based on salary (including fees and any incentive compensation such as commissions or compensation based on advertising revenue) and overtime earnings, up to the IRS cap then in effect, except that effective September 1, 2005, up to the IRS cap then in effect or $200,000, whichever shall be less.  In the event there is no IRS cap in effect at the time Health and Retirement contributions are due, then the last IRS cap in effect or the $200,000 cap, whichever is less, shall apply to the contributions.

(c)     The rate at which the Company is obligated to make contributions to the AFTRA Health and Retirement Funds shall be ten and one-half (10½) percent, except that effective September 1, 2005, the rate shall be eleven (11) percent, and effective September 1, 2006, the rate shall be eleven and one-half (11½) percent.

## ARTICLE XV

## CODES OF FAIR PRACTICE

Except as otherwise provided to in this Agreement, the Company shall abide by the terms and conditions of all the National Codes of Fair Practice and Local Codes, where applicable, including Production Facilities language set forth below:

> "Production Facilities - Responsibility of Company - The Company assumes full responsibility for all its obligations hereunder when it produces programs and/or commercials at its facilities, whether in its own behalf or for others.  In the event the Company permits the use by others of its recording facilities for the purpose of producing recorded

- 12 -

113778.v7

programs and/or commercials for use on WOR-AM or
on the WOR network (but excluding any program or
commercial which is aired on WOR-AM or on the WOR
network on a time purchased basis, but with respect to
programs or commercials aired on WOR-AM not in
excess of twenty-five (25) hours per week), then with
respect to such production (including the initial
recording) of such programs and/or commercials
subject to the provisions of applicable law, the
Company shall require such other producer
(independent contractor, corporation or otherwise) to
sign a copy of the applicable Code (or in the case of an
advertising agency, a Letter of Adherence), and shall
cause said Producer to deliver a signed copy of said
Code or Letter of Adherence to AFTRA prior to the first
scheduled rehearsal or recording session; and in such
event the Company's obligations hereunder shall be
fully discharged."

## ARTICLE XVI

### TERM OF AGREEMENT

The term of this Agreement shall be from September 1, 2003 to and

including August 31, 2007.

## ARTICLE XVII

### TITLE AND SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of

AFTRA and the Company and their respective successors and assigns. No sale of

the station by the Company to another licensee (whether such transaction be by a

transfer, assignment, sale or exchange of stock or by a transfer, assignment, sale or

other conveyance of assets or equipment, or by any other transaction which results

in the operation of the station by a successor licensee) shall be deemed to affect the

continuity of the broadcasting industry hereunder; as such the broadcasting

- 13 -

113778.v7

industry hereunder remains essentially the same after any such transfer of ownership.

## ARTICLE XVIII

### NEGOTIATION OF NEW AGREEMENT

This Agreement constitutes the sole Agreement with respect to staff announcers and staff newspersons except to the extent that the Codes referred to in Articles XIV and XV are applicable, and this Agreement supersedes all other agreements and amendments thereto between the parties with respect to such employees.

## ARTICLE XIX

### INDIVIDUAL EMPLOYMENT CONTRACTS

All individual employment contracts shall be submitted to the AFTRA office within fourteen (14) days of execution.

The following two paragraphs shall be inserted in all individual employment contracts for staff announcers or staff newspersons:

> "Artist agrees that s/he will become, and remain during the term of this contract, a member in good standing of AFTRA subject to the provisions of Articles III and IV of the current AFTRA-WOR-AM Staff Announcers and Staff Newspersons collective bargaining agreement. The Company covenants not to bring or maintain any action or proceedings against Artists, because Artist refrains from rendering his/her services under this contract by reason of any strike or work stoppage (whether partial or complete) called or ordered by AFTRA in the event negotiations between AFTRA and the Company, with respect to a renewal of the collective bargaining agreement between AFTRA

- 14 -

113778.v7

and the Company have, in the opinion of AFTRA, after the collective bargaining agreement has expired, failed. In such event, the Company covenants (a) that neither AFTRA nor its representatives shall be deemed to have induced Artists to breach this contract, (b) that for the direct benefit of AFTRA and its representatives, the Company shall not bring or maintain any action or proceedings against them, or any of them, based upon or arising either out of the existence of this contract or out of Artist's failure to render services under this contract, and (c) that the fact that during such strike or work stoppage, Artist has refrained from rendering services under this contract, shall not be considered by the Company as any cause or justification for terminating or giving notice of intention to terminate this contract, nor shall it operate to modify this contract, except with respect to Artist's right to compensation during the period that Artist refrained from rendering services, and the Company's right, at its option, to extend the term of this contract for the period that the Artist refrained from rendering services.

If the aforementioned negotiations result in a collective bargaining agreement covering work of the type provided for herein, this contract shall, from and after the effective date provided in such Agreement, be deemed modified to afford Artist the benefits of any provisions that may be more favorable to Artist than the terms of this contract."

## ARTICLE XX

## TRAVEL ACCIDENT POLICY

Staff announcers and staff newspersons shall be covered under the Company's Travel Accident Policy providing coverage in the amount of $125,000 for any staff employee earning less than $25,000 per year; $250,000 for any staff employee earning between $25,000 and $50,000 per year; $300,000 for any staff employee earning between $50,000 and $100,000 per year; and $400,000 for any staff employee earning $100,000 per year or more.

- 15 -

113778.v7

## ARTICLE XXI

### NOTICES

The Company shall provide notice to AFTRA within fourteen (14) days of the hire or termination of a full time or part-time staff announcer or staff newsperson.

## ARTICLE XXII

### BEREAVEMENT LEAVE

The Company shall apply to full time staff announcers and staff newspersons the Company policy on bereavement leave as it from time to time exists. Nothing shall preclude the Company from modifying, changing or discontinuing its bereavement policy as it, in its sole discretion, shall determine.

## ARTICLE XXIII

### BULLETIN BOARD

AFTRA shall be permitted to post official AFTRA notices on a bulletin board maintained in the employee lounge.

113778.v7

**IN WITNESS WHEREOF**, the parties have hereunto affixed their hands and seals.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS,
NEW YORK LOCAL

By: _____

Date: ___2·20·04_____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By: _____

Date: ___2/23/04_____

BUCKLEY BROADCASTING
CORPORATION

By: _____

Date: ___3/10/04_____

- 17 -

113778.v7

## SCHEDULE

## I-A

## STAFF ANNOUNCERS

The following are the minimum terms and conditions which govern the employment of staff announcers:

**1.    STAFF DUTIES**

(a)    In the performance of their duties, staff announcers may be assigned to perform such duties as staff announcers have been in the practice of rendering, and such other services as the requirements of the Company may necessitate and as are consonant with their employment as staff announcers. These duties may include the timing and cuing of programs, supervising editing of tapes, preparing and/or selecting music for programs (i.e., programs using recorded music).

(b)    Staff announcers may be assigned by the Company to operate (not maintain) any technical equipment or technical apparatus in connection with the preparation, production, broadcast, recording or playback of their own program or broadcast material, or part thereof, so long as such operation does not conflict with the terms of the collective bargaining agreement between WOR-AM and the National Association of Broadcast Engineers and Technicians.

**2.    EMPLOYMENT OF STAFF ANNOUNCERS**

(a)    There shall be no minimum number of staff announcers.

- 18 -

113778.v7

(b)     There shall be no exclusive duties for staff announcers. Announcing functions need not be performed "live" or on an around-the-clock assignment basis and automated announce systems may be utilized by the Company to play back, either in shift or out of shift, announcements which have previously been recorded by announcers.

(c)     Staff announcers compensation consists of base salary and applicable overtime, if any, as hereinafter specified.  There shall be no fee payments for performing any and all announcing services.  However, where a staff announcer is assigned, either regularly or temporarily, to perform in a capacity other than as a staff announcer (i.e., an on-air program host), then in such event the staff announcer shall be paid the freelance program fee for his/her services on that program set forth in the National Code of Fair Practice for Commercial Radio Broadcasting (hereinafter Commercial Radio Code) e.g., if a staff announcer should be assigned to be the on-air program talent on a vacation relief basis for any of the program hosts on their regular programs, he/she will be paid the appropriate program fee set forth in the Commercial Radio Code.

### 3.     STAFF SALARY

The minimal guarantee of compensation for a staff announcer shall be 1/52nd of the annual compensation set forth herein.  Increases shall be due on an individual's anniversary date of employment, according to the following schedule:

113778.v7

| Length of Service | Sept. 1, 2003 | Sept. 1, 2004 | Sept. 1, 2005 | Sept. 1, 2006 |
|---|---|---|---|---|
| 0 to 1 year | $50,282.51 | $51,790.98 | $53,085.76 | $54,678.33 |
| Over 1 to 2 years | $56,567.82 | $58,264.85 | $59,721.47 | $61,513.12 |
| Over 2 years | $65,995.80 | $67,975.67 | $69,675.06 | $71,765.31 |

**4.    WORK WEEK AND WORK DAY**

(a)    The work week of a staff announcer shall be not more than forty (40) hours in five (5) consecutive days.  The work day of a staff announcer shall be not more than eight (8) hours daily, exclusive of meal periods, including broadcasts and rehearsals, adequate preparation time, and time spent traveling to and from the studio to any assignment (exclusive of traveling to and from home and the studio).  All hours in excess of eight (8) hours daily and/or forty (40) hours weekly shall be overtime and be paid on the basis of time and one-half (1-1/2).  In calculating the number of elapsed hours in each week, the term "week" shall mean a period of one week from sign-on time on Monday.

(b)    Where necessary, the staff announcer's work day shall include adequate time at the beginning of his work shift, for preparation, rehearsal, necessary paper work, script study, record selection, etc.

**5.    WORK ON DAYS OFF**

A staff announcer who may be called in on either of his/her days off shall be entitled to be paid overtime for not less than eight (8) hours on the basis of time and one-half (1-1/2).

- 20 -

113778.v7

### 6.    DAYS OFF

(a)    All staff announcers shall be entitled to two (2) consecutive days off each week, except in an emergency (e.g. illness of another staff announcer or unexpected events of national and/or international importance requiring emergency scheduling).  Staff announcers shall receive notification of change of days off not later than five (5) days in advance of the staff announcer's next two (2) days off.  In the event of the failure of the Company to schedule days off at least five (5) days in advance, except in case of illness of another staff announcer or events of national and/or international importance requiring emergency scheduling, the last two (2) days of the week shall automatically be the staff announcer's days off.

(b)    Two (2) consecutive days off shall permit a staff announcer to be continuously absent from employment not less than sixty (60) hours.  If the total amount of time off is less than sixty (60) hours, a staff announcer shall be paid overtime at the rate of time and one-half (1-1/2) for each hour less than sixty (60).

### 7.    MEAL PERIODS

A one (1) hour meal period shall be assigned by the Company during the period commencing two (2) hours and ending six (6) hours after the start of the work day.  In the event, due to an emergency, a one (1) hour meal period cannot be assigned, a meal compensation of five ($5.00) dollars in addition to one (1) hour's overtime shall be paid to the staff announcer, except that when a failure to assign a meal period to a staff announcer is occasioned by a commercial

- 21 -

113778.v7

assignment of the staff announcer, no meal compensation or overtime need be paid. Any staff announcer may be assigned a work shift of eight (8) hours or less and may, if he/she so requests, waive his/her meal period, subject to the approval of the Company and AFTRA.

## 8. NOTICE OF CHANGE OF STAFF STRETCH

If less than twenty-four (24) hours notice is given to a staff announcer of any change in the start or end of a staff stretch, any time added shall be paid for at the overtime rate of time and one-half (1-1/2), unless such change in schedule is due to emergencies enumerated in paragraph 6 of this Schedule I-A.

## 9. REST PERIOD BETWEEN STAFF STRETCHES

The first staff assignment of any staff announcer on any day shall begin not sooner than twelve (12) hours after the conclusion of his last staff assignment. If any staff announcer is required to work during this twelve (12) hour period, overtime at the rate of double time (2x) shall be paid to the staff announcer for all hours worked within the period which ends twelve (12) hours after the conclusion of his last staff assignment on the preceding day. The Company shall cooperate with staff announcers in the assignment of work hours in order to avoid, wherever possible, short rest periods between staff stretches.

## 10. TRAVEL TIME AND TRAVEL EXPENSES

(a)     There shall be included in the elapsed time a proper allowance for necessary traveling time to and from and time spent at remote points to which a staff announcer may be assigned. Not less than eight (8) elapsed hours shall be

- 22 -

credited to such staff announcer for each full day spent in transit and/or such remote points on such assignment. The Company shall pay all ordinary and necessary out-of-town traveling expenses and expenses for trips between the studio and outside assignments, and for tuxedo maintenance for staff announcers specifically required by the Company to wear dress clothes while on duty, at the rate of two ($2.00) dollars per week, except in cases where staff announcers incur such expenses and/or tuxedo maintenance with respect to commercial assignments.

(b)    On each occasion where the staff announcer, with the consent of the Company, uses his/her car in connection with such traveling, he/she shall receive not less than twenty-eight ($0.28) cents per mile, but in no event less than four ($4.00) dollars per day, whichever is the greater, for the use of operating his/her car.

## 11.    VACATIONS

(a)    Staff announcers whose employment commenced prior to the first day of January in the year in which the vacation is to be scheduled shall be entitled to the following vacation benefits:

(i)    Staff announcers in the Company's employ for a continuous period of less than five (5) years shall receive two (2) weeks and three (3) days vacation with pay.

(ii)    Staff announcers in the Company's employ for a continuous period of five (5) years but less than fifteen (15) years shall receive three (3) weeks and three (3) days vacation with pay.

- 23 -

113778.v7

(iii)    Staff announcers in the Company's employ for a continuous period of fifteen (15) years but less than twenty-four (24) years shall receive four (4) weeks and three (3) days vacation with pay.

(iv)    All staff announcers entitled to vacation benefits under subdivisions (i), (ii) and (iii) shall also be entitled to an additional week of vacation with pay in lieu of the following seven (7) holidays:  New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.  Such additional vacation shall follow consecutively the staff announcers regular summer vacation.

(b)    Staff announcers not in the employ of the Company prior to January 1st of the year in which the vacation is to be taken, shall be entitled to one day's vacation with pay for each month worked, up to and including the month of August, and, in addition thereto, shall be entitled to an additional day of vacation with pay in lieu of each of the following holidays:  New Year's Day, Washington's Birthday, Independence Day, and Memorial Day, provided that such staff announcer was in the employ of the Company on such holiday.

(c)    Vacations may be taken at any time during the vacation period of January 1 to December 31 of each vacation year, and need not be taken in consecutive weeks, provided the Company may exercise reasonable control over the number of staff announcers on vacation at the same time and may require newly hired staff announcers to be employed at least four (4) months before taking any vacation.

113778.v7

(d)    The Company shall have vacation schedules made and posted a reasonable time prior to each vacation year based upon the choices of the staff announcers for each vacation year which choice shall be submitted in writing in time for the Company to prepare such vacation schedules. Should there be a conflict in choice of vacation time, the senior staff announcer shall be given his choice. Once vacations are thus scheduled and posted they may not be changed without the mutual consent of the Company and the staff announcers who would be affected by a change.

(e)    Staff announcers on vacation in accordance with this paragraph shall receive their normal weekly salary as provided for in paragraph 3 of this Scheduled I-A.

### 12.    PART TIME OR PER DIEM ANNOUNCERS

(a)    The Company may engage part-time or per diem announcers for the purpose of illness relief or vacation replacement. Such announcers shall be paid at a minimum base salary of $979.97 effective September 1, 2003; $1,009.37 effective September 1, 2004; $1,034.61 effective September 1, 2005; and $1,065.64 effective September 1, 2006, per week or *pro rata* daily. Such announcers may be dismissed without payment of severance pay, but if employed for a minimum period of four (4) consecutive months shall receive four (4) weeks' notice or two (2) weeks' pay in lieu thereof. Each such announcer shall be notified of his/her status at the time of hiring and such an engagement shall not be availed of by the Company in order to reduce the number of staff announcers regularly employed.

- 25 -

(b)    In addition to the foregoing, per diem announcers may be employed on a daily or hourly basis at the following rates:  $138.72 effective September 1, 2003; $142.88 effective September 1, 2004; $146.45 effective September 1, 2005; and $150.85 effective September 1, 2006 for up to three (3) hours; $26.43 effective September 1, 2003; $27.22 effective September 1, 2004; $27.90 effective September 1, 2005; and $28.74 effective September 1, 2006 per hour for each hour thereafter, or $196.01 effective September 1, 2003; $201.89 effective September 1, 2004; $206.94 effective September 1, 2005; and $213.14 effective September 1, 2006 for an eight (8) hour work day.

(c)    Except as may be specifically provided otherwise, part time announcers and per diem announcers shall not be covered by any other provision of this Schedule I-A.

(d)    Part time announcers shall be entitled to vacation on a pro-rated basis after fifty-two (52) weeks of continuous service.  Per diem announcers shall be entitled to vacation on a pro rata basis after fifty-two (52) weeks of continuous service.

### 13.   SICK LEAVE

The Company shall grant sick leave to full time staff announcers in accordance with the Company's sick leave policy applicable to non-bargaining unit employees generally.  Nothing shall preclude the Company from modifying, changing or discontinuing its sick leave policy as it, in its sole discretion, shall determine.

113778.v7

## 14.    TERMINATION

(a)    Staff announcers, whether full time, part time or per diem may be terminated with or without just cause. The provisions of paragraph 15, Severance Pay, of this Schedule I-A shall apply only in connection with a termination of a full time staff announcer without just cause.

(b)    A full time staff announcer terminated with our without just cause at any time after the beginning of the period during which he/she would be entitled to his/her vacation, shall be paid accrued vacation at the time of termination.

## 15.    SEVERANCE PAY

(a)    In the event of a termination without just cause, the Company shall (i) pay the full time staff announcer two (2) weeks notice of termination or two (2) weeks pay in lieu of such notice; however, if a full time staff announcer terminated without just cause resigns during said two (2) weeks notice period, he/she shall be paid only for the time actually worked and not the full two (2) weeks' pay in lieu of notice; and (ii) severance pay of one (1) week's pay for each year of employment for the first five (5) years of employment and if applicable two (2) weeks' pay for each year of employment after five (5) years of employment up to a cap of fifteen (15) weeks' pay.

(b)    For the purposes of this paragraph, a full time staff announcer shall be defined as a staff announcer regularly employed forty (40) or more hours per week.

- 27 -

### 16.    LEAVE OF ABSENCE

The Company shall consider reasonable requests for a leave of absence to staff announcers for any legitimate reason.

### 17.    COMPETITIVE AUDITIONS

When requested by a sponsor or advertising agency to submit a list of staff announcers available for employment for such sponsor or advertising agency for a commercial program, the Company shall submit to the advertiser or agency a list containing the names of all staff announcers employed by the Company, except those engaged to render services on programs advertising competing products, those scheduled to render services at a conflicting time upon commercial programs or those under exclusive contract to another sponsor or agency. A copy of such list shall be posted on the bulletin board generally used by the Company to provide notices to staff announcers. Competitive auditions shall be held whenever requested by the sponsor or advertising agency, and prompt notice shall be given to the staff announcer listed so that all who wish to compete may do so.

### 18. EXCLU    SIVITY

(a)    The Company shall grant permission to any staff announcer, upon application by him/her, to accept employment for (i) the recording of transcriptions, (ii) commercial spot announcements, whether on transcription, film or the like, (iii) the narration of newsreels or motion picture shorts and the like, which are used exclusively in media other than radio or television, and (iv) the performance of services in connection with television broadcasts.

- 28 -

113778.v7

(b)    The staff announcer's name or likeness may be used in connection with such newsreels, motion picture shorts, and the like, but not in connection with any outside transcription and the like.

(c)    If the Company changes a staff announcer's schedule after giving such permission, with the result that a conflict arises between his staff duties and his outside employment, the Company shall give the staff announcer at least two (2) days' notice of the schedule change, so that the staff announcer shall have an opportunity to adjust the schedule of his outside work to a time that does not conflict with staff duties. If he cannot avoid the conflict, the staff duties shall take precedence and must be performed.

(d)    If any product or service in connection with which any staff announcer performs outside services pursuant to the provisions hereof shall conflict with any product or service in connection with which such staff announcer is at the same time required to perform services on WOR-AM, then the staff announcer, after notice by the Company of such conflict, shall immediately discontinue the performance of such outside services for the conflicting product or service.

(e)    The provisions of this paragraph shall not obligate the Company to give permission to pre-record a network program over other networks or stations, or to do custom built transcriptions for national accounts or library service transcriptions.

- 29 -

113778.v7

**19.    WAIVERS**

All waivers shall be in writing, wherever possible in advance of start
of the broadcast or recording for which the waiver is applicable.

113778.v7

## SCHEDULE

## I-B

## STAFF NEWSPERSONS

The following are the minimum terms and conditions which govern the employment of staff newspersons:

### 1.    STAFF DUTIES

(a)    Newspersons shall continue to perform those news gathering and news casting duties they have been in the practice of rendering as of the effective date of this Agreement, together with such duties as the requirements of the Company may necessitate and are consistent with their employment as newspersons.  Part of the news gathering and news casting functions performed by newspersons hereunder is the writing of on air material, which can be read on air by the newsperson or by another newsperson hereunder.  The primary responsibility of a staff newsperson is news gathering and news casting and as such it is not the intention of the Company to have staff newspersons exclusively assigned to write material for initial delivery by another staff newsperson on a regularly scheduled basis; such writing for another staff newsperson shall not interfere with the primary responsibility of a staff newsperson.

(b)    Staff newspersons may be assigned by the Company to operate (not maintain) any technical equipment or technical apparatus in connection with the preparation, production, broadcast, recording or playback of their own program or broadcast material, or any part thereof, so long as such operation does

- 31 -

113778.v7

not conflict with the terms of the collective bargaining agreement between WOR-AM and the National Association of Broadcast Engineers and Technicians.

### 2.    STAFF SALARY

At the discretion of the Company, staff newspersons may be compensated on the basis of either a minimum annual guarantee of fees basis, or a buy-out of fees basis.

(a)    Staff Newspersons Employed on the Basis of a Minimum Annual Guarantee of Fees:

(i)    All such staff newspersons shall receive weekly, no less than 1/52nd of the minimum annual guarantee set forth herein. All fees provided for hereinafter may be credited against such guaranteed amounts. Annual increases in annual guarantee shall be due on an individual's anniversary date of employment according to the following schedule:

| Length of Service | Sept. 1, 2003 | Sept. 1, 2004 | Sept. 1, 2005 | Sept. 1, 2006 |
|---|---|---|---|---|
| 0 to 1 year* | $56,788.86 | $58,492.53 | $59,954.84 | $61,753.49 |
| Over 1 to 2 years | $61,332.94 | $63,172.93 | $64,752.25 | $66,694.82 |
| Over 2 years | $66,255.92 | $68,243.60 | $69,949.69 | $72,048.18 |

\*    The in-hire rate referred to above may be paid for the first year of employment only to staff newspersons who have had no regular on-air experience on the staff of a radio network or a network-owned station or a commonly owned and operated station in a major market, as such term is defined in the industry.

- 32 -

(ii)    Such staff newspersons shall be credited with compensation for all programs and other broadcast services in the field of news, sustaining or commercial, in accordance with the rates and provisions for announcers contained in the applicable AFTRA Commercial Radio Code or Sustaining Agreement or except as set forth differently below.

(iii)    The special WOR-AM newscast and insert fees are as follows:

a.   The 5-minute WOR-AM newscast fee shall be $53.68 effective September 1, 2003; increased to $55.29 effective September 1, 2004; increased to $56.68 effective September 1, 2005; and further increased to $58.38 effective September 1, 2006;

b.   The 10-minute WOR-AM newscast fee shall be $102.23 effective September 1, 2003; increased to $105.30 effective September 1, 2004; increased to $107.93 effective September 1, 2005; and further increased to $111.17 effective September 1, 2006;

c.   The 15-minute WOR-AM newscast fee shall be $124.02 effective September 1, 2003; increased to $127.74 effective September 1, 2004; increased to $130.94 effective September 1, 2005; and further increased to $134.86 effective September 1, 2006;

d.   WOR-AM inserts performed by a staff newsperson of three (3) minutes or less in length on news programs shall be paid at the rate of $28.58 effective September 1, 2003; increased to $29.44 effective September

- 33 -

1, 2004; increased to $30.17 effective September 1, 2005; and further increased to $31.08 effective September 1, 2006-per news insert, whether his voice is broadcast or not. Such news inserts may be rebroadcast on news programs within twenty-four (24) hours of the time of the original broadcast, up to four (4) such rebroadcasts, without payment of any additional fee. In the event such news insert is broadcast on a news program after twenty-four (24) hours of the time of original broadcast, then the staff newsperson shall be paid the same rate as previously paid for the insert and such news insert may be rebroadcast during an additional twenty-four (24) hour period up to four (4) times. Any further rebroadcast shall be paid for in accordance with these terms.

If a staff newsperson is called back to work to do news inserts, whether his voice is broadcast or not, (1) at a time non-contiguous to his other assignments, then the fee for the first such insert shall be $68.54 effective September 1, 2003; $70.59 effective September 1, 2004; $72.36 effective September 1, 2005; and further increased to $74.53 effective September 1, 2006; or (2) on a regular day off, then the fee for the first such insert shall be $217.43 effective September 1, 2003; $223.95 effective September 1, 2004; $229.55 effective September 1, 2005; and further increased to $236.44 effective September 1, 2006; or the total of all fees earned that day, whichever is higher, and in either case with up to four (4) rebroadcasts on news programs within twenty-four (24) hours of the original broadcast without payment of any additional fees for such insert. For each additional insert, the staff newsperson shall be paid at the rate of $28.57-effective September 1, 2003; $29.43 effective September 1, 2004; $30.16 effective September 1, 2005;

- 34 -

$31.07 effective September 1, 2006, per news insert with up to four (4)

rebroadcasts on news programs within twenty-four (24) hours of the original

broadcast without payment of any additional fees for such inserts.

    (iv) Staff newspersons assigned to work on news programs

on a 6th and/or 7th day shall be guaranteed to earn from fees no less than the

average of $207.89-effective September 1, 2003; $214.13 effective September 1,

2004; $219.48 effective September 1, 2005; and $226.07 effective September 1,

2006, per each such 6th and/or 7th day of assignment, averaged over each

successive thirteen (13) week period, commencing September 1 of each year.

    In no event shall WOR-AM newscast fees exceed those contained

in the Commercial Radio Code.

    (b) Staff Newspersons Employed On a Buy-out of all Fee Basis:

    (i) Staff newspersons employed on a buy-out of all fees

basis shall be guaranteed on a weekly basis no less than 1/52nd of the annual

compensation set forth herein. Said compensation shall represent payment for all

staff newspersons duties set forth in paragraph 1, Staff Duties, of the Schedule I-B.

Increases shall be due on an individual's anniversary date of employment

according to the following schedule:

| Length of Service | Sept. 1, 2003 | Sept. 1, 2004 | Sept. 1, 2005 | Sept. 1, 2006 |
|---|---|---|---|---|
| 0 to 1 year* | $66,255.92 | $68,243.60 | $69,949.69 | $72,048.18 |
| Over 1 to 2 years | $69,094.83 | $71,167.67 | $72,946.87 | $75,135.27 |
| Over 2 years | $75,721.48 | $77,993.12 | $79,942.95 | $82,341.24 |

\*    The in-hire rate referred to above may be paid for the first year of employment only to staff newspersons who have had no regular air experience on the staff of a radio network or a network-owned station or a commonly owned and operated station in a major market, as such term is defined in the industry.

(ii)    Overtime and Work Week -- All such staff newspersons shall have a structured work week of five (5) days, with eight (8) hours each day. Overtime shall commence after forty (40) hours weekly and not after eight (8) hours a day and not for work on a sixth (6th) or seventh (7th) day of work unless the hours worked thereon shall exceed forty (40). After forty (40) hours of work in any week, overtime shall be earned for all hours over forty (40) at the rate of time and one half (1-1/2) the regular hourly rate of pay.

(iii)    Minimum Call - Such staff newspersons shall have a minimum call on days off of four (4) hours of work.

(iv)    Out of Town Assignments - Such staff newspersons who are required by the Company to perform services on an overnight, out of town assignment shall receive for each day so assigned an additional two (2) hours of pay at their regular hourly rate of pay in lieu of any overtime on those days, in

- 36 -

113778.v7

addition to any other compensation required to be paid for that day. For purposes of computing the hours of work in a work week, each day on an overnight out of town assignment shall be considered eight (8) hours.

(v)    Avoiding Graduated Scale - No such staff newsperson shall be terminated solely for the purpose of avoiding the higher payments required by the graduated scale payments provision set forth in (1) above.

### 3.    HOLIDAYS

Staff newspersons shall be entitled to receive the following holidays: New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. A staff newsperson who works on any of the above holidays shall be compensated as follows:

(a)    If employed on a minimum guarantee basis, he/she shall receive his/her normal fees earned for that day for all work performed, or one and one half (1-1/2) times his/her daily minimum guarantee, (i.e., 1/5th of 1/52nd x 1.5), whichever is greater.

(b)    If employed on a buy-out basis, he/she shall receive time and a half (1-1/2) his/her daily rate, (i.e., 1/5th of 1/52nd x 1.5), of the buy-out amount for each holiday worked.

(c)    If the holiday falls on a staff newsperson's day off or during his/her vacation, he/she shall be entitled to receive a compensatory day off in lieu thereof.

4.    **SICK LEAVE**

The Company shall grant sick leave to staff newspersons in accordance with the Company's sick leave policy applicable to non-bargaining unit employees generally. Nothing shall preclude the Company from modifying, changing or discontinuing its sick leave policy as it, in its sole discretion, shall determine.

5.    **VACATIONS**

(a)    Vacation pay shall be calculated at 1/52nd of the staff newsperson's minimum guarantee or buy-out amount, whichever is applicable. However, in no event may a staff newsperson receive vacation pay calculated at less than $700.00 a week, and no staff newsperson may earn less for his vacation period than he earned during his last regular vacation period prior to execution of this Agreement.

(b)    Vacations shall be granted on the following basis:

(i)    For service of one (1) to five (5) years - two (2) weeks' annual vacation

(ii)    For service of five (5) years to fifteen (15) years - three (3) weeks' annual vacation

(iii)    For service of more than fifteen (15) years - four (4) weeks' annual vacation

- 38 -

(c)    Each staff newsperson who is entitled to receive two (2) weeks' paid annual vacation under the provision of subparagraph (a) (1) above, shall, in addition to such paid vacation, be entitled to receive one (1) week's annual vacation without pay.

(d)    Vacations shall be taken during the twelve (12) month period following the date upon which the vacation is earned.

(e)    All staff newspersons may take vacation at any time of the year and may split vacation into two (2) segments if so desired.  However, the Company shall have the right to control the number of newspersons on vacation at any one time and shall make reasonable efforts to accommodate the vacation preferences of individual newspersons based on seniority.

(f)    Staff newspersons shall not receive pay in lieu of vacation.

**6.    TERMINATION**

Staff newspersons whether full-time, part-time or per diem may be terminated with or without just cause.

**7.    NOTICE AND SEVERANCE PAY**

(a)    In cases of termination (except resignations and termination for just cause) of a full-time staff newsperson, the Company shall provide the staff newsperson with (a) four (4) weeks' notice of termination or four (4) weeks' salary in lieu of notice, and (b) severance pay of one (1) week's salary for each year of employment for the first five (5) years of employment, and if applicable two (2)

- 39 -

weeks' salary for each year of employment after five (5) years of employment, or *pro rata* thereof, up to a cap of fifteen (15) weeks' salary.

(b)    A week's salary shall be $700.00 or 1/52nd of the minimum fee guarantee, whichever is greater, or $700.00 or 1/52nd of the buy-out amount, whichever is greater.  If a staff newsperson resigns during the four (4) weeks notice period set forth above, he/she shall be paid only for the time actually worked and not the full four (4) weeks of salary in lieu of notice.  For purposes of this paragraph, a full time staff newsperson shall be a staff newsperson regularly employed for forty (40) or more hours per week.

### 8.    INSURANCE

The Company shall maintain its present life insurance plan covering staff newspersons which provides up to $15,500 of non-contributory life insurance.

### 9.    COMBAT ASSIGNMENT

If a staff newsperson is assigned by the Company to work in a combat zone, he/she shall be paid $100.00 for each week of such assignment in addition to any other compensation otherwise due.

### 10.    EXPENSES

A staff newsperson shall be reimbursed for reasonable expenses accrued in connection with any assigned duties performed for the Company, provided the Company has in advance approved such expenses.

- 40 -

113778.v7

11.    **PART-TIME OR PER DIEM NEWSPERSONS**

(a)    Part-time newspersons or per diem newspersons (whether engaged for vacation replacement, illness relief, or other reason) may be employed under a buy-out basis pursuant to which they shall receive a flat amount of $979.97 effective September 1, 2003, $1,009.37 effective September 1, 2004, $1,034.61 effective September 1, 2005, and $1,065.64 effective September 1, 2006, per week; or *pro rata* on a daily basis ($196.00 effective September 1, 2003, $201.88 effective September 1, 2004, $206.92 effective September 1, 2005, and $213.13 effective September 1, 2006) or under a minimum guarantee basis pursuant to which they shall receive a guarantee fee of $65.92 effective September 1, 2003, $67.90 effective September 1, 2004, $69.59 effective September 1, 2005, and $71.68 effective September 1, 2006; (which shall be a credit against actual fees earned) plus fees earned in excess of the guaranteed fee. The newsperson employed hereunder shall be advised at time of hire whether he/she is employed on a minimum guarantee or buy-out basis. No more than three (3) part-time newspersons may be scheduled to cover regularly scheduled shifts during a workweek. However, the Company shall not be precluded from using more than three (3) part-time newspersons in the event of a news emergency or to cover scheduled and/or unscheduled special events, or in the event of illness of a staff newsperson.

(b)    Measured by starting with September 1, 1992 as the first day of service, part time newspersons shall be entitled to vacation on a pro-rata basis after fifty-two (52) weeks of continuous service.

- 41 -

(c)    Except as may be specifically provided otherwise, part time

newspersons shall not be covered by any other provision of this Schedule I-B.

113778.v7

**SIDE LETTER #1**

As of September 1, 2003

American Federation of Television
  and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    Additional Technical Duties

Gentlemen:

This letter shall supplement the Collective Bargaining Agreement by and between the Buckley Broadcasting Corporation (hereinafter called "Company") and the American Federation of Television and Radio Artists – New York Local (hereinafter called "AFTRA") effective September 1, 2003 (the "Agreement").

In the Agreement of 1989-1992 the duties of staff announcers, newspersons and freelance announcers were expanded to include certain technical duties which were not previously required. In connection with such additional duties, the Company agreed, in the event necessary, to provide adequate training to any staff announcer, newsperson or freelance announcer who was not currently able to perform such duties. If the Company wished to implement any additional duties it would give notice to AFTRA and provide AFTRA with the opportunity to discuss the implementation thereof.

In the event that a staff announcer, newsperson or freelance announcer employed by WOR-AM on or before September 1, 1989 is terminated by the Company because he/she is not able to perform those additional technical duties then, such termination shall not be deemed a termination for cause, and any severance payment due on account of a termination without cause by the Company shall be payable.

- 43 -

113778.v7

If the foregoing constitutes our understanding kindly execute this letter in the space provided and it shall become a binding side letter to the Agreement.

Very truly yours,

BUCKLEY BROADCASTING CORP.

By: _____

Date: 3/10/04 _____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By: _____

Date: 2-20-04 _____

113778.v7

- 44 -

## SIDE LETTER #2

As of September 1, 2003

American Federation of Television
  and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    Severance on Retirement

Gentlemen:

       This letter shall supplement the Collective Bargaining Agreement by and between the Buckley Broadcasting Corporation (hereinafter called "Company") and the American Federation of Television and Radio Artists – New York Local (hereinafter called "AFTRA") effective September 1, 2003 (the "Agreement").

       As part of the 1989 negotiations the question of severance pay upon resignation was discussed between the parties. The Company did not agree to pay severance upon resignation.

       However, in the event a staff newsperson with at least fifteen (15) years of continuous service, who would otherwise be eligible to receive severance pay upon termination wishes to resign from the Company, and such possible resignation might be of mutual interest to both the Company and such individual then, upon his/her request, the Company shall enter into a discussion with him/her on the subject of whether mutually satisfactory arrangements for his/her resignation can be worked out.

113778.v7

If the foregoing constitutes our understanding kindly execute this
letter in the space provided and it shall become a binding side letter to the
Agreement.

Very truly yours,

BUCKLEY BROADCASTING CORP.

By: _____ .

Date: _____3/10/04_____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By: _____

Date: ___2·20·04_____

113778.v7

- 46 -

**SIDE LETTER #3**

As of September 1, 2003

American Federation of Television
 and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    Public Service and Public Affairs
       Announcements

Gentlemen:

     This letter shall supplement the Collective Bargaining Agreement by
and between the Buckley Broadcasting Corporation (hereinafter called
"Company") and the American Federation of Television and Radio Artists – New
York Local (hereinafter called "AFTRA") effective September 1, 2003 (the
"Agreement").

     Notwithstanding the terms and conditions of the Agreement, public
service and public affairs announcements up to two (2) minutes in length, may be
performed by employees employed by WOR-AM on a staff basis in a non-AFTRA
covered capacity, usually in a position of Public Affairs or Community Affairs
Director.

     In such event, such announcements shall be paid for at a rate of
fifteen ($15.00) dollars per announcement. No replay fees are required. Any
person so utilized for the weekly services of such announcements shall be
guaranteed no less than one hundred ($100.00) dollars per week. Health and
retirement contributions to the AFTRA Health and Retirement Fund shall be paid
on compensation paid pursuant to this letter. Such announcements may be aired
for a period of no longer than one (1) week from first use.

- 47 -

113778.v7

If the foregoing constitutes our understanding kindly execute this letter in the space provided and it shall become a binding side letter to the Agreement.

Very truly yours,

BUCKLEY BROADCASTING CORP.

By:_____

Date:___3|10|04_____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By:_____

Date:___2-20-04_____

- 48 -

113778.v7

## SIDE LETTER #4

As of September 1, 2003

American Federation of Television
  and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    Miscellaneous Matters

Gentlemen:

This letter shall supplement the Collective Bargaining Agreement by and between the Buckley Broadcasting Corporation (hereinafter called "Company") and the American Federation of Television and Radio Artists – New York Local (hereinafter called "AFTRA") effective September 1, 2003 (the "Agreement").

1.    Any broadcast material originating from helicopters, except reports of traffic conditions, shall be performed by persons subject to the terms of the Agreement, except with respect to emergencies as specified in Article I(a), Scope of Agreement.

2.    The rate applicable to actors in five (5) minute programs as set forth in the National Code of Fair Practice for Commercial Radio Broadcasting shall be applicable to non-news insert material up to five (5) minutes in duration inserted into a program of longer duration, limited to reports on specified subjects, or interviews of specific subjects but shall not include hard news.

3.    The Company shall have the right, if it so elects, upon sixty (60) days written notice to AFTRA, to negotiate with AFTRA with respect to a new rate for fifteen (15) minute segments to be contained in programs of longer duration, limited to reports on specific subjects, or interviews on specific subjects but shall not include hard news. Failing agreement to such a rate, the Company, at its option only, shall have the right to terminate all agreements with AFTRA.

4.    In accordance with the discussion in the negotiations which led to the 1986-1989 collective bargaining agreement, the Company shall maintain its practice of utilizing a newsperson covered by the Agreement, prior to any other individual, to perform news gathering assignments involving an interview, which might result in an insert, provided such newsperson is available on the premises for such assignment.

- 49 -

113778.v7

5.    AFTRA shall not arbitrate any dispute the substance of which a staff announcer, staff newsperson or freelance announcer has executed a binding and bona fide release from WOR-AM.

6.    The primary intention of paragraph 11 of Schedule I-B, entitled "Part-time or Per Diem Newspersons", is to supplement the regular full-time staff. However, neither the previous sentence, nor any other provision of the Agreement shall be construed as a guarantee of employment for any employee, nor shall it be a protection against a reduction in staff.

7.    In the event that a program host or talent who would ordinarily read a spot announcement, without fee, as part of his/her regular duties on a program, refuses, for reasons approved by the Company, to read such copy, and as consequence the Company assigns a staff announcer to read said copy, then for the first 35 of such spots (limited to 1 minute each), in each year of the Agreement, the Company shall pay to the staff announcer reading the spot a fee of $375 per spot as a buyout of all broadcast rights both local and network.

If the foregoing constitutes our understanding kindly execute this letter in the space provided and it shall become a binding side letter to the Agreement.

Very truly yours,

BUCKLEY BROADCASTING CORP.

By:_____

Date:___3/10/04_____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By:_____

Date:___2.20.04_____

- 50 -

113778.v7

**SIDE LETTER #5**

As of September 1, 2003

American Federation of Television
 and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    <u>Program Hosts and Talent</u>

Gentlemen:

      This letter shall supplement the Collective Bargaining Agreement by and between the Buckley Broadcasting Corporation (hereinafter called "Company") and the American Federation of Television and Radio Artists – New York Local (hereinafter called "AFTRA") effective September 1, 2003 (the "Agreement").

      With reference to program hosts and talent employed on WOR-AM, the Company shall, for the term of this Agreement, abide by the terms and conditions of all of the National Codes of Fair Practice and Local Codes where applicable, including the National Code of Fair Practice for Commercial Radio Broadcasting, except as otherwise provided in the Agreement of 2003, (including, but not limited to Article XIV, AFTRA Health and Retirement Funds), as modified by this side letter.

      1.    Program Hosts and Talent on programs may be assigned to operate (not maintain) any technical equipment or technical apparatus in connection with the preparation, production, broadcast, recording or playback of their own program or part thereof, so long as such operation does not conflict with the terms of the collective bargaining agreement between WOR-AM and the National Association of Broadcast Engineers and Technicians. Nothing herein shall preclude a freelance announcer from negotiating a limitation on such duties in any personal services contract.

- 51 -

113778.v7

2.    Program Hosts and Talent under an exclusive personal service contract or employment arrangement under which his or her services are broadcast five (5) or more days per week, and which has resulted in continuous employment for at least fifty-two (52) consecutive weeks, shall receive a minimum of three (3) weeks written notice of the intention by the Company to terminate the performer's services, or three (3) weeks pay computed at the individual performer's weekly salary (or average weekly earnings over the preceding year where no such weekly salary exists) in lieu of such notice in all cases except where the termination of services is for dishonesty, drunkenness or insubordination, or occurs at the termination date specified in the performer's individual contract or employment arrangement.

3.    A freelance performer employed as a Program Host under an exclusive personal service contract or employment arrangement under which his or her services are broadcast five (5) or more days per week, and which has resulted in continuous employment for at least fifty-two (52) consecutive weeks, shall be entitled in each year of employment thereafter to a minimum of two (2) weeks of vacation with pay at times mutually agreeable to both the performer and the Company, except during ratings periods. Pay for such weeks of vacation shall be computed at the performer's individual then current weekly salary or, in the instance where such salary does not exist, the performer's average weekly earnings from his or her program for the twelve-month period immediately preceding the vacation period. The Company shall not be precluded from requiring, in its discretion, any such performers to prerecord prior to vacation any programs or portions thereof (including commercial announcements) for broadcast during the performer's vacation period when such is not inconsistent with the terms of the individual performer's contract or employment arrangement, and such prerecording of services and subsequent playback during vacation shall satisfy the minimum vacation requirements contained herein.

4.    Should more favorable terms be negotiated in the National Code of Fair Practice for Commercial Radio Broadcasting by the networks, said terms will automatically be offered to the Company for incorporation into this Agreement.

5.    Contributions to the AFTRA Health and Retirement Funds on behalf of Program Hosts and Talents shall be based on salary (including any incentive compensation such as commissions or compensation based on advertising revenue) and overtime

earnings, only up to the IRS cap, except that effective
September 1, 2005, up to the IRS cap or $200,000, whichever
shall be less.  In the event there is no IRS cap in effect at the
time Health and Retirement contributions are due, then the
last IRS cap in effect or the $200,000 cap, whichever is less,
shall apply to the contributions.

      If the foregoing constitutes our understanding kindly execute this
letter in the space provided and it shall become a binding side letter to the
Agreement.

      Very truly yours,

      BUCKLEY BROADCASTING CORP.

      By: _____

      Date: ___3/10/04_____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By: _____

Date: ___2.20-04_____

113778.v7

## SIDE LETTER #6

As of September 1, 2003

American Federation of Television
  and Radio Artists
New York Local
260 Madison Avenue
New York, NY 10016

Re:    Internet

Gentlemen:

This letter shall supplement the Collective Bargaining Agreement by and between the Buckley Broadcasting Corporation (hereinafter called "Company") and the American Federation of Television and Radio Artists – New York Local (hereinafter called "AFTRA") effective September 1, 2003 (the "Agreement").

The Company shall have the unlimited right to use any radio program or any portion thereof produced under the Agreement and any commercial or spot announcement produced under the Agreement on its website(s).  However, if the Company shall assess a charge to the consumer for the downloading of such programs or portions thereof, the Company shall notify AFTRA and the Company and AFTRA shall thereafter negotiate a provision concerning the treatment of such charge but, whether or not such an agreement is reached in connection therewith, nothing shall affect the Company's rights set forth under the foregoing sentence and Article VII, No Strike Clause of the Agreement shall remain in effect.

113778.v7

- 54 -

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement by and between the Company and the Union.

Sincerely,

BUCKLEY BROADCASTING CORP.

By: _____

Date: __3/10/04_____

ACCEPTED & AGREED:

AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS

By: _____

Date: __2.20.04_____

113778.v7

- 55 -