# EXHIBIT C

# AMERICAN FEDERATION OF
# TELEVISION AND RADIO ARTISTS

## ( A F T R A )



## 1994 - 1997

# National Code of Fair Practice for

# Commercial Radio Broadcasting

## COMMERCIAL RADIO

1994 - 1997
National Code of Fair Practice for
Commercial Radio Broadcasting

Para.
Nos.                                    Index

                                Minimum Terms and Conditions

                                Schedule of Minimum Fees and Conditions

                    *ACTORS*

1                               Program Fees

2                               Rehearsal

3                               Thirteen Weeks' Continuous Guarantee

4                               Renewal of Guaranteed Engagement

5                               Program Auditions

6                               Dramatized Commercials

7                               Optional Method of Payment/Syndication

7A                              Standard Openings and Closings

                    *SINGERS*

8                               Program and Rehearsal Fees

                                Multiple Performances - One Calendar Week

9                               Definition of Rehearsal

10                              Program Auditions

11                              Special Minimum Working Conditions

12                              Signature Numbers

13                              Incidental Singing Background

14                              Notice on Group Singers

15                              Contractor for Group Singers

16                              Multiple Tracking and Sweetening

c:radio.cod

1994-97 Radio Code

*ANNOUNCERS*

| | |
|---|---|
| 17 | Program Fees and Rehearsal |
| 18 | Multiple Performances/One Calendar Week |
| 19 | 13 Week Guaranteed Terms |
| 20 | Network Commercial Cut-Ins Announcements |
| 21 | Hitchhike Announcements and Cowcatcher Announcements |
| 22 | Program Auditions |
| 23 | Special Provisions |

*ANNOUNCERS AND NEWS REPORTERS*

| | |
|---|---|
| | Local Program 5 minutes or less |
| | News Cut-Ins |
| | News Services |
| 24 | Sportscasters |

*GENERAL SCHEDULE OF RULES*

| | |
|---|---|
| 25 | Programs Covered by Collective Bargaining Agreement |
| 26 | Recordings |
| 27 | Taped and Pre-recorded Broadcasts and Call Backs |
| 28 | Re-use and Re-play of Recorded Programs |
| 29 | Engagements and Doubling |
| 30 | Compensation |
| | Penalty for Late Payment |
| | Promotional Announcements |
| | Promotional Announcements (Other Than Singers) |
| | Promotional Announcements (Singers) |
| | Public Service Announcements |
| 31 | Deductions for Social Security and Withholding Taxes |

| 32 | Disability Insurance |
| 33 | Notice |
| 34 | Production Prosecuted |
| 35 | Rehearsal Sessions |
| 36 | Voice Tests |
| 37 | Rates/N.Y. Rates for Actors and Singers |
| 38 | Cancelled Program |
| 39 | Postponed Program |
| 40 | Cancelled Individual Engagements |
| 41 | Cancellation by Artist |
| 42 | Admission to Premises |
| 43 | Production Memorandum |
| 44 | Compensation for Traveling |
| 45 | Costume and Dress Maintenance Fee |
| 46 | Extras and Supernumeraries |
| 47 | Rehearsal for Re-broadcast |
| 48 | Dramatic Signatures |
| 49 | Warm-ups and After-shows |
| 50 | Audience Participation |
| 51 | Children's Programs |
| 52 | Name Credits |
| 53 | Segmented Programs |
|  | Participating Programs |
|  | Dramatic Programs |
|  | Co-op Programs |
| 54 | Standard AFTRA Engagement Contract |

| 55 | Bargaining Unit |
| 56 | One-Performance Waiver |
| 57 | People Covered |
| 58 | Simulcasts |
| 59 | Union Shop |
| 60 | Arbitration |
| 61 | No Discrimination |
| 62 | No-Strike Clause |
| 63 | AFTRA Rules |
| 64 | Effective Dates |
| 65 | All Programs Covered |
| 66 | Unfair Producers |
| 67 | Bond or Certified Check |
| 68 | Standard Clauses for Individual Contracts |
| 69 | Individual Contracts |
| 70 | Minimum Scales |
| 71 | Modification of Present Contract |
| 72 | Services in FM |
| 73 | Additional Services |
| 74 | Waivers |
| 75 | Favored Nations |
| 76 | Non-Waiver of Rights |
| 77 | Tax Statements |
| 78 | Check Off |
| 79 | M&O Stations |
| 80 | Broadcast Companies |

81                          New Code/Terminations and Reinstatement

82                          Producer Bound by Other AFTRA Codes

83                          Letters of Adherence

84                          Title of Code

85                          AFTRA Health and Retirement Funds


Exhibit A                   Supplemental Markets

Sideletter #1               Local Radio Announcer Discount

Sideletter #2               Vacation for Freelance Newspersons

Sideletter #3               AFTRA Health and Retirement Provisions

Sideletter #4               Understanding Re: Bonds and Certified Checks.

**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS (AFTRA)**
**(Affiliated with the American Federation of Labor and the Congress**
**of Industrial Organizations)**

**1994 - 1997**

**NATIONAL CODE OF FAIR PRACTICE**

**FOR COMMERCIAL RADIO BROADCASTING**

**(Minimum Terms and Conditions for Radio Artists)**

We, the undersigned, on this _____ day of _____, 19_____, agree with the American Federation of Television and Radio Artists that we will accept and conform to the Code of Fair Practice and the minimum terms and conditions herein contained for the engagement of radio artists on commercial broadcast programs produced under our auspices on the network systems and their several stations. We hereby accept notice of the minimum terms and conditions as specified in the schedules annexed to this Code, which schedules (pages 3 to 52, both inclusive) are included herein and are hereby made a part of this Code.

THE AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS (herein called AFTRA) agrees and represents that it is and will continue to be an open union. AFTRA agrees that it will keep its membership rolls open and will admit to membership all eligible radio artists whom we engage to appear on such commercial broadcasts. We agree that on all present and future commercial broadcasts produced by us, or under our auspices, we will use the services only of performers, including actors, singers, announcers and news reporters, who are members of AFTRA or become such members in accordance with Paragraph 59 of this Code.

AFTRA agrees not to impose unreasonable entrance fees or dues upon its members, and wherever necessary for the Producer's program purposes to qualify members within 24 hours after notice from the Producer.

It is mutually agreed that it is a part of this Code of Fair Practice that the engagement of radio performers for all such present and future commercial broadcasts can be made only under the minimum terms and conditions provided herein or better.

We agree that we will not, for the purpose of evading performance under this Code, sublet or transfer responsibility for commercial network programs produced by us to any third person, and that we will not transfer our operations to any other points of origination for the purpose of defeating or evading this Code.

This agreement is in effect beginning with November 16, 1994, until and including November 15, 1997, subject to the provisions of Paragraph 81 of the General Schedule of Rules.

We agree with the American Federation of Television and Radio Artists for this period to submit to arbitration all questions relating to wages and working conditions affecting live commercial broadcasts not covered by this agreement and Code, as well as any controversy or dispute between AFTRA and ourselves arising with respect to this Code or the interpretation or breach thereof.

Such arbitration shall be conducted under the rules then obtaining of the American Arbitration Association (except as otherwise provided herein), and shall be pursuant to the provisions of Paragraph 60 of this Code.

This agreement and Code of Fair Practice shall be construed by the laws of the State of New York.

IN WITNESS WHEREOF, we have signed this agreement and Code of Fair Practice on the day and year above stated.

_____

Producer

By_____

(Sign above and print or type below)

_____

Address_____

_____

AMERICAN FEDERATION OF TELEVISION
  AND RADIO ARTISTS

By_____
            National Executive Director

**SCHEDULE OF MINIMUM FEES AND CONDITIONS FOR RADIO ARTISTS APPEARING ON COMMERCIAL PROGRAMS USING THE FACILITIES OF THE AMERICAN BROADCASTING COMPANIES, INC. (A WHOLLY OWNED SUBSIDIARY OF CAPITAL CITIES/ABC, INC.) AND CBS INC.**

**ACTORS**

1.    **PROGRAM FEES**

Broadcast Fee:

| Length of Program | 11/16/94 | 6/14/96 | 11/16/96 |
|---|---|---|---|
| 5 minutes or less | $40.00 | $42.00 | $44.00 |
| Over 5 to 15 minutes | 43.00 | 45.00 | 47.00 |
| Over 15 to 30 minutes | 71.00 | 75.00 | 78.00 |
| Over 30 to 60 minutes | 100.00 | 105.00 | 110.00 |

Re-Broadcast Fee:

| Length of Program | 11/16/94 | 6/14/96 | 11/16/96 |
|---|---|---|---|
| 5 minutes or less | $21.00 | $22.00 | $23.00 |
| Over 5 to 15 minutes | 29.00 | 30.00 | 32.00 |
| Over 15 to 30 minutes | 36.00 | 38.00 | 40.00 |
| Over 30 to 60 minutes | 49.00 | 51.00 | 54.00 |

*Rates for Programs in Excess of One Hour:*
In all programs of more than one hour in length, the applicable one-hour rate plus, for each half-hour or part thereof over and above one hour, a sum equal to the difference between the applicable hour rate and the applicable half-hour rate.

*Multiple Performances - One Calendar Week:*
When an actor is engaged for multiple performances in one calendar week in the same show, the Producer may apply a non-cumulative discount to the program fee applicable to the number of performances per week, to the extent shown in the following schedules provided that the program utilizes the services of more than one performer, which shall include one or more actors or singers:

| Programs of 15 minutes in length | | Programs over 15 minutes in length | |
|---|---|---|---|
| Number of Performances  Per Week | Discount | Number of Performances Per Week | Discount |
| 4 | 5% | 3 | 5% |
| 5 | 10% | 4 | 5% |
| | | 5 | 10% |

2.  **REHEARSAL**

$10.00 per hour, first hour required, except for program of five minutes or less in length, in which case the basic fee includes payment for the first hour of rehearsal. After first hour rehearsal may be computed and paid in half-hour periods at the rate of $5.00 per half or part thereof. Each rehearsal session shall be computed and paid for as a separate unit and no such session shall be computed as less than one hour. Individual compensation shall be on the basis of time contracted for, but additional rehearsal time may be requested and if agreed to, paid for.

3.  **THIRTEEN WEEKS' CONTINUOUS GUARANTEE**

(a)  When a producer on a fifteen minute dramatic strip show by written contract with the actor guarantees a thirteen weeks' continuous non-cancelable engagement on such show, the producer may discount the actor's scales to the extent shown in the following schedule if the producer guarantees the actor the minimum amount shown in the schedule, no matter whether he plays or rehearses or not. Base rate on rehearsals when such discount is effective is $10.00 per hour. The schedule follows:

*Single Broadcast Per Day:*

| Number of Appearances Per Week | Discount | Guaranteed Minimum 11/16/94 | Guaranteed Minimum 6/14/96 | Guaranteed Minimum 11/16/96 |
|---|---|---|---|---|
| 5 | 15% | $276.00 | $290.00 | $304.00 |
| 4 | 10% | 264.00 | 277.00 | 291.00 |
| 3 | 5% | 211.00 | 222.00 | 233.00 |

*Broadcast and Repeat:*

| Number of Appearances Per week | Discount | Guaranteed Minimum 11/16/94 | Guaranteed Minimum 6/14//96 | Guaranteed Minimum 11/19/96 |
|---|---|---|---|---|
| 5 | 15% | $369.00 | $387.45 | $407.00 |
| 4 | 10% | 329.00 | 345.00 | 363.00 |
| 3 | 5% | 303.00 | 318.00 | 334.00 |

*Advance Recording Plus Live Network Broadcast (Each appearance means one for recording and one or live):*

| Number of Appearances Per week | Discount | Guaranteed Minimum 11/16/94 | Guaranteed Minimum 6/14/96 | Guaranteed Minimum 11/19/96 |
|---|---|---|---|---|
| 5 | 15% | $421.00 | $442.00 | $464.00 |
| 4 | 10% | 381.00 | 400.00 | 420.00 |
| 3 | 5% | 303.00 | 318.00 | 334.00 |

The compensation which shall be paid to the performer under a thirteen weeks' continuous guarantee contract as above specified shall be the applicable fees plus rehearsal pay, less the discount above set forth, or the guaranteed minimum, whichever is higher.

(b)    On written guaranteed continuous thirteen weeks' non-cancelable engagements of actors for shows of a half-hour or longer, a discount from scale of ten percent of the basic scale is allowed.

4.    RENEWAL OF GUARANTEED ENGAGEMENT

When an artist is engaged under a minimum 13 weeks, continuous guaranteed, non-cancelable contract, and producer desires to renew such engagement, he shall give artist not less than two weeks' written notice of such intention prior to termination of any 13 week period, and such renewal shall be effective on acceptance by the artist.

5.    PROGRAM AUDITIONS

Program auditions shall be paid for at one-half the broadcast fee. Rehearsal time for auditions shall be paid for at the full rate specified for regular broadcasts. This compensation is for program auditions; voice tests may be made without compensation but the producer shall not use this privilege unreasonably.

6.    DRAMATIZED COMMERCIALS

When the actor or singer is engaged for a dramatized commercial, the following minimum scale shall apply:

| Length of Program | Broadcast Fee |
|---|---|
| 15 minutes or less | $36.00 |
| Over 15 to 30 minutes | 48.25 |
| Over 30 to 60 minute | 59.75 |

| Length of Program | Re-Broadcast Fee |
|---|---|
| 15 minutes or less | $17.75 |
| Over 15 to 30 minutes | 24.00 |
| Over 30 to 60 minutes | 29.75 |

*Rates for Programs in Excess of One Hour:*
In all programs of more than one hour in length, the applicable one-hour rate plus, for each half-hour or part thereof over and above one hour, a sum equal to the difference between the applicable hour rate and the applicable half-hour rate.

A fifteen minute rehearsal period prior to the dress rehearsal and the dress rehearsal may be included in the foregoing scale. The foregoing rates shall cover all dramatized commercials for a single sponsor on a program. In the case of a dramatized commercial used on a program of five minutes or less in length, the actors and singers rendering services in such dramatized commercial shall be paid either the rate set

forth in this Paragraph 6 for Dramatized Commercials or the rate provided in Paragraph 1 (Actors) and Paragraph 8 (Singers) for a program of five minutes or less in length, whichever is less.

7.    **OPTIONAL METHOD OF PAYMENT/SYNDICATION**

The Company may have twelve (12) months' unlimited use in syndication of a five (5) minute or less program for a fee of $59.00 ($62.00 effective 6/14/96; $65.00 effective 11/16/96), including one-half (1/2) hour of rehearsal. This method of payment is limited to up to two (2) performers from the categories of actor/announcer/narrator.

7A.    **STANDARD OPENINGS AND CLOSINGS**

Any performer who performs (or permits a portion of a prior performance to be used) in standard openings and closings, and musical signatures for a program broadcast in conjunction with any episode(s) of a series or serial in which the performer does not otherwise perform may be paid on a per-episode basis or a per 13-week basis. The amount payable on the per-episode basis shall be the applicable minimum program fee. The amount payable on the 13-week basis shall be the following rate per performer for each 13-week period during which such broadcasts occur:

| | | |
|---|---|---|
| Actors | $278.50 | per performer |
| Solo/Duo | 139.25 | per performer |
| Singers: Group 3-8 | 83.50 | per performer |
| Singers: Group 9 or more | 66.75 | per performer |

The above rates include unlimited multiple tracking and/or sweetening.

8.    PROGRAM AND REHEARSAL FEES, SINGERS

Program Length
5 Min. or less    (Includes 1st hour. of rehearsal)

| | Broadcast Fee 11/16/94 | Broadcast Fee 5/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 5/14/96 | Rebroadcast Fee 11/16/96 | Rehearsal rate per Person Additional Qtr. Hr. or part thereof |
|---|---|---|---|---|---|---|---|
| Soloists | $80.00 | $84.00 | $88.00 | $27.00 | $28.00 | $30.00 | $2.50 |
| Group of 2,3,4 | 61.00 | 64.00 | 67.00 | 17.00 | 18.00 | 19.00 | 2.00 |
| Group of 5 | 53.00 | 56.00 | 58.00 | 16.00 | 17.00 | 18.00 | 2.00 |
| Group of 6 | 50.00 | 52.50 | 55.00 | 16.00 | 17.00 | 18.00 | 2.00 |
| Group of 7 | 41.00 | 43.00 | 45.00 | 15.00 | 16.00 | 17.00 | 2.00 |
| Group of 8 | 39.00 | 41.00 | 43.00 | 15.00 | 16.00 | 17.00 | 2.00 |
| Group of 9 | 38.00 | 40.00 | 42.00 | 14.00 | 15.00 | 15.00 | 1.50 |
| Group of 10 | 36.00 | 38.00 | 40.00 | 14.00 | 15.00 | 15.00 | 1.50 |
| Group of 11 | 35.00 | 37.00 | 39.00 | 14.00 | 15.00 | 15.00 | 1.50 |
| Group of 12 | 34.00 | 36.00 | 37.00 | 14.00 | 15.00 | 15.00 | 1.50 |
| Group of 13 | 33.00 | 35.00 | 36.00 | 14.00 | 15.00 | 15.00 | 1.50 |
| Group of 14 or more | 33.00 | 35.00 | 36.00 | 13.00 | 14.00 | 14.00 | 1.50 |

7

## Over 5 to 15 minutes

| | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 6/14/96 | Rebroadcast Fee 11/16/96 | Rehearsal rate per person First Hr. Required | Rehearsal rate per Person Additional Qtr. Hr. or part thereof |
|---|---|---|---|---|---|---|---|---|
| Soloists | $105.00 | $111.00 | $117.00 | $39.00 | $41.00 | $43.00 | $10.00 | $2.50 |
| Group of 2,3,4 | 78.00 | 82.00 | 86.00 | 27.00 | 28.00 | 30.00 | 8.00 | 2.00 |
| Group of 5 | 68.00 | 71.00 | 75.00 | 25.00 | 26.00 | 28.00 | 8.00 | 2.00 |
| Group of 6 | 62.00 | 65.00 | 68.00 | 24.00 | 25.00 | 26.00 | 8.00 | 2.00 |
| Group of 7 | 51.00 | 54.00 | 56.00 | 23.00 | 24.00 | 25.00 | 8.00 | 2.00 |
| Group of 8 | 48.00 | 50.00 | 53.00 | 22.00 | 23.00 | 24.00 | 8.00 | 2.00 |
| Group of 9 | 44.00 | 46.00 | 49.00 | 21.00 | 22.00 | 23.00 | 6.00 | 1.50 |
| Group of 10 | 43.00 | 45.00 | 47.00 | 21.00 | 22.00 | 23.00 | 6.00 | 1.50 |
| Group of 11 | 41.00 | 43.00 | 45.00 | 21.00 | 22.00 | 23.00 | 6.00 | 1.50 |
| Group of 12 | 39.00 | 41.00 | 43.00 | 20.00 | 21.00 | 22.00 | 6.00 | 1.50 |
| Group of 13 | 39.00 | 41.00 | 43.00 | 20.00 | 21.00 | 22.00 | 6.00 | 1.50 |
| Group of 14 or more | 37.00 | 39.00 | 41.00 | 20.00 | 21.00 | 22.00 | 6.00 | 1.50 |

## Over 15 to 30 minutes

| | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 6/14/96 | Rebroadcast Fee 11/16/96 | Rehearsal rate per person First Hour Required | Rehearsal rate per Person Additional Qtr. Hr. or part thereof |
|---|---|---|---|---|---|---|---|---|
| Soloists | $129.00 | $135.00 | $142.00 | $45.00 | $47.00 | $50.00 | $10.00 | $2.50 |
| Group of 2,3,4 | 91.00 | 96.00 | 100.00 | 33.00 | 35.00 | 36.00 | 8.00 | 2.00 |
| Group of 5 | 80.00 | 84.00 | 88.00 | 28.00 | 29.00 | 31.00 | 8.00 | 2.00 |
| Group of 6 | 75.00 | 79.00 | 83.00 | 28.00 | 29.00 | 31.00 | 8.00 | 2.00 |
| Group of 7 | 60.00 | 63.00 | 66.00 | 26.00 | 27.00 | 29.00 | 8.00 | 2.00 |
| Group of 8 | 57.00 | 60.00 | 63.00 | 25.00 | 26.00 | 28.00 | 8.00 | 2.00 |
| Group of 9 | 54.00 | 57.00 | 60.00 | 24.00 | 25.00 | 26.00 | 8.00 | 2.00 |
| Group of 10 | 50.50 | 53.00 | 56.00 | 24.00 | 25.00 | 26.00 | 6.00 | 1.50 |
| Group of 11 | 48.00 | 50.00 | 53.00 | 22.00 | 23.00 | 24.00 | 6.00 | 1.50 |
| Group of 12 | 45.00 | 47.00 | 50.00 | 22.00 | 23.00 | 24.00 | 6.00 | 1.50 |
| Group of 13 | 43.00 | 45.00 | 47.00 | 21.00 | 22.00 | 23.00 | 6.00 | 1.50 |
| Group of 14 or more | 42.00 | 44.00 | 46.00 | 20.00 | 21.00 | 22.00 | 6.00 | 1.50 |

## Over 30 to 45 minutes

| | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 6/14/96 | Rebroadcast Fee 11/16/96 | Rehearsal rate per person First Hour Required | Rehearsal rate per Person Additional Qtr. Hr. or part thereof |
|---|---|---|---|---|---|---|---|---|
| Soloists | $158.00 | $166.00 | $174.00 | $53.00 | $56.00 | $58.00 | $10.00 | $2.50 |
| Group of 2,3,4 | 105.00 | 110.00 | 116.00 | 37.00 | 39.00 | 41.00 | 8.00 | 2.00 |
| Group of 5 | 93.00 | 98.00 | 103.00 | 33.00 | 35.00 | 36.00 | 8.00 | 2.00 |
| Group of 6 | 85.00 | 89.00 | 94.00 | 32.00 | 34.00 | 35.00 | 8.00 | 2.00 |
| Group of 7 | 69.00 | 72.00 | 76.00 | 30.00 | 31.50 | 33.00 | 8.00 | 2.00 |
| Group of 8 | 65.00 | 68.00 | 72.00 | 28.00 | 29.00 | 31.00 | 8.00 | 2.00 |
| Group of 9 | 61.00 | 64.00 | 67.00 | 28.00 | 29.00 | 31.00 | 6.00 | 1.50 |
| Group of 10 | 58.00 | 61.00 | 64.00 | 26.00 | 27.00 | 29.00 | 6.00 | 1.50 |
| Group of 11 | 55.00 | 58.00 | 61.00 | 25.00 | 26.00 | 28.00 | 6.00 | 1.50 |
| Group of 12 | 54.00 | 57.00 | 60.00 | 24.00 | 25.00 | 26.00 | 6.00 | 1.50 |
| Group of 13 | 49.00 | 51.00 | 54.00 | 24.00 | 25.00 | 26.00 | 6.00 | 1.50 |
| Group of 14 or more | 47.00 | 49.00 | 52.00 | 24.00 | 25.00 | 26.00 | 6.00 | 1.50 |

## Over 45 to 60 minutes

| | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 6/14/96 | Rebroadcast Fee 11/16/96 | Rehearsal rate per person First Hour Required | Rehearsal rate per Person Additional Qtr. Hr. or part thereof |
|---|---|---|---|---|---|---|---|---|
| Soloists | $183.00 | $192.00 | $202.00 | $59.00 | $62.00 | $65.00 | $10.00 | $2.50 |
| Group of 2,3,4 | 118.00 | 124.00 | 130.00 | 42.00 | 44.00 | 46.00 | 8.00 | 2.00 |
| Group of 5 | 106.00 | 111.00 | 117.00 | 37.00 | 39.00 | 41.00 | 8.00 | 2.00 |
| Group of 6 | 98.00 | 103.00 | 108.00 | 36.00 | 38.00 | 40.00 | 8.00 | 2.00 |
| Group of 7 | 79.00 | 83.00 | 87.00 | 34.00 | 36.00 | 37.00 | 8.00 | 2.00 |
| Group of 8 | 74.00 | 78.00 | 82.00 | 33.00 | 35.00 | 36.00 | 8.00 | 2.00 |
| Group of 9 | 69.00 | 72.00 | 76.00 | 32.00 | 34.00 | 35.00 | 6.00 | 1.50 |
| Group of 10 | 65.00 | 68.00 | 72.00 | 29.00 | 30.00 | 32.00 | 6.00 | 1.50 |
| Group of 11 | 65.00 | 68.00 | 72.00 | 28.00 | 29.00 | 31.00 | 6.00 | 1.50 |
| Group of 12 | 58.00 | 61.00 | 64.00 | 28.00 | 29.00 | 31.00 | 6.00 | 1.50 |
| Group of 13 | 55.00 | 58.00 | 61.00 | 27.00 | 28.00 | 30.00 | 6.00 | 1.50 |
| Group of 14 or more | 53.00 | 56.00 | 58.00 | 27.00 | 28.00 | 30.00 | 6.00 | 1.50 |

q

1994-97 Radio Code

*Multiple Performances - One Calendar Week*

When a singer is engaged for multiple performances in one calendar week in the same show, the Producer may apply a non-cumulative discount to the program fee applicable to the number of performances per week, to the extent shown in the following schedules provided that the program utilizes the services of more than one performer, which shall include one or more actors or singers:

| Programs of 15 minutes in length Number of Performances Per Week | Discount | Programs over 15 minutes in length Number of Performances Per Week | Discount |
|---|---|---|---|
| 4 | 5% | 3 | 5% |
| 5 | 10% | 4 | 5% |
| | | 5 | 10% |

**9.    DEFINITION OF REHEARSAL**

All "called" rehearsals to be paid for at applicable rehearsal rates. However, soloists and groups of 2 to 6 inclusive will be permitted to prepare their own material for their own mutual benefit and at their own convenience and only with the person or persons responsible for coaching, accompanying or arranging for them and not in conjunction with any other act or orchestra without payment of an additional rehearsal fee.

**10.    PROGRAM AUDITIONS FOR SINGERS**

Program auditions shall be paid for at one-half the broadcast fee. Rehearsal time for auditions shall be paid for at the full rate specified for regular broadcasts. This compensation is for program auditions; individual and group voice tests may be made without compensation, but the producer shall not use this privilege unreasonably.

**11.    SPECIAL MINIMUM WORKING CONDITIONS FOR SINGERS**

(a)    Any performance must begin within twenty-four (24) hours of the original to be considered a re-broadcast; otherwise, first performance fee prevails.

(b)    No rehearsal shall be considered as less than one (1) hour in duration except such rehearsal as is called immediately before or after performance. However, a singer may be required to stand by fifteen (15) minutes before a performance without payment of rehearsal fee, but there shall be no rehearsal during the said stand-by period.

(c)    There must be a rest period of five (5) minutes each hour in rehearsals of more than one (1) hour in duration.

(d)    On written guaranteed continuous thirteen (13) weeks' non-cancelable engagements of singers for shows of fifteen (15) minutes or longer, a discount from scale of ten (10) percent of the basic scale is allowed.

**12.    SIGNATURE NUMBERS**

Signature numbers shall be at the rate of $23.00 per person for the broadcast and $11.50 per person for the re-broadcast, with dress rehearsal included. Exceptional situations such as traveling on the road will be met by waivers under Paragraph 74 of the Rules.

13. **INCIDENTAL SINGING BACKGROUND**

When incidental background singing is used in a dramatic production, and a singer or singers are engaged to create this atmosphere, the producer may apply for a waiver to pay such performer the applicable actor's rate and AFTRA, in its discretion, may grant the producer the right to pay such rate.

14. **NOTICE ON GROUP SINGERS**

Any individual member (not under contract) of a singing group who has appeared on six (6) or more consecutive programs shall receive at least two weeks' notice of discharge except for cause. However, any member who auditions for a program as a member of a group shall, in the event that said group is accepted for the program, be considered to be a member of said group and may not be discharged without justifiable cause without AFTRA's consent as long as the group remains on said program or for a period of thirteen (13) weeks, whichever is less.

15. **CONTRACTOR FOR GROUP SINGERS**

(a)    When any member of a singing group of six (6) or more is requested to give any additional services, such as contacting singers, arranging for auditions, arranging rehearsals, or any other similar or supervisory duties, such person shall be paid at least twice the full applicable minimum fee.

(b)    If there is a choral director on the program, a member of the singing group shall be assigned as contractor and such person shall be paid at least 125% of the full applicable minimum fee if a member of a group of 3 to 5, and 135% of the full applicable minimum fee if a member of a group of 6 or more. In the absence of a contractor or leader, one member of each singing group shall be deputized by the singers to act as their deputy. All requests from the Producer, or Producer's authorized representative, relating to any matters governed by this Code shall be made through the singers' deputy. It shall be the deputy's responsibility to request a five-minute rest period each hour in rehearsals of more than one (1) hour in duration.

(c)    For every singing group of nine (9) or more, there shall be a contractor who shall perform any service commonly associated with the services of a contractor and shall be paid $25 in excess of scale.

16. **SINGERS - MULTIPLE TRACKING AND SWEETENING**

*"Multiple tracking"* refers to singing the same part two or more times where separate sound tracks are recorded and a composite is made of separate renditions.

*"Sweetening"* refers to singing different parts or notes recorded at different times where separate sound tracks are made and a composite is made of separate renditions.

For broadcast of multiple tracking and/or sweetening on a program, a singer shall be entitled to a single payment equal to:

(1)    33-1/3% of the applicable minimum program fee, which constitutes payment for unlimited multiple tracking, or

(2)    66-2/3% of the applicable minimum program fee, which constitutes payment for unlimited sweetening and unlimited tracking.

No such payment shall be required for:

(a)    mechanical over-dubbing where the broadcast includes no composite of separate renditions by the same singer, or

(b)    guide tracks used only for rehearsal and not for broadcast, or

(c)    multiple tracking and sweetening for rehearsal only, where there is no broadcast of any composite of separate renditions by the same singer.


## ANNOUNCERS

17.    **PROGRAM FEES**

| Program Length | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Broadcast Fee 11/16/96 | Rebroadcast Fee 11/16/94 | Rebroadcast Fee 6/14/96 | Rebroadcast Fee 11/16/96 |
|---|---|---|---|---|---|---|
| 15 min. or less | $45.00 | $47.00 | $50.00 | $30.00 | $31.50 | $33.00 |
| Over 15 to 30 min. | 75.00 | 79.00 | 83.00 | 38.00 | 40.00 | 42.00 |
| Over 30 to 60 min. | 106.00 | 111.00 | 117.00 | 53.00 | 56.00 | 58.00 |

*Rates for Programs in Excess of One Hour*: In all programs of more than one hour in length, the applicable one-hour rate plus, for each half-hour or part thereof over and above one hour, a sum equal to the difference between the applicable hour rate and the applicable half-hour rate.

*Rehearsal*: $10.00 per hour, first hour required; after first hour, rehearsal may be computed and paid in half-hour periods at the rate of $5.00 per half-hour or part thereof. Rehearsals for programs in excess of fifteen (15) minutes may be held in two sessions, each session to be computed and paid for as a separate unit and no such session shall be computed as less than one (1) hour. Individual compensation shall be based on the time contracted for, but additional rehearsal time may be requested and if agreed to, paid for.

18.    **MULTIPLE PERFORMANCES · ONE CALENDAR WEEK**

When an announcer is engaged for multiple performances in one calendar week in the same show, the Producer may apply a non-cumulative discount to the program fee applicable to the number of performances per week, to the extent shown in the following schedules provided that the program utilizes the services of more than one performer, which shall include one or more actors and singers:

Programs of 15 minutes in length

| Number of Performances Per Week | Discount |
|---|---|
| 4 | 5% |
| 5 | 10% |

Programs over 15 minutes in length

| Number of Performances Per Week | Discount |
|---|---|
| 3 | 5% |
| 4 | 5% |
| 5 | 10% |

19.  **13-WEEK GUARANTEED TERMS**

(a)  When announcer is engaged for a commercial program for guaranteed terms of not less than thirteen (13) weeks, on 15 minute programs broadcast five (5) times or more a week, the following minimum weekly compensation may be provided:

<u>Minimum Weekly Compensation-Broadcast Fee</u>

| Times Per Week | 11/16/94 | 6/14/96 | 11/16/96 |
|---|---|---|---|
| 5 | $254.00 | $267.00 | $280.00 |
| 6 | 295.00 | 310.00 | 325.00 |

<u>Minimum Weekly Compensation - Re-broadcast Fee</u>

| Times Per Week | 11/16/94 | 6/14/96 | 11/16/96 |
|---|---|---|---|
| 5 | $124.00 | $130.00 | $137.00 |
| 6 | 142.00 | 149.00 | 157.00 |

In such cases of guaranteed term engagements at the weekly rate, 45 minute rehearsal time per day is included.

(b)  On written guaranteed continuous thirteen weeks' non-cancelable engagements of announcers for shows of a half-hour or longer, a discount from scale of ten percent of the basic scale is allowed.

20.  **NETWORK COMMERCIAL CUT-IN ANNOUNCEMENTS**

Network commercial cut-in announcements shall be paid at the rate of $18.75 for each such announcement.

Cut-ins are those announcements inserted on a network program but which are released to a lesser portion of the network but consisting of more than one (1) station (except that in New York the rate shall apply to a single station). The term "cut-ins" in this Paragraph 20 does not apply to news "cut-ins" under Paragraph 23.

21.  **HITCHHIKE ANNOUNCEMENTS AND COWCATCHER ANNOUNCEMENTS**

Shall be paid at the rate of $19.00 for each such announcement on a 15 minute program; $26.00 for each such announcement on a half-hour program; $32.35 for each such announcement on a one hour program. In the event more than one announcement is made on a program, the announcer shall be paid at the specified rate for each such announcement or at the basic announcer's minimum program and rehearsal rate, whichever is lower.

22.  **PROGRAM AUDITIONS**

Shall be paid for at one-half the broadcast fee. Rehearsal time for auditions shall be paid for at the full rate specified for regular broadcasts. Voice tests may be had without compensation.

23.    **SPECIAL PROVISIONS**

*ANNOUNCERS*

(a)    When a prior recording is made in connection with a five (5) times a week live broadcast, the fee for five (5) such recordings shall be $132.00 ($139.00 effective 6/14/96; $146.00 effective 11/16/96).

(b)    The 45-minute rehearsal allowed for each of five (5) broadcasts may be computed as 225 minutes to be used by producer as desired within five days. If producer desires, he may use such rehearsal time for prior recordings and announcer agrees to allow fifteen (15) minute rehearsal for each live broadcast. These conditions apply only in connection with thirteen (13) week non-cancelable contracts.

*ANNOUNCERS AND NEWS REPORTERS*

(c)    News broadcasts:

(i)    On network news broadcasts, the rate for the announcer or reporter who delivers the news shall be as follows:

| Program Length | Broadcast Fee 11/16/94 | Broadcast Fee 6/14/96 | Re-Broadcast Fee 11/16/94 | Re-Broadcast Fee 6/14/96 |
|---|---|---|---|---|
| 5 min. or less | $69.00 | $72.00 | $32.00 | $34.00 |
| Over 5 to 10 min. | 74.00 | 78.00 | 37.00 | 39.00 |
| Over 10 to 15 min. | 75.00 | 79.00 | 40.00 | 42.00 |
| Over 15 to 30 min | 93.00 | 98.00 | 54.00 | 57.00 |
| Over 30 to 45 min. | 122.00 | 128.00 | 57.00 | 60.00 |
| Over 60 to 90 min. | 151.00 | 159.00 | 69.00 | 72.00 |
| Over 90 to 120 min | 181.00 | 190.00 | 84.00 | 88.00 |

(ii)    On five (5) minute local news broadcasts with not less than two (2) per day, originating in New York City only, the fee for the announcer or news reporter shall be $24.00 ($25.00 effective June 14, 1996) for each such broadcast.

(iii)    The rate for the announcer or news reporter who delivers the news on over 10 to 15-minute local news broadcasts originating in New York City only, shall be $76.00 ($80.00 effective June 14, 1996) for each such broadcast.

(d)    The rate for announcers or news reporters on local programs of five minutes or less in length broadcast over any one major station in New York City shall be $33.00 ($35.00 effective June 14, 1996), per program. Such rate shall not include any rehearsal. In the event rehearsal is required, there shall be a minimum of one half-hour paid for at the rate of $5.75 per hour or part thereof.

(e)    News cut-ins of five minutes or less in length inserted on a network program which are released to one station in New York only shall be paid for at the rate of $31.00 ($33.00 effective June 14, 1996) per person for each such cut-in. For such payment any news cut-in covered by this Paragraph may be used for an unlimited number of broadcasts within 24 hours of the original

broadcast; and for a further payment of $24.00 ($25.00 effective June 14, 1996), or the applicable program rate, whichever is the lesser sum, such news cut-in may be used for an unlimited number of broadcasts for an additional seven (7) days.

(f)    News cut-ins of five (5) minutes or less in length inserted in a local New York news program of any length shall be paid for at the rate of $31.00 ($33.00 effective June 14, 1996) per person for each such cut-in, or the applicable program rate, whichever is the lesser sum. For such number of broadcasts within 24 hours of the original broadcast; and for a further payment of $24.00 ($25.00 effective June 14, 1996) or the applicable program rate, whichever is the lesser sum, such news cut-in may be used for an unlimited number of broadcasts for an additional seven (7) days.

(g)    News cut-ins (originating from New York, Chicago, Hollywood, Los Angeles, San Francisco or Washington, D.C.) of five minutes or less in length broadcast on network news programs of any length shall be paid for at the rate of $46.00 ($47.00 effective September 25, 1995) per person for each such cut-in, or the applicable program rate, whichever is the lesser sum. For such payment any news cut-in covered by this Paragraph may be used for an unlimited number of broadcasts within 24 hours of the original broadcast; and for a further payment of $36.00 ($38.00 effective September 25, 1995), or the applicable program rate, whichever is the lesser sum, such news cut-in may be used for an unlimited number of broadcasts for an additional seven (7) days.

(h)    Except as otherwise provided in subparagraph (i), nothing in this Code shall be construed as requiring the payment by Producer of additional compensation to any person for using an excerpt of five (5) minutes or less from a news program in any other news program.

(i)    News Service:

    (1)    Any person rendering services after December 1, 1967 on behalf of Producer in the field of news of the type covered by this Code, under Paragraph 57, who performs in live or recorded news stories not exceeding five (5) minutes in length which originate within the continental limits of the United States and which are made available by Producer for broadcast on a non-interconnected basis by two or more stations as a part of their local news programs shall be paid by Producer one single payment of $23.00 ($25.25 effective September 25, 1995) for each news story in which such person is heard, up to a maximum of $44.00 ($50.50 effective September 25, 1995) per person for all news stories made available by Producer on any day, provided:

        (i)    such person is employed by Producer in New York, Los Angeles, Chicago, San Francisco or Washington, D.C., and said news story originates from such city or originates from another city within the continental limits of the United States when such person is sent to such other city for the purpose of making such origination; or,

        (ii)    such person's employment is otherwise covered under an AFTRA contract with a station if such contract covers services in the field of news.

    For the payment made pursuant to this subparagraph (1), Producer may allow each local station either or both of the following: (a) an unlimited number of such broadcasts within 48 hours after the news story has first been made available by Producer hereunder; (b) one such broadcast after such 48-hour period but within seven (7) days after the news story has first been made available by Producer.

    (2)    If a news story covered by this subparagraph (1) is broadcast by Producer on a network radio program, payments made for such network broadcast may be credited against any payments due under this paragraph.

(3)  If Producer assigns an announcer to perform introductions, lead-ins, lead-outs and the like for news stories made available for broadcast by local stations, Producer shall not permit any such local station to broadcast under the terms of this subparagraph (1) the voice of such announcer, as distinguished from the voices of the persons heard in such news stories.

(4)  Producer's total obligation for work which is covered only by this paragraph (i) shall be to make the payments specified in this paragraph and the applicable payments to the AFTRA Health and Retirement Funds.

(j)  With respect to news or public special events programs, if the program is two (2) hours or less in length, payment shall be made at the rates provided in this Code for the category of the person performing such services; but if the program is more than two (2) hours in length:

(i)  payment for services on such program shall be made at the two-hour rate plus an additional amount which shall be the subject of individual negotiation, provided that in the case of special events such as political conventions and the like, the said individual negotiation on behalf of the AFTRA member involved may be undertaken by the Local Executive Director of the appropriate AFTRA Local if the AFTRA member involved so desires;

(ii)  payment for services in one or more separate portions of the program shall be made for each separate portion as if it were a complete program, or instead, payment shall be in accordance with subdivision (i) above;

(iii)  payment for services on such program by staff newspersons and staff announcers shall be governed by the provisions of their respective staff agreements.

## 24.  SPORTSCASTERS

Sportscasters and assistant sportscasters (color persons) shall be paid no less than the following rates per event:

(a)  Championship events - Sportscasters $495.00 ($520.00 effective 6/14/96; 546.00 effective 11/16/96), assistant sportscasters $348.00 ($365.00 effective 6/14/96; $384.00 effective 11/16/96). Championship events are designated as follows: *college football* - NCAA Championship game, Rose Bowl, Cotton Bowl, Sugar Bowl, Orange Bowl, Gator Bowl, Fiesta Bowl, Senior Bowl, North-South, Blue-Gray and East-West Shrine games; *professional football* - National Conference and American Conference world championship games, Super Bowl, Pro Bowl and the professional-college All-Star games; *major league baseball* - World Series, League Championship Series, All-Star games; *professional boxing* - World Championship matches in all weight divisions; professional basketball - NCAA Final Four, NBA Championship Series; *professional horse racing* - Kentucky Derby, Belmont Stakes, Preakness; *professional golf* - U.S. Open, Masters Golf Tournament, PGA and LPGA Championships; *professional tennis* - Wimbledon and U.S. Open; professional hockey - NHL Stanley Cup Final Series.

(b)  Major league baseball double-header (other than one scheduled as a result of postponement, which is covered in subparagraph (c) hereof): Sportscasters $399.00 ($419.00 effective 6/14/96; $440.00 effective 11/16/96); assistant sportscaster $286.00 ($300.00 effective 6/14/96; $315.00 effective 11/16/96).

(c)  All other events - Sportscasters $343.00 ($360.00 effective 6/14/96; $378.00 effective 11/16/96); assistant sportscasters $234.00 ($246.00 effective 6/14/96; $258.00 effective 11/16/96). Weekly guarantee: The weekly rate, maximum of seven (7) events pay or play, shall be not less than

$965.00 ($1,013.00 effective 6/14/96; $1,064.00 effective 11/16/96) per week for the play-by-play sportscaster; $618.00 ($649.00 effective 6/14/96; $681.00 effective 11/16/96) per week for the assistant sportscaster (color person). A week means any seven consecutive days.

An event is whatever the daily ticket of admission buys; however, no event covered by subparagraph (a) and (b) hereof shall be included as an event for the purposes of the weekly rate provided in subparagraph (c) hereof.

## GENERAL SCHEDULE OF RULES

25.  **PROGRAMS COVERED BY COLLECTIVE BARGAINING AGREEMENT**

(a)  *Network Programs Originating at Major Centers*: The terms and conditions covered by this agreement are for the engagement of radio artists on commercial "network" broadcast programs produced under the auspices of the Producer, on the "network" facilities of American Broadcasting Companies, Inc. (A Wholly Owned Subsidiary of Capital Cities/ABC, Inc.) and CBS Inc., originating in New York, Chicago, Hollywood, Los Angeles, San Francisco or Washington, D.C. "Network" means two or more stations joined by wire for simultaneous broadcasting. On major stations in New York, the network rate shall apply to a broadcast from one such station except as modified by paragraph 37(b) of this Code. The following stations only are included in the term "major stations" in New York, namely: Stations WCBS, WABC, and WWOR. The rates in the Code do not apply to programs originating in Hollywood, Los Angeles or San Francisco, unless the same are available to stations in other than the eleven western states. Originations from Chicago or Washington, D.C., are only subject to the Code scales on hook-ups of two or more stations including the station of origination. The words "several stations," as used throughout this Code, are clarified and controlled by this paragraph, and no additional obligations are imposed by the addition of the words "several stations".

(b)  *Network Programs Originating Outside of Major Centers*: This Code shall apply to Traveling Shows, as the term is generally understood in the Industry, which normally originate at one of the production centers covered by this Code, regardless of the point of origination of the broadcast. This Code also shall apply to all persons covered by this Code on sports broadcasts produced by a signatory to this Code or to the letters of adherence and broadcast on the "network" regardless of the point of origination of the broadcast.

(c)  When a program is produced or co-produced by a signatory to this Code or to the letters of adherence for broadcast to the network but said program originates at a point other than New York, Chicago, Los Angeles, San Francisco or Washington, D.C., the terms and conditions of this Code (except the provisions of Paragraph 57 hereof when inapplicable under the Labor Management Relations Act, 1947, as amended) shall nevertheless apply to such network program. Excluded from the coverage of the preceding sentence are programs (but not cut-ins or feeds to other programs other than news cut-ins which are governed by the provisions of Paragraph 23 of this Code) in the field of news and public affairs; "remote" originations of events (such as a rodeo or sportscar races) which by their nature feature persons who are not performers within the meaning of this Code and which as a matter of course occur in the locality from which the broadcast originates; religious programs broadcast in connection with observance of particular religious holidays.

AFTRA agrees to consider and grant (when warranted) waivers of the provisions of this subparagraph (c) for network program originations in special circumstances.

26.    **RECORDINGS**

Producer shall have the right, within sixty days of the original broadcast, whether such original broadcast was live or pre-recorded, to broadcast a delayed recording of the original broadcast once and once only in any area where said program was not previously broadcast, without additional payment to the performers on such original broadcast.

27.    **TAPED AND PRE-RECORDED BROADCASTS AND CALL-BACKS**

(a)    Pre-recorded programs shall be treated as live programs hereunder. If a recording session extends beyond the original call, the performers shall receive one and one-half (1-1/2) times the applicable rehearsal rates, in one-half hour segments, for the time spent beyond the original call.

(b)    Subject to their availability, performers may be called back for re-recording of a program or portion thereof within thirty (30) days, provided they are paid one-half the applicable minimum program fee plus a minimum of one hour of rehearsal.

28.    **RE-USE AND RE-PLAY OF RECORDED PROGRAMS**

(a)    Rebroadcast

For a second broadcast of a program in one or more cities in the United States, its territories or possessions, or Canada by tape or recording within twenty-four (24) hours of the original broadcast, performers shall receive not less than the applicable minimum re-broadcast fee provided for in this Code. Such second broadcast within twenty-four (24) hours shall be considered a re-broadcast. Written consent of overscale performers must be obtained.

(b)    Re-play

(i)    Each additional broadcast (other than a re-broadcast covered by paragraph (a) above) in any city in the United States, its territories or possessions, or Canada where the program has previously been broadcast shall be considered a re-play.

(ii)    Producers may re-play any program produced on or after November 16, 1985, provided that the program utilized the services of more than one performer, including one or more actors or singers.

(iii)    Producers may re-play any program produced on or after November 16, 1985, provided that the individual contract of the performer contains a separate provision for additional compensation for re-plays.

(iv)    For all re-plays covered by (ii) and (iii) above, performer shall be paid no less than the following percentages of the applicable basic minimum program fee:

| | |
|---|---|
| For the first re-play | 75% |
| For the second re-play | 50% |
| For the third re-play | 25% |
| For the fourth re-play | 25% |
| For the fifth re-play | 25% |
| For the sixth re-play | 25% |
| For the seventh re-play | 10% |
| For the eighth re-play and each replay thereafter | 5% |

"Applicable basic minimum program fee," as used above, means the basic minimum commercial program fees as contained in the National Code of Fair Practice for Commercial Radio Broadcasting existing at the time of the performance.

(c)    Payment of the applicable fee for the first re-play shall entitle the Producer to broadcast the program once in each city where the program has not previously been re-played. Similarly, payment for the second re-play entitles the Producer to broadcast the program once in each city where the program has previously been re-played not more than once. The same test applies to each additional re-play.

## 29.    ENGAGEMENTS AND DOUBLING

(a)    Performer shall have specific notice of the part to be played, date, time and place of broadcast, time of live re-broadcast, if any, place of rehearsal and rehearsal time, contracted for. An actor is permitted to double one part per performance without additional compensation, provided that no more than two (2) actors may double on programs of 30 minutes or less, and no more than three (3) actors may double on programs of longer than 30 minutes duration. In the event that more than the allowed number of doubles are used, the additional compensation due shall be divided equally among all actors who double on the program pursuant to the preceding sentence. The above limitations of the number of actors who may double without additional compensation shall not apply to a double for a very trivial part involving a very few words which are in the nature of dressing up the script in the order of, "The carriage awaits, sir." AFTRA upon request shall be furnished copies of all scripts containing doubles of this category.

(b)    Multiple doubles are permitted in variety shows, or where the program consists of a series of short different episodes such as, but not being limited to, dramatized news broadcasts, or historical sequences. Participation in group noise shall not be considered a double and is permissible without additional compensation.

## 30.    COMPENSATION

(a)    Performer shall be paid not less than the minimum fee applicable in legal tender and not later than ten (10) calendar days after the time specified for broadcast, or in the case of a pre-recorded program, after final rendition of physical services. The minimum fees shall be net to the performer and no deductions whatever may be made therefrom (except for such taxes and withholdings as are required by law). No term or provision of this Code may be waived by any performer without the prior written consent of AFTRA, but nothing in this Code shall prevent any performer from agreeing to any terms and/or conditions more favorable to such performer than those specified herein.

(b)    Penalty for Late Payment

In the event Producer fails to make timely payment, as provided in the preceding subparagraph (a), the following cumulative penalty payments shall be added to the compensation due and payable to the performer for each day (beginning with the day following the date of default) on which payment remains not made or received:

$1.50 for each of the first 5 days, and
$2.50 for each day thereafter

up to a maximum penalty payment of $25 (12 days); provided, however, that Saturdays, Sundays and legal holidays which Producer observes shall not be computed as penalty days, and further provided that the penalty shall not be invoked or payable when the performer is at fault for failure to furnish his W-4 form or when the performer, having been furnished an engagement contract

on or before show day, fails to return the signed contract promptly, or when there is a bona fide dispute as to compensation.

(c)    Promotional Announcements

A featured performer employed under at least a thirteen week contract may, with his/her consent, make live or recorded promotional announcements without additional fee promoting programs on which he/she is engaged, provided that he/she is identifiable on such announcements. For local New York programs only, a featured performer employed under at least a thirteen week contract, which is in excess of scale, may, with his/her consent, make live or recorded promotional announcements without additional fee.

(d)    Promotional Announcements (Other Than Singers)

When a performer is engaged to perform services in a program promotional announcement (i.e., a non-commercial announcement promoting one or more programs or series) the fee shall be $139.25 for the recording and not more than thirteen weeks of use on the network and on network owned-and-operated local stations and on network affiliated stations. In the event that a program produced under this Code is released in syndication, such fee shall cover not more than thirteen weeks of use on each station to which such program is released. Any other use shall be paid for pursuant to the provisions of the applicable AFTRA Code or Contract.

(e)    Promotional Announcements (Singers)

When a singer is engaged to perform services in a program promotional announcement (i.e., a non-commercial announcement promoting one or more programs or series), the fee shall be as set forth below for the recording, including unlimited tracking and/or sweetening, and not more than thirteen weeks of use on the network, and on network owned-and-operated local stations and on network affiliated stations:

| Singers: | Solo/Duo | $ 139.25 | per performer |
|----------|----------|----------|---------------|
|          | Group 3-8 | $ 83.50 | per performer |
|          | Group 9 or more | $ 66.75 | per performer |

In the event that a program produced under this Code is released in syndication, such fee shall cover not more than thirteen weeks of use on each station to which such program is released. Any other use shall be paid for pursuant to the provisions of the applicable AFTRA Code or Contract.

(f)    Public Service Announcements

(i)    When a performer or singer is engaged to perform services on network or syndicated public service announcements the fees and use provisions shall be those stated in sub-paragraphs 30 (d) and (e).

(ii)   A featured performer employed under at least a thirteen week contract, which is in excess of scale, may, with his/her consent, make live or recorded public service announcements without additional fee, provided each such public service announcement is not longer than three minutes in length.

## 31.    DEDUCTIONS FOR SOCIAL SECURITY AND WITHHOLDING TAXES

Social Security and withholding taxes shall be deducted from all employees covered by this Code regardless of whether they are part time or full time, staff or freelance employees.

32.  **DISABILITY INSURANCE**

In states which have state disability insurance laws requiring deductions, such deductions shall be noted on the checks or statements given to the performer. The check or statement should also include the employer's name or registration number in those states where unemployment insurance laws require that such information be given to the employee by the employer.

33.  **NOTICE**

On all regularly scheduled programs, such as serials, strip shows and the like, the artist shall be given not less than five (5) days' notice of the broadcast for which he is engaged. In the event an artist (who has performed the same role for five (5) consecutive programs on which the role was written in immediately preceding the day for which he was called on less than five (5) days' notice), accepts another engagement, and the Producer engages a substitute to perform in such role because of the unavailability of the original artist to perform, then in such case the artist originally performing such role may not be replaced in the role for the next ensuing four (4) weeks during which the role is written in the script.

Where and only where the call is given to artists on strip shows as herein provided, and subsequently a proper notice of cancellation is given as provided in Paragraph 38 (General Schedule of Rules) of the Code, the artists shall not be paid for such cancelled broadcast. If as a result of any such cancellation, it is necessary to reschedule scripts in their original sequence, the artists affected by such rescheduling shall receive compensation only for such of the programs for which the artists were originally scheduled and for which they are available, ready and willing to perform, or on which they perform. Of course, where the artists' individual contracts or the Code itself contain provisions more favorable to the artists than the foregoing, such more favorable provisions shall govern.

On all regularly scheduled programs, such as serials, strip shows and the like, artists having running parts, or who are required to hold themselves available for such programs, and who have been employed for at least one year, shall be entitled to two consecutive weeks' specified vacation without pay each year. Such artists may be required to pre-record any programs which require their services for broadcast during the vacation period.

34.  **PRODUCTION PROSECUTED**

In the event that the program for which the performer is engaged is complained of and any prosecution, civil or criminal, private or governmental, shall follow, Producer agrees at his expense to defend the performer and to pay all charges and judgments so incurred. This paragraph does not apply to a case where the prosecution is in respect of material furnished by the performer or acts done by the performer without the authorization of the Producer. There shall be no distinction made between live and pre-recorded programs for purposes of the application of this paragraph.

35.  **REHEARSAL SESSIONS**

Rehearsal sessions for 15-minute programs, 30-minute programs and 60-minute programs shall be held in not more than 1, 2 and 3 sessions respectively, except that an additional session may be held in each case where a 15-minute program has been rehearsed in one session of three (3) or more hours, where a 30-minute program has been rehearsed in two (2) sessions totaling eight (8) or more hours, and where a 60-minute program has been rehearsed in three sessions totaling ten (10) or more hours. This does not alter the fact that whenever an actor or singer is called for rehearsal, he gets a minimum of one hour's rehearsal pay, except as in the Code otherwise provided. AFTRA agrees that after there are three (3) or more consecutive hours of rehearsal during one session, a meal period of not more than one (1) hour may be granted without pay provided such meal period is given during the normal meal time and is followed by not less than one hour's rehearsal or by not less than one-half hour's rehearsal immediately preceding the broadcast.

36.  **VOICE TESTS**

Participation in a voice test by an artist already engaged for the program shall be deemed to be rehearsal for that artist.

37.  **RATES**

(a)  *Rate is Per Person*:  All rates in the Code are per person and not per group.

(b)  *Local New York Rates for Actors and Singers*:  The program rates for actors and singers may be discounted by 33-1/3% for local programs broadcast over any one major New York station (to wit, WABC and WCBS), and not connected or hooked up with any other station and not broadcast over any network.  This discount applies only (a) to the Code rates for actors and singers, and not to any other categories; (b) to "program" rates, and not to extra rehearsal rates, commercials, or to any other items or money figures in this Code.

38.  **CANCELLED PROGRAM**

When the entire program is cancelled, the performer shall, nevertheless, be paid in full for all contracted time as specified in this agreement, unless he shall have been notified in writing of the cancellation at least 24 hours in advance of the first scheduled call for rehearsal.

39.  **POSTPONED PROGRAM**

If a postponed program involves a change in the call of the performer to another broadcast day, the producer of such program shall not be required to pay a performer for such postponement provided: (1) the performer has been given notice of the postponement at least 48 hours prior to the time of the performer's scheduled call; and (2) the performer is notified within fourteen (14) business days from the notice of postponement of the date to which the performance is to be rescheduled.  In the event that a program is postponed to a later hour of the same broadcast day (such change not having been made known to the artist 24 hours in advance), then the hours intervening between the originally scheduled time for the performance and the time of the actual performance shall be considered rehearsal time.  In the event that such call for postponement conflicts with performer's bona fide prior professional commitments, the original call shall be considered as a cancelled individual engagement for which he/she shall be paid pursuant to Paragraph 40.  However, in the event that the performer declines to perform on the rescheduled date for reasons other than a bona fide prior professional engagement, the producer shall be relieved of an obligation to pay the performer for the postponed program.  The performer must notify the producer of his/her decision not to perform on the rescheduled date or his/her bona fide prior professional engagement at the time he/she is notified of the rescheduled performance date.  Subject to the above provisions the change of a performance from a live to pre-recorded basis shall not be deemed to be a cancelled program.  If a program is postponed more than once, payment to the performer must be made pursuant to Paragraph 40.

40.  **CANCELLED INDIVIDUAL ENGAGEMENTS**

In the event the performer's engagement for the program is cancelled, Producer agrees, nevertheless, to pay the performer in full for all contracted time, as herein specified, except where cancellation is for gross insubordination or misconduct.  Producer agrees that after the engagement is made, the risk of performer's incompetence is assumed by him.

**41.  CANCELLATION BY ARTIST**

Every artist under written contract (by way of option or otherwise) for more than 26 weeks, whose weekly compensation under such contract is at the minimum rates provided for in this Code, shall have the right to cancel his/her contract at the end of every 26-week period of his/her contract, upon 35 days' prior written notice, unless his/her individual contract gives him/her, a more favorable cancellation right.

**42.  ADMISSION TO PREMISES**

Any representative of AFTRA shall be admitted to the premises of the Producer or where the rehearsal or broadcast takes place, at any reasonable time, to check the performance by the Producer of this Code; but such checking shall be done so as not to interfere with the conduct of the Producer's business. Producer agrees, upon AFTRA's request, to furnish a list of all artists appearing on any program.

**43.  PRODUCTION MEMORANDUM**

Producer agrees to furnish AFTRA with a production memorandum for each individual program signed by an authorized agent of the Producer. The production memorandum shall give full and specific information, sufficient to permit computation of performer's fee, with respect to the services rendered by the performer and the gross fees paid. Such information shall be furnished when timely in standard-form reports which will be promulgated by AFTRA by agreement with representatives of the Broadcasting Industry. Said memorandum shall be filed with AFTRA within five days after the time required for payment to the performer and no later.

**44.  COMPENSATION FOR TRAVELING**

When the Producer requests any artist who is engaged at aggregate broadcast fees of less than $115 per day (and the artist consents thereto) to travel more than 20 miles from the broadcasting centers of New York, Chicago, Hollywood, San Francisco or Washington, D.C., or beyond the city limits of New York, Chicago or San Francisco, whichever is greater, the Producer shall furnish first class transportation, shall pay reasonable living expenses and shall pay, in addition to the fee, $28.75 per full day for such required absence, and if the total time of such absence is less than 24 hours, the Producer shall pay for each hour at the rate of $2.40, but not in excess of $28.75; provided, however, that if the actual period includes time between midnight and 8 a.m., these hours shall be deducted from the total elapsed time of such absence, if first-class sleeping accommodations are furnished. Paid rehearsal and performance time shall not be included in the computation where the total elapsed time is less than 24 hours. The broadcasting center in New York City shall be Times Square, in Chicago shall be the Loop, in Hollywood shall be Hollywood and Vine, in San Francisco shall be Taylor and O'Farrell Streets, and in Washington, D.C. shall be the Capitol.

It is recognized that there are many variations of the above situation which may arise in connection with traveling and it is understood that in such cases of variation, Producer and the artist, with AFTRA's consent, will determine a fair amount of traveling compensation in the spirit of the above and Producer will pay such amount.

In the event of air travel, coach or economy class on jet or turbo-prop airplanes of regularly-scheduled airlines shall be considered first class transportation, provided that no employee of the Producer represented by any other craft, guild or union is furnished a higher class of air transportation on the same assignment. However, the proviso of the preceding sentence shall be inapplicable in those cases in which the employee was furnished such higher class air transportation by virtue of an existing collective bargaining agreement which has not expired or been renegotiated by the Producer subsequent to the negotiation of this Code.

When a performer travels at the request of the Producer in connection with an assignment to perform services for the Producer on a program (including tours and personal appearance for purposes of program promotion), anywhere inside or outside the continental limits of the United States, the Producers shall

provide (at Producer's own cost) a $200,000 accidental death or dismemberment insurance policy covering the performer for such travel for the benefit of the performer or such beneficiary as the performer may designate.

**45.   COSTUME AND DRESS MAINTENANCE FEE**

When Producer requires a specified costume, other than evening clothes to be worn by artists on the program, such costume shall be furnished by the Producer at his expense. When Producer requires artists on the program to wear evening clothes, which they furnish, he/she shall pay a minimum fee of $15.00 to artists (male or female) and this fee shall include the original broadcast and repeat provided both are performed on the same day.

**46.   EXTRAS AND SUPERNUMERARIES**

Extras and supernumeraries who do not speak individual lines shall be paid not less than $14.00 ( $15.00 effective 6/14/96) for the program and $9.00 ($10.00 effective 11/16/96) for re-broadcast. The program and re-broadcast fee shall include only two hours of rehearsal, with overtime at $3.00 (for the term of the agreement) per hour for additional rehearsal.

**47.   REHEARSAL FOR RE-BROADCAST**

The re-broadcast fee on 15-minute shows include a 15-minute dress rehearsal immediately preceding re-broadcast. This applies both to actors and announcers.

**48.   DRAMATIC SIGNATURES**

Signature voices on dramatic shows shall be paid a minimum of $94.00 ( $99.00 effective 6/14/96; $104.00 effective 11/16/96) for five programs a week and $23.00 ($24.00 effective 6/14/96; $25.00 effective 11/16/96) for the re-broadcasts; $19.00 ($20.00 effective 6/14/96; $21.00 effective 11/16/96) for single broadcast and $4.00 ($4.50 effective 11/1/6/96) for re-broadcast; and 15 minute rehearsal and dress rehearsal included.

**49.   WARM-UPS AND AFTER-SHOWS**

Performers not engaged for broadcast shall be paid not less than $31.00 on warm-ups and/or after-shows. Performers engaged for the broadcast who are also engaged for an after-show shall be paid not less than $31.00, but the time for the after-show shall not be treated as rehearsal time. "After-show" is defined as planned entertainment immediately following broadcast. "Warm-up" is defined as planned entertainment immediately preceding broadcast.

**50.   AUDIENCE PARTICIPATION**

Audience participation is excepted, but it is the intention of the Producer not to abuse this right.

**51.   CHILDREN'S PROGRAMS**

The Producer, agents and production personnel shall be required to arrange that calls for school-age children on public school days for auditions, interviews, etc. shall be after 3:00 p.m., except for actual employment. Children on adult programs shall receive the minimum applicable fee for adults. Special children's programs where more than 75% of the cast are children come within the provisions of the waiver clause and shall be so treated.

Producer agrees to cooperate with AFTRA in an effort to secure a more efficient handling of the issuance of working permits for children from the New York Society for the Prevention of Cruelty to Children and the Mayor's office of the City of New York.

Producer acknowledges that it is bound by applicable law concerning the employment of minors.

## 52.  NAME CREDITS

There shall be identifiable billing for all leads and the announcer, and credits for all major parts on each broadcast, provided that on 15-minute programs such billing need not be given more than once weekly. In the event of unavoidable contingencies occurring during the broadcast, Producer reserves the right to delete such billing, subject to AFTRA's right to arbitrate if in AFTRA's opinion the contingency did not warrant the deletion.

## 53.  (a)  SEGMENTED PROGRAMS

With the exception of those programs referred to in a separate letter agreement, and dramatic programs, performers employed on segmented programs will be paid the applicable commercial fee for each sponsored segment on which they appear and, in addition, if they appear on a sustaining segment the sustaining fee applicable to the overall length of the sustaining portion of the program; however, in no event will a performer be paid more than the commercial fee applicable to the entire program.

When a performer is paid in accordance with the provisions of this sub-paragraph, with respect to any program of more than two hours in length in which the performer's live appearances are separated by two or more hours, the performer shall receive a minimum payment of a sixty-minute program fee.

### (b)  PARTICIPATING PROGRAMS

On non-segmented participating programs, of thirty minutes or more in length, other than dramatic programs, performers shall be paid upon the basis of the length of the portion of the program, measured in 15-minute units, in which the performer appears, and payment shall be the rate for each 15-minute unit in which he appears, or the commercial fee applicable to the over-all length of the program, whichever is less; provided, however, that if there is even one commercial announcement during the program, or any portion or time of the program is sponsored, the program shall be considered commercial in its entirety, and payment to the performer for each unit of 15 minutes in which he performs shall be at the commercial rate even though that particular 15-minute portion of the program is broadcast on a sustaining basis.

When a performer is paid in accordance with the provisions of this sub-paragraph, with respect to any program of more than two hours in length in which the performer's live appearances are separated by two or more hours, the performer shall receive a minimum payment of a sixty-minute program fee.

### (c)  DRAMATIC PROGRAMS

With respect to dramatic programs, performers will be paid the commercial fee for the entire program when any portion of the program becomes sponsored; however, no additional payment shall be due if the balance of the program is subsequently sponsored.

### (d)  'CO-OP PROGRAMS'

If any station broadcasts a commercial announcement during any network program or if any network program is offered or made available for sale to sponsors on a local or regional basis, i.e.; co-op, participating, or any other similar program which includes cued, or timed, allocations of public service or other announcements, which makes them available to local stations in such a manner as to enable local stations to broadcast local commercial announcements, such a program shall be considered a commercial program subject to all the terms and conditions of this Code.

54. **STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE RADIO BROADCAST AND FOR MULTIPLE RADIO BROADCASTS WITHIN ONE CALENDAR WEEK**

Every engagement for a single radio broadcast or for multiple radio broadcasts within one calendar week shall, if in writing, be on the following standard form of contract, and, if oral, shall be deemed to be on such standard form. Additions to the standard form must be more favorable to the performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code.

## STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE RADIO BROADCAST AND FOR MULTIPLE RADIO BROADCASTS WITHIN ONE CALENDAR WEEK

Dated: _____ 19___

Between _____

_____ hereinafter called "Performer," and

_____ hereinafter called "Producer".

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM:_____

TYPE OF PROGRAM:      Local ( )    Network ( )    Sustaining ( )    Commercial ( )

SPONSOR (if commercial): _____

DATE(S) AND TIME(S) OF PERFORMANCE*:_____

PLACE OF PERFORMANCE:_____

AFTRA CLASSIFICATION:_____

PART(S) TO BE PLAYED:_____

COMPENSATION:_____

REHEARSALS*:

| Date | From | To | Place | Date | From | To | Place |
|------|------|-----|-------|------|------|-----|-------|
| Date | From | To | Place | Date | From | To | Place |
| Date | From | To | Place | Date | From | To | Place |
| Date | From | To | Place | Date | From | To | Place |

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

PRODUCER

_____
Performer

By_____

_____
Telephone Number

_____
Social Security Number

*Subject to change in accordance with AFTRA Code.

Standard AFTRA Engagement Contract (cont.)

## STANDARD TERMS AND CONDITIONS

1.　　Performer shall render Performer's services in connection with this engagement to the best of Performer's ability, and subject to Producer's direction and control. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsors and their advertising agencies, and Performer will refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and leads into and out of such commercial inserts. The Producers, broadcasters, sponsors and their advertising agencies may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2.　　(a)　　Performer shall indemnify Producer, the sponsors and their advertising agencies, the network, and all stations broadcasting the program against any and all claims, damages, liabilities, costs and expenses (including reasonable attorney's fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith. Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

　　　　(b)　　If this agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading "Additions," be and remain the property of Performer.

3.　　In full payment for Performer's services and the rights and privileges granted to Producer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to produce or broadcast the program or to use Performer's services or materials, if any.

4.　　The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording radio programs, whether now known or hereafter developed. All recordings as between Producer and Performer shall be Producer's sole property, but shall be subject to the provisions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing.

5.　　Producer is prohibited from requiring the performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if the artist's compensation for this engagement shall be $500.00 or more.

6.　　Notwithstanding any provision in this agreement to the contrary, it is specifically understood and agreed by all parties hereto:

(a)    That they are bound by all the terms and provisions of the AFTRA National Code of Fair Practice for Commercial Radio Broadcasting or the AFTRA National Sustaining Radio Agreement, whichever is applicable.  Should there be any inconsistency between this agreement and the applicable Code or Agreement, the applicable Code or Agreement shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in the applicable Code or Agreement.

(b)    That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the provisions of the applicable Code or Agreement.

(c)    That the artist is covered by the provisions of Paragraph 85 of said Commercial Code and Paragraph 27 of said Sustaining Agreement entitled "AFTRA Health and Retirement Funds."

(d)    All disputes and controversies of every kind and nature arising out of or in connection with this agreement shall be determined by arbitration in accordance with the procedure and provisions of the said AFTRA Code or Agreement.

7.    This agreement, when executed by Performer and Producer, shall constitute the entire understanding between them, and shall be construed according to the laws of the State of _____.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA
## AND ARE NOT PART OF STANDARD FORM

55. **BARGAINING UNIT**

AFTRA represents that it does and will, for the duration of the Code, represent for collective bargaining purposes, a majority of the actors, singers, announcers and news reporters, as required by the National Labor Relations Act. The bargaining unit used for this Code is without prejudice to either party.

56. **ONE-PERFORMANCE WAIVER**

AFTRA agrees to give a waiver for persons employed for no more than one performance during each year of the term of this Code because of reputations acquired in fields other than the amusement field, provided that such waiver will be granted only where such person gives the producer a written statement that he has not previously appeared under the conditions provided in this waiver clause.

57. **PEOPLE COVERED**

(a)    Throughout the Code a variety of terms are used, such as "radio artists," "artists," "performers," etc. Nevertheless, the Code is intended to cover and does cover actors, singers and announcers (other than staff announcers performing staff duties), and news reporters including all persons who come within those categories under the definitions provided for in this Code.

(b)    This Code also applies to all persons (other than staff newspersons) rendering services in the field of news, including but not limited to commentators and analysts and persons who criticize, review and/or comment on the following: books, the fine arts, music, sports, the theater, finance, movies, dance, radio, television, society, travel and weather; however, management personnel delivering editorials are excluded from the coverage of this Code. Services in the field of news covered by this Code under the preceding sentence shall be paid for under the terms, conditions and rates applicable to announcers and news reporters.

(c)    Masters of Ceremonies, Quiz Masters and Man-on-the-Street Announcers shall be defined as actors and shall receive applicable actors' fees in all categories.

(d)    Reporters and analysts (with the exception of government employees) in the fields of home economics, fashions, farm and rural subjects, market reports and sports, shall be classified as announcers and shall be paid the applicable announcer's fee in all categories; provided, however, that persons who do not work or are not engaged to work in these special categories for 13 consecutive weeks or more, shall be excepted; and provided further that the Producer may make percentage arrangements with such artist under which such artist is guaranteed that the average payment per program during the term of the contract shall not be less than the minimum AFTRA fee.

(e)    Sportscasters shall also be classified as announcers and their minimum fees shall be those hereinabove set forth under the heading "Sportscaster."

For the purpose of the Code, an actor is a person who is employed to enact a character or perform a role or who enacts a character or performs a role; persons like Ed Sullivan who play themselves are actors; a singer is a person who is employed to give, or who gives, vocal renditions of musical compositions; announcer is defined as the term is generally understood in the industry.

58. **SIMULCASTS**

Performers whose performance is simulcast shall receive no less than the applicable minimum television scale under the AFTRA Code of Fair Practice for Network Television Broadcasting plus the applicable minimum radio scale (including one hour of rehearsal if required under this Code) under this Code, where

the radio broadcast is commercial. The hour of rehearsal referred to herein shall be available to the Producer for use. It may be used without reference to the television minimum call if it is used for radio purposes only. A broadcast shall be deemed to be a simulcast if one performance of that broadcast is used for both radio and television broadcasts, whether or not the radio and television broadcasts of that performance are actually simultaneous. Except as otherwise specified herein, all provisions of the said AFTRA Codes shall be applicable to simulcasts.

## 59.   UNION SHOP

Until and unless the union security provisions of the Labor Management Relations Act, 1947, as amended, are repealed or amended so as to permit a stricter union security clause the following provisions shall apply:

> "It is agreed that during the term of this agreement, we will employ and maintain in our employment only such persons covered by this agreement as are members of the American Federation of Television and Radio Artists in good standing or as shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder or the date of execution of this agreement, whichever is the later, and thereafter maintain such membership in good standing as a condition of employment."

In the event the said Act is repealed or amended so as to permit a stricter union security clause the above provision shall be deemed amended accordingly. The provisions of this paragraph are subject to said Act.

## 60.   GRIEVANCE AND ARBITRATION

All disputes and controversies of every kind and nature whatsoever between any Producer and AFTRA or between any Producer and any member of AFTRA, arising out of or in connection with this Code, and any contract or engagement (whether overscale or not, and whether at the minimum terms and conditions of this Code or better) in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Code and/or such contract or engagement, shall be submitted for resolution in accordance with the following grievance and arbitration procedures:

1.   **Time Limits**
     Proceedings for grievance and/or arbitration of a claim must be commenced on or before the earlier of:

     (a)    Twelve (12) months following the date on which the party bringing the grievance or arbitration proceeding knew or should have known of the facts upon which the claim is based; or

     (b)    Two (2) years following the date on which the event in dispute occurred.

2.   **Grievance Procedure**
     Within ten (10) working days after the filing of a grievance, authorized representatives of the Producer and AFTRA or (with the written consent of AFTRA) the artist concerned shall discuss and attempt to settle the dispute.

3.   **Arbitration**
     A dispute may be submitted to arbitration at any time twenty (20) or more days following the filing of a grievance, whether or not a discussion of the grievance under the grievance procedure has occurred, or earlier if it appears that the demand for arbitration would otherwise be untimely under the time limits specified in subparagraph 1. Such arbitration shall be conducted under the

Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association except as otherwise provided herein:

(a)    AFTRA, the Producer concerned, or (with the written consent of AFTRA endorsed upon the demand for arbitration), the artist concerned, may demand such arbitration in writing. The hearing shall be held and the award made by a single AFTRA-Industry Arbitrator, who shall be named in accordance with the provision of this Paragraph 60.

(b)    In the demand for arbitration, the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

(i)    The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within seven (7) days after the close of the submission of evidence.

-or-

(ii)    The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

If the party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph 3(b)(ii) above of Paragraph 60.

The award of the Arbitrator so appointed shall be final and binding upon all parties to the proceeding during the period of this agreement, and judgment upon such award may be entered by any party in the highest court of the forum, state or federal, having jurisdiction.

(c)    The parties agree that the provisions of this Paragraph shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this agreement and which is therefore arbitrable as set forth above. The arbitration provisions of this agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this agreement.

(d)    AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and AFTRA may do anything which an artist named in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in court following the award, shall be promptly filed with AFTRA.

(e)    Nothing herein contained shall be deemed to give the Arbitrator the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Code.

(f)    The Network Broadcasting Companies (CBS and ABC) signatory hereto acting in behalf of all present and future Signatories to this Code and letters of adherence thereto shall:

1.    Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) the single AFTRA-Industry Arbitrator referred to in subparagraph "(a)" above (it being understood and agreed that there shall be a different "single AFTRA-Industry Arbitrator" designated in each

network center who shall serve as arbitrator in any arbitrable matters arising under this Code), or, in the alternative,

2.  Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) a Panel of Arbitrators for each network center from which there shall be selected (in accordance with the selection procedure set forth below) a single AFTRA-Industry Arbitrator to serve as arbitrator in the network centers in any arbitrable matters arising under this Code.

Whichever method of selecting an arbitrator is first utilized (i.e., either (f)1 or (f)2 above) shall be determinative hereunder.

In the event an arbitrator (selected pursuant to (f)1) is unable to perform his duties for any reason whatsoever the said Broadcasting Companies and AFTRA shall mutually agree upon a successor immediately and if they are unable to do so agree then the procedure set forth in Paragraph 60(g) hereof shall become applicable.

Immediately upon serving a demand for arbitration, a copy of the demand shall be filed with the American Arbitration Association, which shall select the single Arbitrator for the hearing in accordance with whether AFTRA and the said Broadcasting Companies have utilized either method (f)1 or (f)2 for the designation of the arbitrator.

If method (f)2 has been utilized and therefore a Panel of Arbitrators has been selected for each network center, then the Arbitrator shall be selected from the Panel named for the network center in which the demand is filed. In any case, both parties shall be notified by the American Arbitration Association of the Arbitrator assigned to their case immediately upon his appointment.

In making selections from the Panel, the American Arbitration Association shall do so in numerical order, and shall appoint the first arbitrator on the Panel who is available. The Arbitrator for the next arbitration shall again be processed in numerical order, omitting only those arbitrators who have been previously appointed, it being the intention that no arbitrator will be appointed more often than any other (except by virtue of his numerical position on the Panel) unless all those on the Panel who have not served as many times are unavailable for the arbitration in question. Should none of the Arbitrators on the Panel be available for any particular arbitration, such arbitration shall be determined by a single neutral arbitrator Arbitrators selected in accordance with the procedure set forth in subparagraph (g) following, which for this purpose is made a part of this paragraph with the same force and effect as though fully set forth herein.

(g)  All of the foregoing provisions of this Paragraph 60 shall be effective immediately upon the execution of this Code, but pending only the utilization of either method (f)1 or (f)2 for the designation of the arbitrator, and the designation in writing to the American Arbitration Association of the name of the single AFTRA-Industry Arbitrator or the Panel of Arbitrators, the following arbitration provisions shall apply:

(A)  AFTRA, the Producer concerned, or (with the written consent of AFTRA endorsed upon the demand for arbitration) the artist concerned, may demand such arbitration in writing. A single neutral arbitrator shall be selected to resolve the dispute, pursuant to the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association.

(B)  In the demand for arbitration the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

(i) The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within seven (7) days after the close of the submission of evidence.

-or-

(ii) The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

If the party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph 3(g)(B)(ii) above of Paragraph 60.

The award of the arbitrator shall be final and binding upon all parties to the proceedings, and judgment upon such award may be entered by either party in the highest court of the Forum, State or Federal, having jurisdiction.

The parties agree that the provisions of this Paragraph shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this agreement and which is therefore arbitrable as set forth above. The arbitration provisions of this agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this agreement.

(C)     AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and AFTRA may do anything which an artist named in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in court following the award, shall be promptly filed with AFTRA.

(D)     Nothing herein contained shall be deemed to give the arbitrator the authority, power or right to alter, amend, change, modify add to or subtract from any of the provisions of this Code.

(h)     The arbitrator in making an award with respect to any claim hereunder may, in the light of all the facts and circumstances involved in connection with such claim, in his/her discretion: (a) make his/her award effective as of the date when payments were first due, but in no event more than two years prior to the date when the written demand for arbitration was served, or (b) make his/her award effective as of the date of the award, or (c) make his/her award effective as of any intermediate date.

## 61.    NO DISCRIMINATION

Producer agrees not to discriminate against any performer because of age, race, sex, creed, color, sexual preference, national origin, or physical disability in accordance with applicable law.

In accordance with this policy, Producer will make every effort to cast performers belonging to all groups in all types of roles, including continuing roles, having due regard for the requirements of and suitability for the role.

In accordance with the above, AFTRA reaffirms its policy of non-discrimination with respect to admission to membership, and rights of membership.

The Joint Industry-AFTRA Committee shall also serve as a Committee of Fair Employment Practices to consider any complaints hereunder.

This matter is not arbitrable, but shall be subject only to referral to the Committee.

The Producer agrees to participate in the Joint Industry-AFTRA Committee established to administer the policies and procedures set forth in the 1963 Joint Statement of Policy.

## 62. NO-STRIKE CLAUSE

So long as the producer performs this Code, AFTRA will not strike against the producer as to the performers covered by this Code in the field covered by this Code. To the extent AFTRA has agreed not to strike, it will order its members to perform their contracts with the producer. This paragraph only applies to producers who sign this Code.

## 63. AFTRA RULES

Producer agrees that he has notice that the performer, if a member of AFTRA, must obey its rules. Producer admits specifically notice of the rule which requires the AFTRA member to render services only upon a program where all the performers within AFTRA's jurisdiction are members in good standing of the American Federation of Television and Radio Artists, except as otherwise provided by law. AFTRA agrees that it has no present rule and will make no future rule in derogation of the Code.

## 64. EFFECTIVE DATE

This Code shall be referred to as "The 1994-1997 AFTRA National Code of Fair Practice for Commercial Radio Broadcasting." Notwithstanding any pre-existing contracts to the contrary containing terms less favorable to AFTRA members than the terms of this Code, all terms of this Code (including minimum compensation and working conditions) shall be effective as of the date of the signing of this Code or the letter of adherence thereto; provided that all money rates contained in this Code shall be retroactive to and including November 16, 1994 unless another date is specified.

## 65. ALL PROGRAMS COVERED

Any program produced under the provisions of this Code, whether it be live, pre-recorded, off-the-line, or by any similar or new device hereafter utilized, shall be subject to the conditions of this Code and may not be interpreted as being covered by any other AFTRA contract, without the written consent of AFTRA.

## 66. UNFAIR PRODUCERS

Producer agrees that he has notice that the Code represents the minimum terms and working conditions of performers in Network commercial broadcasting. Any producer who engages bargaining unit performers and who breaches any material term or condition of the Code may be regarded as unfair and performers may be instructed not to work for anyone who is unfair. This paragraph is a statement by the Producer that he has notice of the facts stated in this paragraph, and goes no further.

Any producer who engages bargaining unit performers and who is declared to be unfair by any branch of the Associated Actors and Artistes of America upon action taken by the Associated Actors and Artistes of America by reason of a primary dispute between such branch and such producer may be declared unfair by AFTRA and artists may be instructed not to work for any such person. Artists may not be required to take direction from anyone who has been declared unfair under this provision.

Producer shall notify AFTRA of the names of all employers who use the Producer's recording facilities for the purpose of making recordings at least 24 hours in advance of each recording session.

### 67. BOND OR CERTIFIED CHECK

AFTRA reserves the right, in the event it determines that a particular Producer is not reliable or financially responsible, to require the posting in advance of an adequate bond, cash or other security. AFTRA also reserves the right to require a Producer to make payment by certified check to the performers, delivered to the AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under applicable provisions of this Code.

### 68. STANDARD CLAUSES FOR INDIVIDUAL CONTRACTS

Every written contract made on or after November 16, 1994, between producers and any artist covered by the Code shall contain and every oral contract as well as every written contract made at any time, whether prior or subsequent to November 16, 1994, shall be deemed to contain the following clause:

"Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed by all parties hereto that:

(1)     They are bound by all the terms and provisions of the AFTRA National Code of Fair Practice for Commercial Radio Broadcasting (Minimum Terms and Conditions for Radio Artists), but nothing in this provision shall affect terms, compensation or conditions provided for in this contract which are not covered by said Code or which are more favorable to members of AFTRA than the terms, compensation and conditions provided for in said Code.

(2)     That the artist is or will become a member of the American Federation of Television and Radio Artists in good standing, subject to and in accordance with Paragraph 59 of said Code of Fair Practice.

(3)     That the artist is covered by the provisions of Paragraph 85 of said Code entitled 'AFTRA Health and Retirement Funds.'

(4)     All disputes and controversies of every kind and nature arising out of or in connection with this agreement shall be determined by arbitration in accordance with the procedure and provisions of the said Code of Fair Practice."

### 69. INDIVIDUAL CONTRACTS

Notice of this Code will be given to AFTRA members, and they will contract subject thereto, and as to such producers who either sign this Code or signify their intention to abide thereby, the member will sign any contracts subject to the fulfillment of all obligations of such Producer hereunder.

### 70. MINIMUM SCALES

Producer agrees that he will make no contract with any performer at terms less favorable to such performer than those contained in this Code and make no changes or alterations of these provisions without the written consent of AFTRA, nor, without such consent, shall any performer be deemed engaged upon terms which would commit such performer to perform any services after this Code expires or is terminated, which would violate any rule of AFTRA. Issuance of, or compliance with, such AFTRA rule shall not subject AFTRA or AFTRA members to any liability.

### 71. MODIFICATION OF PRESENT CONTRACT

The Producer agrees, for the benefit of AFTRA and all performers employed by the Producer, that existing contracts with all performers are hereby modified in accordance herewith, but no terms, wages or hours now had by any such performers which are more favorable to such performers than the terms, wages or hours herein specified, shall be deemed so modified. If there are any other contracts between or among signatories to this Code or those who signify their intention of abiding thereby, which require performers to work under terms, wages or conditions less favorable to such performers than this Code, then, notwithstanding such contracts, it is agreed that this Code shall, nevertheless, apply for the benefit of all such performers and of AFTRA.

## 72. SERVICES IN FM

All radio fees set forth in this Code cover broadcast on AM only or simultaneous broadcast on AM and FM. The broadcast of a program once on an FM station within four days of the broadcast of such program on a commonly-owned AM station in the same area shall be considered simultaneously broadcast on AM and FM. For provisions applicable to broadcast on FM only, see the AFTRA National Sustaining Radio Agreement.

## 73. ADDITIONAL SERVICES

No service of the performer is contracted for except as specified herein. This paragraph is not intended to prevent the performer from contracting for services of a kind not covered by the Code by individual contract at such rates of pay and under such conditions as the Producer and the performer shall agree, subject only to the fact that it shall not be in conflict with this Code.

## 74. WAIVERS

AFTRA will give waivers in proper cases upon application by the Producer to meet any program requirements with respect to working conditions. Minimum fees are not working conditions. AFTRA will give waivers where in its opinion special circumstances warrant an extra rehearsal session on 15-minute serial programs immediately following the broadcast.

## 75. FAVORED NATIONS

Any more favorable terms or conditions given to competitors producing network shows at the six points of origination mentioned in Paragraph 25 of General Schedule of Rules will be given by AFTRA to the producer to the extent given such competitor. This does not apply to waivers given by AFTRA in special instances, if such waivers be given in good faith and without intent either to evade this clause or to give an unfair competitive advantage.

## 76. NON-WAIVER OF RIGHTS

The acceptance by a member of AFTRA, for any work or services under this Code, of payment or other consideration in money, by check, or in any other form, shall not be deemed a waiver by such AFTRA member, nor constitute a release or discharge by him, of such AFTRA member's rights either under this Code or under any agreement subject to this Code, for additional compensation or of his/her contractual rights. Releases, discharges, notations on checks, cancellations, etc., and similar devices which may operate as waivers or releases shall be null and void to the extent provided for above unless AFTRA's prior written approval is first had and obtained.

## 77. TAX STATEMENT

Producer agrees to furnish at least weekly to each artist a statement specifying the name of each employer (whether sponsor, agency, broadcaster or otherwise, as the case may be), the period covered by the statement, the dates of the performance (wherever practicable), the amount of the payment, the amount of

each deduction and all other pertinent information which may be necessary for tax purposes. Such statement may be on check vouchers or in any other convenient form which may be retained by the artist.

78. **CHECK OFF**

The Producer agrees that, on thirty days' written notice from AFTRA, he/she will deduct, for and on account of union membership dues, that percentage or amount requested in the AFTRA notice, of all compensation earned and to be earned by each employee covered under this agreement for whom there shall be filed with the Producer a written assignment in accordance with Section 302(c) of the Labor Management Relations Act, 1947. The Producer shall commence making such deductions with the first wage payment to be made to each such employee following the date of the filing of his/her said written assignment, and such deductions shall continue thereafter with respect to each and every subsequent wage payment to be made to each such employee during the effective term of his/her said written assignment.

Within ten days after the end of each month, the Producer shall remit to the Union, by check drawn to the order of American Federation of Television and Radio Artists, the total amount of all deductions made during the said month for all such employees. At the time of such remittance, and together therewith, the Producer shall also furnish to the Union a record certifying the names of the employees on whose account such deductions were made, their respective earnings during said month, and the amount of deductions for each such employee during said month.

The Producer agrees that he/she will cooperate with the Union in order to expedite the procurement by the Union of the written assignments of the employees, as herein required.

79. **M & O STATIONS**

Referring to the seventh paragraph on page 1, American Broadcasting Companies, Inc. (A Wholly Owned Subsidiary of Capital Cities/ABC, Inc.), or CBS Inc., or AFTRA may refuse to arbitrate wages and working conditions for programs produced by the American Broadcasting Companies, Inc. (A Wholly Owned Subsidiary of Capital Cities/ABC, Inc.), or CBS Inc., at any of their managed or operated stations in cities other than the originating points mentioned in Paragraph 25, but AFTRA reserves its complete right to strike against such programs and stations without notice.

80. **BROADCAST COMPANIES**

CBS Inc., and American Broadcasting Companies, Inc. (A Wholly Owned Subsidiary of Capital Cities/ABC, Inc.), are signing such Code for and on behalf of themselves, respectively, and not for any other person, firm or corporation. The mere fact that broadcasting facilities are used for the broadcast of a radio program does not make such program one produced under the auspices of the broadcasters whose facilities are used, nor does it bring such programs under the Code as far as such broadcasters are concerned.

81. **NEW CODE/TERMINATION AND REINSTATEMENT**

At least sixty days prior to the end of the term of this Code, AFTRA and the Producer agree to negotiate in good faith with respect to a new Code. This Code shall expire at the close of business on November 15, 1997. Notice to the Code signatories of termination of this Code shall also serve as automatic termination of the letters of adherence. Any notice hereunder shall be deemed served on a signatory to the Code upon mailing such notice to the last address filed by such signatory with AFTRA's national office. Any termination pursuant to this Code shall be binding upon and applied jointly to all the signatories to the Code and letters of adherence.

82.   **PRODUCER BOUND BY OTHER AFTRA CODES**

In addition to this Code, the producer agrees to abide by, conform to, and be bound by each and every provision of the following:

(1)     The "1994-97 Schedule of Minimum Fees and Conditions for Performers Appearing on Regional Commercial Programs Originating in Hollywood, Los Angeles, or San Francisco, and Not Available to Stations Other Than Those in the Eleven Western States",

(2)     The "1994-97 Schedule of Rates and Conditions for Local Chicago Commercial Programs",

(3)     The "1994-97 Schedule of Minimum Fees and Conditions for Freelance Performers Appearing on Local Commercial Programs Originating on the Stations Classified Therein on the Pacific Coast",

(4)     The "1994-97 AFTRA National Code of Fair Practice for Network Television Broadcasting", and the New York, Chicago and Los Angeles local and regional codes,

(5)     The "1994 AFTRA Radio Recorded Commercials Contract",

(6)     The "1994-97 AFTRA National Sustaining Radio Agreement",

(7)     The "1994 AFTRA-TV Recorded Commercials Contract",

(8)     The "1994-97 National Code of Fair Practice for Transcribed Radio Programs".


83.   **LETTERS OF ADHERENCE**

The term "Producer" as used in this Code includes advertising agencies who sign the letters of adherence. Only advertising agencies may sign letters of adherence and such letters of adherence are binding upon the advertising agencies, and must be delivered to AFTRA, or to a broadcasting company signatory with a copy to AFTRA.  The network signatories to the Code agree to submit such letters of adherence to advertising agencies which on their own behalf or on behalf of a client use the facilities of the network for a program not furnished by the network, and if the advertising agency refuses to sign and deliver such letter of adherence to AFTRA or to the network signatory, with a copy to AFTRA, the network signatory agrees to notify AFTRA promptly of such refusal.  The letter of adherence shall be in the following form:

Dear Sirs:

We acknowledge receipt of your letter of _____, enclosing a copy of:

(1)     The "1994-97 AFTRA National Code of Fair Practice for Commercial Radio Broadcasting",

(2)     The "1994-97 Schedule of Minimum Fees and Conditions for Performers Appearing on Regional Commercial Programs Originating in Hollywood, Los Angeles, or San Francisco, and Not Available to Stations Other Than Those in the Eleven Western States",

(3)     The "1994-97 Schedule of Rates and Conditions for Local Chicago Commercial Programs",

(4)     The "1994-97 Schedule of Minimum Fees and Conditions for Freelance Performers Appearing on Local Commercial Programs Originating on the Stations Classified Therein on the Pacific Coast",

(5)     The "1994-97 AFTRA National Code of Fair Practice for Network Television Broadcasting", and the New York, Chicago and Los Angeles local and regional codes,

(6)    The "1994 AFTRA Radio Recorded Commercials Contract",

(7)    The "1994-97 AFTRA National Sustaining Radio Agreement",

(8)    The "1994 AFTRA-TV Recorded Commercials Contract",

(9)    The "1994-97 National Code of Fair Practice for Transcribed Radio Programs".

We wish to enjoy peaceful and pleasant relations with the American Federation of Television and Radio Artists (AFTRA) and its members and to that end in accordance with the uniform practice established in the broadcasting industry in its dealings with AFTRA, we agree to abide by and conform to all the terms and conditions specified in the aforementioned documents.

Without limiting the generality of the foregoing, the undersigned agrees to all the arbitration provisions of the said documents. While this Letter of Adherence is in full force and effect, we and AFTRA agree that, pending arbitration and award, there will be no stoppage of work relating to the dispute under arbitration and the parties agree that all awards rendered shall be binding upon them.

Further, the undersigned agrees to all the pension and welfare provisions of the said documents and agrees to be bound by the AFTRA Health and Retirement Funds Agreement and Declaration of Trust, dated November 16, 1954, and abide by and conform to all the terms and conditions specified in the aforementioned Trust Agreement including amendments thereto; and, more specifically, the undersigned hereby appoints the Producer Principal Trustees and Alternate Trustees named therein and/or their successors.

You are authorized to deliver copies of this letter to AFTRA.

Very truly yours,

_____                    _____
Date                                        Advertising Agency


84.    TITLE OF CODE

This Code shall be referred to as "The 1994-97 AFTRA National Code of Fair Practice for Commercial Radio Broadcasting".

85.    AFTRA HEALTH AND RETIREMENT FUNDS

Section 1(a)    With respect to services performed under this Code on and after November 16, 1994 (including all services such as rehearsal theretofore performed in connection therewith) and with respect to "recordings" produced under this Code and broadcast on and after November 16, 1994 the Producer shall pay to the American Federation of Television and Radio Artists Health and Retirement Funds (hereinafter referred to as the AFTRA Health and Retirement Funds), a sum equal to 10.5% of the gross compensation due each performer for such services and/or the use of such "recordings". As used in the preceding sentence, the term "recordings" shall have the meaning given in Paragraph 4, Page 28 of this Code. The Producer's obligation to pay such sum shall apply to the performer's gross compensation, including talent agent's commission (it being understood that nothing in this Code shall be construed as requiring Producer to pay a talent agent's commission) without any deductions whatsoever, whether pursuant to oral or written contracts entered into prior to, on or after November 16, 1956. (However, this shall not be construed as requiring any duplication of payment made under any previous AFTRA Code.)

(b)    In the event gross compensation paid, due or to become due to a "star performer", or, on his behalf, to any other person, firm or corporation, directly or indirectly, for an engagement under this Code is more than twenty-five (25%) percent below the performer's reasonable or customary compensation as measured by the average gross compensation paid, due or to become due to the performer, or on his behalf, to any other person, firm or corporation, directly or indirectly, by other Producers, with which performer had no relationship, for his last four (4) comparable appearances (excluding "exchanges") then Producer shall be obligated to pay to the AFTRA Health and Retirement Funds a sum equal to 10.5% of such reasonable or customary compensation, as measured by such last four (4) comparable appearances, for the instant engagement; provided however, that the foregoing criterion of the average reasonable or customary compensation for the last four (4) comparable appearances shall in no event apply where (i) the engagement is for a type of program on which it has been customary to pay star performers minimum compensation or compensation not substantially in excess of minimum or (ii) there has been a substantial loss in the "marquee value" of the star performer, or (iii) no last four (4) comparable appearances have occurred during the eighteen (18) month period immediately prior to the instant engagement of the performer, or (iv) the performer's engagement is only for a "flash" appearance. Upon request of Producer, AFTRA shall furnish to Producer such records as can be obtained by AFTRA as are necessary to ascertain the average gross compensation for performer's last four (4) comparable appearances.

(c)    As used in the preceding paragraph, a "star performer" is a performer whose average gross compensation for an appearance under this Code as measured by his last four (4) comparable appearances (excluding "exchanges"), is more than $500. A "comparable appearance" is an appearance under this Code or a prior AFTRA Code on a comparable program. "Exchanges" are those situations where star performers exchange appearances on each other's programs.

(d)    The aforementioned sum shall be used solely (a) for the purpose of providing pension benefits for eligible employees under this Code, (b) for the purpose of providing welfare benefits for eligible employees under this Code and, at the discretion of the Trustees, for eligible performers within AFTRA's jurisdiction and, at the further discretion of the Trustees for their families and (c) for the incidental expenses connected with the establishment and administration of the AFTRA Health and Retirement Funds.

(e)    The aforementioned sum may also be used to provide occupational disability benefits to performers who suffer disability arising out of or in the course of employment in rendering services within the jurisdiction of AFTRA. The Trustees of the AFTRA Health Fund are directed to continue such benefits to performers whether or not eligible for other benefits of the AFTRA Health Fund, so long as the Trustees determine in their discretion that such benefits can be provided to such performers without impairing the financial security of the AFTRA Health Fund to continue or expand the existing plan or benefits.

(f)    Nothing in this Code shall be construed as suspending or modifying the prior AFTRA Code Health and Retirement provisions applicable to services performed or recordings broadcast from November 16, 1956 to and including November 15, 1994 nor shall this Code be construed as requiring any duplication of payment made under such prior AFTRA Code Health and Retirement provisions.

(g)    With respect to any agreement for the services of a performer (f/s/o agreement), including services covered by the AFTRA National Code of Fair Practice for Commercial Radio Broadcasting, to be furnished by a "loan-out company" (i.e., a corporation which is controlled by the performer and which furnishes performer's services to others under

an f/s/o agreement), payments into the AFTRA Health and Retirement Fund (hereinafter "contributions") shall be governed by the following:

(i)    In its f/s/o agreement with the loan-out company, the Producer shall separately state the compensation applicable to services covered by the AFTRA National Code of Fair Practice for Commercial Radio Broadcasting.[1]

(ii)    If other than AFTRA covered services are involved and an amount is allocated to such other services, the Producer shall notify AFTRA of the amount allocated to the AFTRA covered services. If AFTRA disputes the amount allocated to the AFTRA covered services, the parties will discuss what the appropriate allocation of such compensation shall be, giving substantial consideration in resolving the dispute to the performer's "customary salary". If, after such discussions, AFTRA does not agree on the appropriate allocation, then either party may submit the matter, as it relates to health and retirement contributions only, to arbitration in accordance with the provisions of this Code.

(iii)    Contributions shall be based on the amount the Producer pays the loan-out company for furnishing the performer's AFTRA covered services.

(iv)    (a) Agreements with loan-out companies for covered services of the loaned-out performer shall provide that Producer shall make health and retirement contributions directly to the Plans as agent for this purpose for the loan-out company.

(b) Until such time as the Producer implements the direct payment system described in subparagraph (iv) (a) above, the loan-out company shall have the obligation to make the contributions; provided, however, that the Producer and the loan-out company may enter into an agreement which provides that the Producer shall pay such contributions directly to the AFTRA Health and Retirement Funds and notify the AFTRA National Executive Director of such agreement and such payment shall be made by Producer without notice from AFTRA or the Fund. If the loan-out company does not pay contributions within ten (10) business days following the date they become due, AFTRA or the Plan shall give written notice to the Producer within a reasonable period thereafter and the Producer, as agent for this purpose for the loan-out company, shall pay the contributions within ten (10) business days after receiving such notice.

(v)    If the loan-out company does not pay contributions within ten (10) business days following the date they became due, AFTRA or the Fund shall give written notice to the Producer within a reasonable period thereafter and the Producer, as agent for the loan-out company, shall pay the contributions within ten (10) business days after receiving such notice.

Section 2.    The AFTRA Health and Retirement Funds (formerly the AFTRA Pension and Welfare Funds) shall be Trust Funds and shall be administered under the AFTRA Health and Retirement Funds Agreement and Declaration of Trust dated November 16, 1954, which Agreement and Declaration of Trust is hereby ratified and confirmed, and is made a part of this Code with the same force and effect as though fully set forth herein. The said Agreement and Declaration of Trust shall provide, among other things:

---

1. Section 1(g)(i) of Article 85 shall apply only to an agreement for the services of a performer (f/s/o agreement), as defined above, or negotiated renewal thereof, which commences on or after the first day of the month following the execution of this agreement.

(a)  That the Health and Retirement Funds be administered by twelve (12) named Principal Trustees, six (6) designated by the Producers and six (6) designated by AFTRA; and six (6) named Alternate Trustees are designated to serve in place or stead of the Principal Trustees in the event of death, disability, resignation or absence.

(b)  That AFTRA may, at any time in its discretion on written notice to all the Trustees then in office, appoint a successor or successors for any one or more of the AFTRA Principal Trustees and Alternate Trustees named in said Agreement and Declaration of Trust. The written notice shall contain the names of the new Principal and/or Alternate Trustees and the names of the Principal and/or Alternate Trustees whom they replace. The Producers may, in a similar manner in their discretion, appoint successor Principal Trustees and Alternate Trustees for any one or more of the Producers' Principal Trustees and Alternate Trustees named in said Agreement and Declaration of Trust. The Principal Trustees of the AFTRA Health and Retirement Funds and any Alternate Trustee when acting as a Principal Trustee are herein referred to as the "Trustees". The Trustees shall act by majority vote.

(c)  That the trustees shall determine the form, nature and amount of pension and welfare benefits and the rules of eligibility for such benefits, except as otherwise provided in this agreement. The welfare benefits shall include in the discretion of the Trustees any one or more of the following benefits (but none other): death, accidental death, dismemberment, hospitalization, surgical expense, medical expense, temporary disability.

(d)  That employers having other collective bargaining agreements with AFTRA may, with the approval of the Trustees, become contributing Producers and parties to the Trust Agreement; and by agreeing to be bound by the Trust Agreement, such other Producers thereby appoint the Producers' Principal Trustees and Alternate Trustees named in the Agreement and Declaration of Trust and/or their successors.

(e)  That the plan of pension benefits adopted thereunder shall be subject to the approval of the Bureau of Internal Revenue as a qualified plan. If any part of the plan is not approved by the Bureau of Internal Revenue, the plan shall be modified by the Trustees, but subject to the limitations set forth in this agreement, to such form as is approved by the Bureau of Internal Revenue.

(f)  That no portion of the contribution may be paid or revert to any Producer.

The Producers and AFTRA further agree that the Trustees of the AFTRA Health and Retirement Funds (formerly the AFTRA Pension and Welfare Funds) are directed to meet promptly to amend the existing Agreement and Declaration of Trust, dated November 16, 1954, establishing the AFTRA Retirement Fund and the AFTRA Health Fund, as may be necessary to permit pension and welfare benefits to be provided as specified in this Code, and the Agreement and Declaration of Trust as amended shall be deemed a part hereof with the same force and effect as though fully set forth herein.

Section 3.    If the Trustees fail to amend said Agreement and Declaration of Trust on or before April 15, 1961, or any subsequent date agreed to by the Trustees, then any and all unresolved matters pertaining to the provisions to be included in the Agreement and Declaration of Trust shall be submitted to arbitration in accordance with the procedure set forth in this Code. Nothing herein contained shall permit the arbitrator to enlarge upon, modify or

alter the terms of this Agreement. All the Trustees shall thereupon amend the Agreement and Declaration of Trust in such forms as finally determined by the arbitrator.

Section 4.    Each Producer shall furnish the Trustees the information pertaining to the names, job classifications, social security numbers and wage information for all performers covered by this Agreement, together with such other information as may be reasonably required for the proper, low cost and efficient administration of the AFTRA Health and Retirement Funds. Producer agrees to furnish a remittance report and to pay to the appropriate AFTRA Health and Retirement Fund office the contribution specified in Section 1 not later than fifteen (15) days following the Thursday (a) after the week during which the performance shall have taken place, or (b) in the case of prerecorded program after the final rendition of physical services.

Section 5.    The provisions of the AFTRA Health and Retirement Funds are in addition to (and not in substitution in whole or in part for) any existing pension and/or welfare funds covering any of the performers under this agreement; and no performer shall lose, in whole or in part, any of his rights or privileges under such other pension and/or welfare funds by virtue of receiving or being entitled to receive benefits under the AFTRA Health and Retirement Funds; nor may any payments, rights or privileges available to a performer under the AFTRA Health and Retirement Funds be credited to any payments, rights or privileges under any other pension and/or welfare funds and vice versa. Based on the representations of advertising agencies which sign letters of adherence that none of the performers covered by this Agreement are within the coverage of any existing pension and/or welfare funds maintained by advertising agencies and/or advertisers, the provisions of this Section are not intended to apply to such advertising agencies and/or advertisers.

Section 6.    No part of the Producers' contributions or the performer's benefits from the Health and Retirement Plans (a) may be credited against the performer's overscale compensation or against any other benefits or emoluments whatsoever that the performer may be entitled to, no matter what form such other benefits or emoluments may take, or (b) are subject to any talent agency commission, or other deductions.

Section 7.    The Producers and AFTRA hereby ratify and confirm the action of the Trustees of the AFTRA Health and Retirement Funds in amending the existing Agreement and Declaration of Trust, dated November 16, 1954 to provide coverage for the benefit of AFTRA employees and employees of the AFTRA Health and Retirement Funds upon terms and conditions established by the Trustees.

Section 8.    The Trustees are authorized to allocate contributions made hereunder between the Health Fund and the Retirement Fund in amounts (expressed as dollars or percentages) that they may consider necessary and appropriate. The Producer ratifies the current and prior allocations heretofore adopted by the Trustees.

Section 9.    Wherever the phrase "Agreement and Declaration of Trust" is used in this Paragraph 85, the Trustees shall have the right in their discretion to construe said phrase as also meaning the plural.

EXHIBIT "A"

As of November 16, 1994

American Federation of Television
    and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

The following sets forth our understanding and agreement with respect to radio programs produced under the AFTRA National Code of Fair Practice for Commercial Radio Broadcasting, (hereinafter, the Commercial Radio Code), or any of its predecessors, which are released in Supplemental Markets.

1.    Scope of Agreement

    This agreement shall apply to radio programs produced under the Commercial Radio Code, or any of its predecessors, which are released in Supplemental Markets. The rights of Producer in radio programs produced under such Codes shall include the right to exhibit such programs in Supplemental Markets (as hereinafter defined), subject to any provisions contained in individual employment contracts of performers in such radio programs.

2.    Definition of Supplemental Markets

    The term "Supplemental Markets", as used in this agreement, means distribution of radio programs in markets or by means other than those provided for elsewhere in the Commercial Radio Code. For example, distribution in foreign markets (i.e., outside of the United States, its territories or possessions, or Canada), on commercial or common carriers ("in-flight"), on audio cassettes or records shall be considered Supplemental Markets uses. Domestic radio broadcasts (whether by network, syndication, or simulcast) and uses for which AFTRA has traditionally granted waivers (such as educational uses, use on Armed Forces Radio) are not Supplemental Markets uses.

3.    Supplemental Market Fees

    (a)    As to each radio program within the scope of paragraph 1 above which is released in Supplemental Markets, Producer will pay for the benefit of the performers on such program 6% of the Producer's gross receipts in perpetuity (as hereinafter defined). Such 6% payment shall be for the benefit of all performers on the program, except for extras and supernumeraries. If there is only one performer on the program, the payment shall be 1%. In the event any performer has individually negotiated with Producer an individual payment formula for such distribution, his pro rata share shall be credited against the payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by the Producer or to AFTRA for distribution to the performers as the parties may mutually determine. Additionally, a contribution based upon a percentage of the Supplemental Markets fee payable under this Paragraph 3 (a) shall be made to the AFTRA Health and Retirement Funds. The applicable percentage shall be the same as the percentage of gross compensation payable to the AFTRA Health and Retirement Funds under the AFTRA Code at the time the program is first released for distribution in Supplemental Markets.

    (b)    Upon the sale, transfer, assignment, license, lease or other disposition by Producer of its right to release a radio program in Supplemental Markets, Producer shall not be responsible to AFTRA or to any performers for any payments thereafter due with respect to Supplemental Market use or

for a breach or violation of this Agreement by such transferee, if Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

" _____
(insert name of transferee)

hereby agrees with_____that all recorded programs covered by this
(insert name of Producer)

agreement are subject to the 1994-97 AFTRA National Code of Fair Practice for Commercial Radio Broadcasting, including Exhibit A thereof, the AFTRA Supplemental Markets Agreement. Transferee hereby agrees expressly for the benefit of AFTRA as representative of the performers affected thereby to make the additional compensation payments for Supplemental Markets use subsequently incurred and required by said Agreement and all Social Security, withholding, unemployment insurance and disability insurance payments and other payments required of employers by law with respect to such additional compensation, and all appropriate contributions to the AFTRA Health and Retirement Funds required under the provisions of said Agreement with respect to such additional compensation, and to comply with the provisions of said Agreement with respect to the use of recorded programs and required records and reports. It is expressly understood and agreed that the rights of transferee to release such recorded programs in Supplemental Markets shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Agreement, and AFTRA shall be entitled to injunctive relief, in the event such payments are not made. It is also expressly understood and agreed that any dispute between the transferee and AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 60 of said Code."

4.    Definition of Producer's Gross Receipts

"Producer's gross receipts" shall be the fee or payment received by the Producer from licensing the right to distribute such program in Supplemental Markets.

If the Producer itself acts both as producer and as distributor, a reasonable allocation of the gross receipts from the distribution shall be made as between Producer as producer and Producer as distributor, and only the former shall be deemed to be "Producer's gross receipts". The reasonableness of such allocation shall be subject to arbitration and, in such arbitration, generally prevailing trade practices in the industry with respect to dealings between non-related companies shall be relevant evidence.

Allocation of Gross Receipts

If any agreement for distribution in the Supplemental Market includes more than one program, or includes both Supplemental Market rights and other rights, Producer shall make a reasonable allocation for the purpose of determining payments due hereunder. If AFTRA contends that such allocation is not reasonable, then such claim may be submitted to arbitration in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association.

5.    Time of Payment and Reports

Payments of any Supplemental Market fees due under this agreement shall be made quarterly on the basis of quarterly statements. Payments shall continue as long as gross receipts are realized from the distribution. Producer shall furnish to AFTRA written quarterly reports showing Producer's gross receipts, in accordance with the foregoing, from distribution of programs in Supplemental Markets. AFTRA shall

have the right, at reasonable times, to examine the books and records of Producer insofar as they relate to Producer's gross receipts from distribution in Supplemental Markets.

Producer shall furnish to AFTRA, promptly upon the release of any program to Supplemental Markets, information including the name, length and date of production of the program and a complete program cast list of performers covered by this agreement, their social security numbers and a description of the services rendered by each.

Within a reasonable time after the expiration of such calendar quarter but not exceeding sixty (60) days, Producer will furnish or cause to be furnished to AFTRA, a written report showing the gross receipts during the preceding quarter, from the distribution of each such radio program by Producer in Supplemental Markets with respect to which Producer is required to make payments hereunder (whether distributed by the Producer or through another Distributor), showing the date of first release in the Supplemental Market, and concurrently with the furnishing of such written report, Producer shall make the payment thereby shown to be due. If the Producer shall fail to pay such additional compensation when and as the same becomes due and payable, the Producer shall pay a late-payment penalty of 1-1/2% per month on the unpaid balance commencing to accrue from the date of delinquency.

No such reports need be furnished with respect to any periods during which there were no gross receipts. An inadvertent failure to comply with the reporting provisions of this subsection shall not constitute a default by the Producer hereunder, provided such failure is cured promptly after notice thereof is received by the Producer from AFTRA.

6.    Assignment of Rights

It is agreed that the rights of performers to compensation for the Supplemental Markets use of a program in accordance with the terms of this agreement shall not be affected by any sale, assignment, pledge, hypothecation, or other transfer of the recording of the program, or by any attachment, garnishment, bankruptcy assignments for benefits of creditors, probate, or any other legal proceeding involving the Producer or his successors in interest. Accordingly, it is expressly agreed that the right of any Producer hereunder to use a recording of any program pursuant to this agreement is subject to the condition precedent of the payment of all fees required by this agreement and that:

(a)    Any person acquiring all or part of the property rights of said Producer in such recording by voluntary assignment shall do so subject to the same conditions precedent; and

(b)    In the event of any involuntary assignment, whether by operation of law or otherwise, the Producer's rights in such recording shall be deemed personal and non-assignable, and no assignee thereof shall acquire any right to use such recording; provided, however, that AFTRA agrees to permit the assignee in the event of an involuntary assignment, whether by operation of law or otherwise, to exercise all rights hereunder upon payment to the AFTRA performers in the program of all fees that may be due or become due to them hereunder; and further, that the assignee shall be deemed to have full title to said recording upon his executing an agreement with AFTRA whereby said assignee assumes the obligation of the debtor to the AFTRA performers. Producer agrees to incorporate the terms of this paragraph in any transfer of his interest in a recording and to require the same undertaking on behalf of his successors and assigns in interest.

(c)    The performer shall have the right to apply for and secure an injunction against any Supplemental Market use of a program containing performer's services in the event the requirements of this agreement are not satisfied, and more particularly in the event all payments provided for herein (or in the performer's agreement with the Producer) are not made.

7.    Availability of Agreement

This agreement shall be available to any Producer which produces radio programs within the scope of agreement set forth in paragraph 1 which are released in Supplemental Markets.

8.   Other AFTRA Codes or Agreements

The release of a radio program in Supplemental Markets pursuant to this Agreement shall in no event subject such program to the provisions of any other AFTRA Agreement.

9.   Term of Agreement

This agreement shall be effective on the date of execution hereof and shall be coterminous with the 1994-1997 AFTRA Commercial Radio Broadcasting Code.

Accepted and Agreed:

AMERICAN FEDERATION OF TELEVISION
   AND RADIO ARTISTS

BY_____                    _____
                                                                                        Producer

_____                      _____
Date of Execution

Sideletter #1

As of November 16, 1994

American Federation of Television
  and Radio Artists
260 Madison Avenue
New York, New York 10016

Dear Sir or Madam:

The following provision shall be limited to announcers employed on WABC or WCBS:

Announcers employed on a regular basis under an arrangement which would require at least four (4) weeks notice prior to ending such arrangement, will receive the same discount set forth in Paragraph 19 (b) herein.  However, in the event that an announcer who has been paid the discounted rate is terminated during the initial thirteen weeks of employment, such announcer will receive the difference between the basic scale and the discounted rate upon termination.

Very truly yours,

_____

By_____

AGREED:

AMERICAN FEDERATION OF TELEVISION
  AND RADIO ARTISTS

By_____

Sideletter #2

As of November 16, 1994

American Federation of Television
   and Radio Artists
260 Madison Avenue
New York, New York 10016

Dear Sir or Madam:

This letter expresses our understanding that the Company will offer two weeks of vacation during each 52-week period of continuous employment to freelance newspersons who deliver news on the air on a 5-day-a-week basis.

Very truly yours,

_____, Producer

By_____

AGREED:

AMERICAN FEDERATION OF TELEVISION
   AND RADIO ARTISTS

By_____

Sideletter #3

As of November 16, 1994

American Federation of Television
  and Radio Artists
260 Madison Avenue
New York, New York 10016

Dear Sir or Madam:

This letter is to express our understanding that in the event AFTRA and the Industry Producers resolve new language updating the Health and Retirement Funds provision of the 1994-1997 AFTRA Code of Fair Practice for Network Television Broadcasting, the language of Paragraph 85 of the 1994-97 AFTRA Code of Fair Practice for Commercial Radio Broadcasting shall be modified to conform to such new language.

It is understood that this shall in no way affect the contribution rate of ten and one-half percent (10.5%) set forth in Paragraph 85 of this agreement.

Very truly yours,

_____, Producer

By_____

AGREED:

AMERICAN FEDERATION OF TELEVISION
  AND RADIO ARTISTS

By_____

Sideletter #4

As of November 16, 1994

Capital Cities/ABC, Inc.
CBS, Inc.

Dear Sir or Madam:

In connection with the portion of Paragraph 67 of the AFTRA NATIONAL CODE OF FAIR PRACTICE FOR COMMERCIAL RADIO BROADCASTING, which provides "AFTRA also reserves the right to require a Producer to make payment by certified check to the performers, delivered to the AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under applicable provisions of this Code", it is agreed that this is not intended to apply to you, the network broadcasters.

Very Truly Yours,

AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED and AGREED TO:

AMERICAN BROADCASTING COMPANIES, INC.
a wholly owned subsidiary of Capital Cities/ABC, Inc.

By_____

CBS INC.

By_____

# ALPHABETICAL INDEX

(References are to paragraph numbers)

ACTORS: program fees--**1, 3, 6, 7**; local New York programs--**37(b)**

Additional services--**73**

Admission to premises--**42**

Advertising agencies--**83**

After-shows--**49**

AFTRA rules--**63, 70**

ANNOUNCERS: program fees, special provisions--**7, 17, 18, 19, 20, 21, 22, 23**; local New York broadcasts--**23(c), 23 (d), 23 (e), 23(f)**

Arbitration--**54-6(d), 60, 69-4; p.1, 7th & 8th par.**

Artist, defined--**57**

Assistant sportscaster--**24**

Audience participants--**50**

Auditions--**5, 10, 15, 22**

Bargaining unit--**55**

Billing--*Cf.* Cast Credits

Bonds, posting of--**67**

Broadcast companies--**79, 80**

Call, minimum--**11(b), 35**

Cancellation by artist--**41**

Cancelled individual engagement--**40**

Cancelled program--**33, 38**

Conflicts, engagement--**33, 39**

Cast Credits--**52**

Check-off, union dues--**78**

Children's programs--**51**

Color person (sports)--**24**

Commentators, news--**57**

Compensation--*Cf.* PAYMENT

Contractor for group singers--**15**

CONTRACTS, INDIVIDUAL: additional service--**74**; cancellation by artist--**41**; existing contracts--**71**; standard clause--**68**; standard engagement contract--**54**; strip shows--**33**; subject to code--**54, 69, 69, 70, 71**

Co-op programs--**53(d)**

Costume, dress maintenance--**45**

Coverage of code--**25, 66, 79, 80; p. 1, 1st & 4th par.**

Cowcatchers--**21**

Credits--*Cf.* Cast Credits

Critics--**57**

CUT-INS: announcements--**20**; news--**23, 25 (c)**

Deductions-- **30, 31,32, 78**

Deputy--**16(b)**

Disability insurance--**32**

Discharge--**14, 40**

Discrimination, no--**61**

Doubling--**29**

Dramatic programs--**53(c)**

Dramatic signatures--**48**

Dramatized commercials--**6**

Dress maintenance--**45**

Effective date of Code--**64, 81; p.1, 6th par.**

ENGAGEMENTS: cancelled--**40**; cancelled program--**38**; notice--**29**; postponed program--**39**; reporters, analysts--**57**; running parts--**33**; singing group--**15**; standard clauses--**68**; standard contract--**54**; subject to AFTRA rules--**63, 70**; subject to code--**71**; thirteen weeks guarantee--**3, 4, 12, 19**; vacations--**33**; *Cf.* CONTRACTS, INDIVIDUAL

Exclusions from coverage--**56, 57, 79, 80**

Extras and supernumeraries--**46**

Favored nations--**75**

FM services--**72**

Group noises--**29**

Guarantees, 13 weeks--**3, 4, 11(d), 19**

Health & Retirement--**85**

Hitchhike Announcements--**21**

Incidental singing background--**14**

Letters of Adherence--**83**

Meal period--**35**

Minimum call--**12(b), 35**

Minimum scales--**30(a), 70, 71**

Modification of existing contracts--**71**

Multiple performances: Actors--**1**; Singers--**8**, Announcers--**18**

Multiple Tracking--**16**

Network program defined--**25, 80**

New Code--**81**

New York Local rates: actors & singers--**37 (b)**; news broadcasts--**23**

News Cut-ins--**23(e)-(g), 25**

NEWSPERSONS--**23; 57**

News service--**23(j)**

No discrimination--**61**

No Strike clause--**62**

Non-waiver of rights--**76**

Notice--**33**

Participating programs--**53(b)**

PAYMENT: deductions--**31**; disability insurance--**32**; due date--**30 (a)**; late payment--**30(b)**

People Covered--**55, 56, 57**

Postponed program--**39**

PRODUCER: bonds--**67**; bound by other Codes--**82**; responsibility-**p. 1, 5th par.**; tax statements--**77**; unfair--**66**

Production memorandum--**43**

Production prosecuted--**34**

Program auditions--**5, 10, 22**

Promotional announcements--**30 (c)-(e)**

Public Service Announcements--**30(f)**

Re-Broadcast--**1, 8, 12, 17, 23(c), 28(a), 47**

Rehearsal--**35**

Re-plays--**28(b)**

Reporters/analysts--**57**

Rest period for singers--**11(c), 16**

Reviewers--**57**

Segmented Programs--**53(a)**

Signatures--**12, 48**

Simulcasts--**58**

SINGERS: auditions--**10**; contractor--**15 ;** deputy--**16(b)**; incidental singing background--**13**; notice on group--**14**; program fees--**8**; local New York programs--**37(b)**; promotional announcements--**30(e)**; rehearsals--**9**; rest

period--**11(c)**;    signatures--**12,48**;    special    working
conditions--**11**

Social security--**31**

Special events programs--**23(j), 57**

Sports broadcasts--**24**

Sportscasters--**24; 57(e)**

Standard AFTRA engagement contact--**54**

Standard clause for individual contracts--**68**

Standard openings & closings--**7(A)**

Supplemental markets--**Exhibit "A"**

Sweetening--**16**

Taped & pre-recorded broadcasts--**27**

Tax statement--**77**

Term of code--**64, 81;  p. 1, 6th par.**

Termination & reinstatement--**81**

Thirteen weeks guarantee--**3, 19**

Title of code--**65, 84**

Travelling--**44**

Travelling shows--**25(b)**

Unfair producer--**67**

Union shop--**59, 63, 68(2), 78**

Vacations--**33**

Voice tests--**36**

Waivers--**30, 51, 56, 74, 76**

Warm ups--**49**

Withholding tax--**31**